## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| Let Them Play MN, Jane Doe 1, both individually and as parent and guardian of Jane Doe 2 and John Moe 3, minors, John Moe 4, as parent and guardian of John Moe 5, a minor, Jane Doe 6, Jane Doe 7, as parent and legal guardian of John Moe 8 and Jane Doe 9, minors. | ) ) ) ) ) ) ) ) ) | Case No. 21-cv-79 |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | **COMPLAINT** |
| Governor Tim Walz, in his official capacity, Attorney General Keith Ellison, in his official capacity, Commissioner Jan Malcolm, in her official capacity, Minnesota Department of Health, Commissioner Tarek Tomes, in his official capacity as designated coordinator of youth sports for the Administration of Governor Tim Walz, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

Plaintiffs for their Complaint against Defendants state and allege as follows:

## **INTRODUCTION**

1.     COVID-19 has proven to be a difficult public health threat. For Minnesota Governor Tim Walz, COVID has also posed a significant political challenge. In March 2020, he began to assert sweeping "peacetime emergency" powers through which he has promulgated numerous restrictive Executive Orders and related State agency guidance. The

Governor and his Department of Health ("MDH") immediately began using briefings and other communications to generate support for their emergency restrictions.

2.      At one of his earliest briefings in March, Governor Walz predicted that COVID's spread would likely peak in May or June. This prediction—on which the Governor and MDH based one of their earliest, and certainly their most drastic "Stay Home MN," order—proved problematic. By mid-November, the Governor faced a trifecta of conflicting interests.

3.      COVID-19's peak fell, not as predicted in May or June, but instead in mid-November. Meanwhile, Defendants had expended their most powerful public health weapon—Stay Home MN's shutdown—seven months earlier. When that peak actually occurred, Defendants faced the inevitable economic consequences from shutting down huge swathes of the Minnesota economy in April and May. Finally, the staying power of COVID made it unlikely COVID would fade to a distant memory before the 2022 election, inevitably increasing the political stakes for the Governor and necessarily factoring more heavily into calculations about responsive measures available to combat COVID.

4.      In sum, by mid-November Defendants had to demonstrate public action to the virus' peak (after all, throughout 2020 Defendants had portrayed their public health response to COVID as simply "adjusting the dials"). Yet the economic harm from earlier measures, and the political fallout from further economic harm, caused Defendants to believe areas of concern such as retail shopping were off the table.

5.      Defendants' dilemma caused a dramatic shift in their public statements during the first half of November. In the first week of November 2020:

- MDH Commissioner Malcolm announced that *in **a single week*** ending October 24, Minnesota had "***95 total workplace outbreaks***" (without considering workplace guests, such as customers) with "the ***highest number[s in] retail*** and offices." (Recording of Nov. 2, 2020 MDH briefing at https://www.youtube.com/watch?v=07dLbttPTw8&feature=emb_logo from 4:54 to 5:32.)

- Three days later, MDH privately admitted to amateur sports organizations that the agency only believed there had been ***66 confirmed "outbreaks" during the entire year*** (ending October 24) among the more than 500,000 elementary, middle, and high-school age (collectively, "youth") athletes in Minnesota. (Exhibit ("Ex.") A at slide 16.)

6.    To be sure, it may have been economically devastating for Minnesota's (and would likely have been politically devastating for Governor Walz) to again impose draconian, but more effective, measures to fight the spread of COVID (such as restrictions on retail shopping) in November and December 2020. As a result, and notwithstanding MDH's own data, Defendants needed to find another visible (and less political threatening) scapegoat. Defendants prioritized the appearance of action over effectiveness and ignoring the harm caused to Minnesota's youth athletes.

7.    Defendants' shift to targeting youth sports had fully occurred by November 18. Contrary to MDH's data announced earlier that month, Governor Walz justified EO 20-99, stating "we see relatively fewer outbreaks in retail settings" (because state health officials had stopped looking) while alleging that "192 outbreaks connected to sports [we]re too concerning to let these activities continue . . . ." EO 20-99 pp. 1-3. Of course,

the order failed to mention that "192 [alleged] outbreaks connected to sports" referred to alleged outbreaks beyond youth sports, included among college and professional athletes that EO 20-99 had allowed to "continue." In addition, for youth sports—unlike "retail" and "workplace outbreaks"—alleged sports "outbreaks" included cases among guests and other tangential visitors not materially different than a customer. In fact, Defendants own data show MDH categorizes an "outbreaks connected to sports" even if the data shows neither an "outbreak" nor any actual "connect[ion] to sports.".

8.      In sum, beginning on November 18 and continuing through the date of this Complaint, Defendants' have singled out youth athletes—restricting their liberty and ignoring their health—as a political sacrifice without support in their own data, sound science, or any rational basis.

9.      It is not rational (or lawful) to harm young people for political gain. Fortunately for Minnesota's youth athletes, they live in a nation of laws, where courts decide winners and losers based on the law and evidence, rather than a litigants' age or perceived short-term economic or political utility. "[E]ven in a pandemic, the Constitution cannot be put away and forgotten." *Roman Catholic Diocese of Brooklyn v. Cuomo*, __ U.S. __, 2020 WL 6948354, at *3 (Nov. 25, 2020) (per curiam).

10.      Plaintiffs ask the Court to provide immediate temporary and ultimately permanent injunctive relief barring Defendants from further violations of their constitutional freedoms and the other relief set forth below.

## DEFENDANTS

11.     Defendants Governor Tim Walz is a party in his official capacity as Governor of the State of Minnesota. Governor Walz issued the executive orders at issue in this action.

12.     Attorney General Keith Ellison is a party in his official capacity as Attorney General of the State of Minnesota. Attorney General Ellison is tasked with and has enforced Governor Walz's executive orders at issue in this action, including to close down facilities at which youth athletes play or exercise or desire to do so without the harms caused by face coverings.

13.     MDH designed the methodology for its data collection, collected and analyzed select data, and otherwise contributed to Governor Walz's executive orders. MDH also promulgated "guidance" purportedly having the force of law pursuant to Governor Walz's executive orders and enforced such orders and its own guidance.

14.     Commissioner Jan Malcolm is a party in her official capacity as Commissioner of MDH.

15.     Commissioner Tarek Tomes is Minnesota's Commissioner of Information Technology. However, Commissioner Tomes is relevant to this action because he has been held out by Governor Walz and MDH as "[o]verseeing youth sports during the pandemic" and as purportedly shaping MDH guidance through "partnerships . . . built . . . with members of the organized sports community" and as responsible for MDH "dial turns [*sic*] toward more openness and activity across the state [*sic*]" of Minnesota.

16.     All acts of Defendants and their officers, agents, servants, employees, or persons acting at their behest or direction set forth herein, were done and are continuing to

5

be done under the color and pretense of state law and pursuant to Defendants' policies, practices and/or customs.

## PLAINTIFFS

17.     Plaintiff Let Them Play MN ("LTP") is a Minnesota non-profit corporation. LTP was founded as an unincorporated association in August 2020 by its current Executive Director Dawn Gillman. As a mom of high school athletes, Ms. Gillman founded LTP because she believed it was unfair to prohibit certain sports from playing when, in fact, it was safe to let them play. Over the four months since its founding, LTP has organized more than 25,000 supporters, including parents, coaches, and fans from across Minnesota who understand the value of participation in youth sports and activities.

18.     LTP exists to overcome obstacles and enable Minnesota youth to safely participate in sports and other healthy activities. LTP promotes youth participation in athletics and activities by educating and providing resources for parents, educators, coaches, and the public related to: (1) the benefits of youth activities for physical and mental health; (2) accurate scientific evidence regarding youth participation in activities; (3) best practices for safe participation; and (4) overcoming potential obstacles to participation.

19.     Jane Doe 1 ("Doe 1") has coached high school sports for five years. She has coached cross country, Nordic skiing, and track and field for a high school in the Twin Cities Metro Area. She had planned to coach all three sports during the 2020-2021 school year. During the fall 2020 cross country season, to Doe 1's knowledge, none of her athletes, no other coaches, and none of her opponents contracted the 2019 coronavirus (herein,

"COVID" or "COVID-19."). No other teams had to cancel competitions or had any need to quarantine. During the cross-country season, Doe 1 found it easy for her runners to maintain social distancing and to safely participate.

20.     After EO 20-99 (numbered Minnesota executive orders will be cited as "EO" followed by their respective number), Doe 1 was allowed to run and ski outdoors ***unless*** that running or skiing was done as part of a youth sports team or school program. Meanwhile, Governor Walz had encouraged Minnesotans to get outside and exercise (including skiing) after he issued EO 20-99.

21.     Because of EO 20-99 and EO 20-103, Doe 1 has temporarily moved to another state to allow her son to practice his sport without harmful and unnecessary restrictions imposed by Defendants. Doe 1 has lost income from being forced to give up coaching Nordic Skiing and possibly not coaching track and field because of her son's need to temporarily relocate and because she could not, in good conscience, require Nordic skiers to wear masks while skiing outdoors. This would be completely unsafe and could subject Doe 1 to liability for harming her skiers.

22.     Jane Doe 2 is a junior at a public high school in the Twin Cities Metro Area. She began lifting weights when she was 11 and participates in her school's Olympic weightlifting club. She loves the sport and has been state champion for three years. She has placed in the top 3 in national competition. Doe 2 wants to continue lifting in college and sees the Olympics as a possibility, if she continues to be allowed to train without inhibiting restrictions.

23.     Like other high school kids, Doe 2 spends time with friends her age when she is not busy with school and athletics. Doe 2 has noticed that shutting down school and sports has only given kids her age more free time that they use to spend together, hanging out or shopping. Kids her age are bored and tired of being isolated during a long, difficult year.

24.     In Doe 2's experience, High school kids are not overly concerned about COVID because there is no risk to them. To be clear, Doe 2 socially distances and avoids crowds like retail shopping even though she is allowed to shop. The only close contact Doe 2 has had with COVID-19, to her knowledge, is from an aunt who Doe 2 spent time with earlier in 2020. After that contact, Doe 2 quarantined for two weeks, but ultimately tested negative for COVID.

25.     Masks are completely unnecessary when weight training. For Doe 2's events, others were required to stand back for safety reasons. Doe 2 is concerned that her mask may be caught on a machine while training and could cause an injury. Masks make it harder to breathe when exercising and regularly fall down when working out.

26.     John Moe 3 ("Moe 3") is a high school swimmer who has competed and would be practicing and competing on the swim team of a public high school in the Twin Cities Metro area if EO 20-99 had not shut down swimming in Minnesota and EO 20-103 did not mandate masks when training out of the pool. Earlier in 2020, pools were closed and Moe 3 had to swim in a lake. Now, to train in Minnesota, Moe 3 would be required to immediately put on a mask after getting out of a pool from a workout or race. Moe 3 does

not want to do so because by definition he would be breathing heavily through a soaking wet mask. Moe 3 does not want to experience that risk.

27.     Moe 3 was at the top of his age group in his best swimming event, heading into the state meet in March 2020. However, that meet was shut down when swimmers were already at the venue. Swimming was again shut down by EO 20-99. Because of this and because of continuing irrational requirements, including masks, Moe 3 travelled to another state where youth athletes are allowed to play and where Moe 3 has a relative. Even though he is sleeping on the floor of an apartment, Moe 3 is thankful to have the option to train without wearing a mask, while being allowed to change and dry off at the pool instead of walking to a car after practice in Minnesota soaking wet. Many kids could not travel and kids in Minnesota are not allowed to train at all even though swimming is safe and thousands of swimmers practiced and competed in 2020, once they were allowed to do so in late summer and the fall.

28.     Moe 4 is a high school senior and lives in Central Minnesota. He is captain of his high school's basketball team. Moe 4 missed part of the football season in the fall because the Minnesota State High School League ("MSHSL") cancelled/postponed football (along with volleyball) apparently as requested or temporarily required by Governor Walz and/or MDH. The end of the season was then shortened when Governor Walz issued EO 20-99.

29.     After only a handful of practices, Moe 4 has serious concerns about wearing a mask/face covering while playing basketball. To Moe 4, wearing a mask while playing basketball feels like having a sweaty sock over your mouth and nose, effectively choking

you. Moe 4 cannot catch his breath with a mask covering his mouth and nose. He and other players must regularly remove or move their masks to breathe. Masks become wet with sweat and saliva almost immediately when playing or practicing basketball, inhibiting players' ability to breathe. Because of this, players continually move and touch their wet masks to enable breathing. Players, who have just touched a wet mask, then dribble and pass a basketball back and forth that is wet with saliva and sweat.

30.     Meanwhile, Moe 4 has observed that high school age young people/kids who were playing sports while he was playing football in the fall did not just stay home alone. It is a depressing year and kids feel a need to get together. Even parents who are more concerned about COVID allow their kids to be with friends to prevent them from being too depressed. At Moe 4's first football game of the shortened 2020 season, both teams took a knee and had a moment of silence because of a player's suicide during the summer of 2020. When high school kids play sports (at least when they play without masks), kids have a safe and healthy outlet to move and to be social, safely. If high school kids are not able to play, they play Xbox in their bedroom or basement with their friends present or engage in other activities, like driving around with a group of friends, regardless of what Governor Walz has ordered in any given week or month. Minnesota kids have been forced to stay alone for so long, they cannot continue.

31.     Jane Doe 6 ("Doe 6") is a youth archery coach. Archery is a safe and healthy activity in which youth participants learn about discipline, goal setting, and problem solving. Doe 6 is involved in several archery organizations and traveled outside of Minnesota several times in 2020. To Doe 6's knowledge, no one associated with these

groups or competitions has contracted COVID-19 and the virus has not been transmitted through archery. Throughout 2020, archery organizations have adopted and carefully followed protocols that allow the sport to continue without any difficulty or danger. Yet, EO 20-99 banned kids from practicing or competing in archery with or without protocols.

32.     In Doe 6's experience, masks are unsafe and make it impossible to participate in archery. Doe 6 spent significant time coaching and participating in archery in 2020, both in Minnesota and in other states. She is aware of no data and has not heard or experienced any spread of COVID-19 from participating or competing in archery. Mask use in archery is clearly unsafe. A bowstring comes in contact with a shooters' face when shooting an arrow, creating an unacceptable risk that a string or arrow could catch a mask causing serious injury.

33.     John Moe 8 ("Moe 8") is seven years old and lives with his parents in the Twin Cities metro area. Moe 8 plays hockey and has not yet limited himself to any specific position in hockey. Moe 8 is currently homeschooling due to restrictions on his public school. Hockey is Moe 8's outlet for safe and healthy exercise and fun. His parents believe strongly in the benefits that sports provide for Moe 8 and his sister Doe 9. Despite this, Moe 8's parents may withdraw him from hockey due to Governor Walz's mask mandate/face shield and other restrictions on hockey.

34.     Moe 8's parents are particularly concerned about the mask/face shield mandate due to its restrictions on Moe 8's breathing and limitations on his visibility. The intensity of skating and playing hockey causes masks to quickly become saturated in sweat. Moe 8's father is a coach and spent much of Moe 8's team's first practice after the total

ban on sports was lifted adjusting masks in ways that caused Moe 8's father to be much closer to team members' breathing than ever before. Many kids on Moe 8's team are too young to strap their helmets alone therefore they need assistance. Having the coaches assist with masks increases the likelihood of spreading COVID.

35.     Moe 8's parents purchased an expensive clear face shield as allowed under guidance announced by MDH. This preferable to other face coverings, but still decreases Moe 8's ability to breath, particularly with any air holes covered. Covering the air holes decreases airflow which causes the shield to fog up, decreasing visibility and making Moe 8 less safe. And, of course, Moe 8's parents and other parents already incur significant expenses for their kids to play hockey. It seems wrong to Moe 8's parents that they are required to incur another expense for a face shield that does not make anyone safer from COVID, but makes Moe 8 more likely to fall or collide with another player due to the lack of visibility.

36.     Jane Doe 9 ("Doe 9") is 9 years old and lives with her parents in the Twin Cities metro area. She plays hockey year-round. Doe 9 plays goalie. She learned to skate when she was four and hockey became her passion.

37.     As a goalie, Doe 9's position in hockey is normally distanced from other players and she is never within 6 feet of any given player for more than 15 cumulative minutes across an entire practice or a game. Nonetheless, the State orders her to wear a mask under her goalie helmet. Doe 9 plays a position with a high risk of being hit in the face with a puck or pushed over by a collision with another player, as a result she needs

to wear a mouthguard and has been required to wear a mouthguard when she has played hockey.

38.     Because of Governor Walz's order regarding masks, Doe 9's hockey team no longer requires Doe 9 to wear a mouthguard. This is because she could not breath with a mouthguard and a mask. Wearing a mask under a goalie helmet does no good even if Doe 9 were routinely close to other players. During practice, the mask quickly shifts and, with a goalie catcher and blocker on both hands, there is no way to keep a mask over her mouth and nose.

39.     There is also no way to have a goalie wear a clear mask, even if there were a clear mask strong enough for a goalie, closing off the air holes makes the mask fog up causing serious danger from a lack of visibility. Meanwhile, if a cloth mask is on properly Doe 9's downward peripheral vision is greatly reduced. With reduced visibility and no mouthguard, it seems crazy to Doe 9's parents that Governor Walz apparently believes it is safe to have pucks launched at Doe 9's head. Doe 9 and her parents want Doe 9 to play, particularly given the likelihood Governor Walz will shut down sports again or continue to move the goalposts on kids, again, but it is hard to say whether the tradeoffs are worth it for Doe 9 and her parents.

40.     Each of the Plaintiffs is participating in this lawsuit so that all of the more than 500,000 youth (elementary, middle, and high school aged) athletes in Minnesota can return to fully, healthy, and safe participation in sports and activities as soon as possible, without unsafe face coverings and without constantly changing limitations and restrictions.

## JURISDICTION AND VENUE

41.     This Court has personal jurisdiction over Defendants.

42.     The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331, as this action arises under: (a) the Fourteenth Amendment to the United States Constitution; (b) 28 U.S.C. § 1343(a)(3), as it is brought to redress deprivations, under color of state law, of rights, privileges, and immunities secured by the United States Constitution; (c) 42 U.S.C. § 1983, which provides a cause of action for the protection of civil rights; (d) 42 U.S.C. § 1988(b), as it seeks an award of attorneys' fees; (e) 28 U.S.C. § 2201(a), as it seeks to secure declaratory relief; and (f) under 28 U.S.C. § 2202, as it seeks to secure permanent injunctive relief and damages. This Court has supplemental subject matter jurisdiction over the state law claims in this case under 28 U.S.C. § 1367.

43.     Venue is proper in the United States District Court for the District of Minnesota under 28 U.S.C. § 1391(b), as all or a substantial part of the events giving rise to the claims occurred within the District.

## THE BENEFICIAL EFFECTS OF YOUTH SPORTS AND ACTIVITIES

44.     Participation in organized youth sports and other activities is safe and healthy and promotes the physical and mental health of Minnesota youth.

45.     According to a 2019 report issued by the U.S. Department of Health and Human Services, "The benefits for youth who engage in regular physical activity are clear: they have improved bone health, weight status, cardiorespiratory and muscular fitness, cardiometabolic health, and cognitive function and a reduced risk of depression." U.S. Department of Health and Human Services, *National Youth Sports Strategy* 11 (2019),

14

*available at* https://health.gov/sites/default/files/2019-10/National_Youth_Sports_Strateg y.pdf.

46.     President Barrack Obama's Council on Fitness, Sports & Nutrition (the "President's Council") issued a report highlighting the importance of youth sports as to combat decreasing youth activity levels in America, citing several studies showing the value of sports and youth. U.S. Department of Health and Human Services, *Physical Activity Guidelines for Americans Midcourse Report: Strategies to Increase Physical Activity Among Youth.* (2012), *available at* https://health.gov/sites/default/files/2019-09/pag-mid-course-report-final.pdf. This report found:

> Despite the importance of regular physical activity in promoting lifelong health and well-being, current evidence shows that levels of physical activity among youth remain low, and that levels of physical activity decline dramatically during adolescence.

*Id.* at 1.

47.     In January 2015, the President's Council partnered with the Aspen Institute to issue *Sports for All, Play for Life: A Playbook to Get Every Kid in the Game*, a report offering strategies to promote meaningful, accessible, and safe options for all youth to participate in sports due to the many benefits of youth sports.

48.     According to MDH, "Children and teens ages 6 to 17 should get at least 60 minutes of physical activity every day, with muscle- and bone-strengthening activities at least three days a week." https://www.health.state.mn.us/communities/physicalactivity/pa basics.html

49.     During the COVID-19 pandemic, MDH Commissioner Jan Malcom explained, "It is important that we look for opportunities to allow children to engage in activities that promote health and well-being" and that she is "well aware of the importance of youth sports to . . . student athletes and the broader community."

50.     Minnesota courts have recognized the value of athletics in the development of the child. *Thompson v. Barnes*, 200 N.W.2d 921, 926 n. 11 (Minn. 1972) (stating that "participation in interscholastic activities . . . is today recognized . . . as an important and integral facet of the youth's education process.").

51.     Governor Walz has recognized the value of youth sports, stating: "The well-rounded student has these extracurricular activities, whether they be football, concert band, speech and debate, volleyball. And to try and get our students back into them — if we can do it safely with what we know now — we should try to do so."

## MENTAL HEALTH CONCERNS RELATED TO COVID-19 CANCELLATIONS OF YOUTH SPORTS

52.     Numerous authorities have raised significant concerns regarding stress and challenges for youth, including youth athletes, in 2020. According to a Centers for Disease Control and Prevention ("CDC") report issued on October 17, 2020:

> Emergency departments (EDs) are often the first point of care for children's mental health emergencies. U.S. ED visits for persons of all ages declined during the early COVID-19 pandemic (March–April 2020). . . . Beginning in April 2020, the proportion of children's mental health–related ED visits among all pediatric ED visits increased and remained elevated through October. Compared with 2019, the proportion of mental health–related visits for children aged 5–11 and 12–17 years increased approximately 24% and 31%, respectively.

\*\*\*

Children's mental health during public health emergencies can have both short- and long-term consequences to their overall health and well-being. . . . CDC supports efforts to promote the emotional well-being of children and families and provides developmentally appropriate resources for families to reduce stressors that might contribute to children's mental health–related ED visits.

https://www.cdc.gov/mmwr/volumes/69/wr/mm6945a3.htm

53.     A *COVID-19 Parental Resources Kit* for parents published by the CDC describes numerous challenges for young people in 2020, including:

School closures due to COVID-19 have meant that adolescents have been participating in learning from home. . . . School closures have also meant a break in access to some essential developmental services like occupational, behavioral, or speech therapy. It could also have impeded continuity in adolescents' development of athletic or hands-on vocational skills, with potential impacts on their higher education and professional future.

\*\*\*

Physical distancing can feel as if one is placing life on hold. . . Social distancing, stay-at-home orders and limits to gatherings have affected their ability to gather in person with friends and family to celebrate or grieve in typical ways. Grief is a normal response to losing someone or something important to you. It is important for family and friends to help adolescents find alternate, creative and safe ways to connect and support each other at a distance.

https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/parental-resource-kit/adolescence.html

54.     According to the MDH:

Drug overdose deaths increased 31% during the first half of 2020 as compared to the first half of 2019, according to new statewide data released by the Minnesota Department of Health (MDH). The first half of 2019 (January to June) showed 373 deaths while the first half of 2020 showed 490 deaths.

Overdose deaths in 2020 started to increase sharply in March . . . .

https://www.health.state.mn.us/news/pressrel/2020/overdose120320.html

55.     After Governor Walz and MDH shut down youth sports through EO 20-99, MDH published *COVID-19 Youth and Adult Sports under Executive Order 20-99* on November 30, 2020 (the "November 30 Sports Guidance"). This guidance specifically recognized mental health problems youth athletes may suffer as a result of EO 20-99's ban on youth sports. Through its question and answer "guidance" offering "activities" MDH believed would ameliorate the negative effect on mental health from Defendants' decision to ban youth sports:

> Sports help me cope, what can I do to get through this dial back [i.e., total ban on any youth sports from November 18 through January 4]?
>
> ▪ Physical activity is important to everyone's physical, emotional, and mental health and this pause [ban] doesn't prevent you from engaging in physical activities alone or with members of you household [if any and they are available].
>> ▪ Consider these physical activities:
>>> ▪ Participate in practices or individual skills and fitness development ***virtually***. . . .
>>> ▪ ***Jog in place in your bedroom***, build muscle strength through resistance training, engage in stretching exercises to improve your flexibility and balance.
>>> ▪ Try an exercise routine that you can do through ***a video game console, online video, or online streaming***.
>>> ▪ Look for ***virtual exercise, meditation***, strength training [but not while the same order mandated closure of gyms, high school weightrooms, or pools], aerobic and yoga classes.

(Ex. B pp. 2-3 (emphasis added).)

56.     MDH's November 30 Sports Guidance referred youth athletes in Minnesota to Mental Health America's ("MHA") mental health screening tool (if "jog[ging] in place in [their] bedroom[s]" or video games did not solve their depression or other mental health

concerns). , suggesting youth athletes should "Explore resources to support your mental health in other wats, such as: . . . Mental Health America['s online] Mental Health Test (https://screening.mhanational.org/screening-tools) . . . . " MDH endorsed MHA's online screening stating "Online screening is one of the quickest and easiest ways to determine whether you are experiencing symptoms of a mental health condition." (Ex. B p. 3.)

57.     On October 20, MHA had published summaries of the results from this online mental health screening tool for the period of January to September 2020, during which 1,560,288 individuals across the United States (the most ever) used MHA's screening tool. Among other findings, MHA found:

- "The number of people looking for help with anxiety and depression has skyrocketed."

- "The number of people screening with moderate to severe symptoms of depression and anxiety has continued to increase throughout 2020 and remains higher than rates prior to COVID-19."

- "More people are reporting frequent thoughts of suicide and self-harm than have ever been recorded in the MHA Screening program since its launch in 2014."

- "Young people are struggling most with their mental health. . . . throughout the COVID-19 pandemic youth ages 11-17 have been more likely than any other age group to score for moderate to severe symptoms of anxiety and depression."

- "In September 2020, over half of 11-17-year-olds reported having thoughts of suicide or self-harm more than half or nearly every day of the previous two weeks."

(*See* https://www.mhanational.org/number-people-reporting-anxiety-and-depression-nationwide-start-pandemic-hits-all-time-high (accessed Jan. 7, 2021).)

58.     In response to this and other concerns referenced in this Complaint Let Them Play and others demanded MDH disclose any data justifying the harm to the mental and

physical health of Minnesota's youth athletes due to restrictions and cancellations of sports. In response to this request for data that might explain MDH's need to ask kids to stop or limit the sports they love, the Solicitor General of Minnesota flatly asserted that "neither Governor Walz nor MDH are required to explain the decision to restrict youth sports while allowing shopping malls to be open at all, let alone exhaustively." ECF 19, D. Minn. Case No. 0:20-cv-02505-JRT-HB at p. 19.

## MINNESOTA'S RESPONSE TO COVID-19
## AND EO 20-99 AND EO 20-103

59.     Beginning in March 2020, Governor Walz and Minnesota's executive agencies began to repeatedly take unilateral actions allegedly responding to COVID-19 through Executive Orders issued by Governor Walz and related "guidance" issued MDH and other State agencies. Defendants also launched a public information campaign designed to promote compliance and acceptance of their mandates.

60.     Effective March 17, Governor Walz, MDH, and other Defendants banned indoor sports activities by closing all "indoor sports facilities." EO 20-04 at § 1(e).

61.     On March 25, Governor Walz provided a lengthy briefing in which he and MDH wrongly predicted numerous issues related to COVID-19, including that COVID cases would peak in Minnesota 9 to 14 weeks later. During this briefing, the Governor began to roll out a new catchphrase, "Stay Home MN." (*See* video at https://www.mprnews.org/story/2020/03/25/latest-on-covid19-in-minnesota.)

62.     Effective March 27, Defendants banned youth sports altogether, along with nearly all activities outside the home, with narrow exceptions that did not include sports.

EO 20-20 § 1. To generate support and compliance this sweeping order, by March 30, Governor Walz began using a refined catchphrase "#StayHomeMN" in tweets and communications. This hashtag and more professional graphics were designed and/or implement through Governor Walz's contract with Twin Cities public relations firm Tunheim Partners, Inc. ("Tunheim") owned by Kathy Tunheim.

63.    On May 13, while providing services to Governor Walz (or shortly after finishing its services), Tunheim published an article titled *The Do's and Don'ts of Crisis Communications* in which the firm explained (next to a picture of Governor Walz) the following relevant advice related to COVID-19 and other "crisis communications:"



(*See* https://www.facebook.com/tunheimagency/posts/10157879920854821 and

https://tunheim.com/crisis-blog/the-dos-and-donts-of-crisis-communications/.)

64.    Effective May 21, Defendants permitted youth sports practices to resume with limited "pod" sizes and prohibiting youth athletes from "participat[ing] in games or

tournaments." MDH *Guidance for Social Distancing in Youth Sports*, at 1

available at https://web.archive.org/web/20200522003548/https://www.health.state.mn.us/diseases/coronavirus/schools/youthsports.pdf.

65.     Effective May 31, Defendants permitted indoor and outdoor places of public accommodation to open for organized youth sports, as outlined in guidance to be designed and promulgated later by MDH . EO 20-63 §§ 7(c)(xii), 7(g)(ii) (requiring preparedness plans "in accordance with guidance" at https://mn.gov/deed/guidance").

66.     Effective June 6, Defendants allowed youth sports competition to resume for sports Defendants arbitrarily deemed "low risk" such as diving and badminton, and for sports Defendants' knew would create an appearance of decreasing restrictions by increasing the number of "allowed" sports that are obviously impossible to undertake in the summer, such as alpine and Nordic skiing, and snowboarding. MDH *Guidance for Social Distancing in Youth Sports*, at 1, available at https://web.archive.org/web/20200608023042/https://www.health.state.mn.us/diseases/coronavirus/schools/youthsports.pdf (hereinafter "June 6 MDH Sports Guidance").

67.     After the shutdown of sports throughout the COVID-19 pandemic, Defendants had no basis to deem other sports "high risk" particularly after the limited data MDH actually collected demonstrated that wrestling, cheerleading, dance, and hockey were, in fact, safe. *Id* pp. 16-17.

68.     Sports that Defendants deemed as medium risk sports such as bobsledding, tables tennis, volleyball, basketball, and baseball were not were not permitted to play games under the June 6 MDH Sports Guidance.

69.     Effective June 9, Defendants continued the requirements for youth sports in the June 6 MDH Sports Guidance but added the requirement to adhere to any guidance posted (or updated) at https://staysafe.mn.gov. EO 20-74 § 7(g)(ii).

70.     Effective June 24, Defendants allowed indoor and outdoor youth sports to begin practicing and outdoor sports to begin games. MDH *Guidance for Youth and Adults*, at 1, available at https://web.archive.org/web/20200620032929/https://www.health.state.mn.us/diseases/coronavirus/sportsguide.pdf.

71.     Effective July 1, Defendants allowed indoor youth sports to begin playing games. *Id.*

72.     In August 2020, Defendants informed the Minnesota State High School League ("MSHSL") that it must cancel or postpone football and volleyball seasons. However, when the MSHL was challenged, Defendants withdrew their previous assertion. Confused, the MSHSL immediately reinstated football and volleyball

73.     Announced on November 18 and effective November 20, Defendants ordered "Organized Youth Sports organizations and programs must stop all in-person activities—including practices, group workouts, games, and tournaments." EO 20-99 § 7(g) (Nov. 18, 2020).

74.     Among other mandates, EO 20-99 required pools, gymnasiums, fitness centers, recreation centers, and other sports facilities and organizations to close or cease operations Plaintiffs used and desired to use, including requiring that "Organized Youth Sports organizations and programs must stop all in-person

activities—including practices, group workouts, games, and tournaments." EO 2-99

§ 7.g; *see also id* §§ 7.c.iii.B, 7.c.iii.C.

75.     EO 20-99 defined "Organized Youth Sports" that were prohibited as:

> any sports activity, where participants are children or adolescents, organized by an entity, association, club, or organization providing for registration of participants and oversight on a regular basis for a defined period of time. Sports activities within this definition include all sports offered by schools (public and nonpublic), the Minnesota State High School League, or similar organizations, as well as dance, cheerleading, and other sports traditionally offered by supplemental associations or organizations.

*Id*. § 7.g.

76.     While EO 20-99 banned youth sports, EO 20-99 specifically allowed other athletics and activities to continue. Among other activities, EO 20-99 allowed the following activities to continue:

- "Physical education instruction that meets academic requirements as part of the school day." *Id*. § 7.g.ii.B.

- "Professional sports, meaning sports in which the athletes receive non-de minimis payment for performance." *Id*. § 7.h.ii.B.

- "Any collegiate or university institution team or athlete participating in intercollegiate athletics, provided that the team or athlete follows guidance for sports activities as listed in Recommendations for Different Levels of COVID-19 Transmission Among Higher Education Institutions, available at MDH's Institutes of Higher Education website (https://www.health.state.mn.us/diseases/coronavirus/schools/ihe.html)." *Id*. § 7.h.ii.C.

77.     EO 20-99 did not allow any youth sport or youth sports program to operate, even if any team or athlete followed guidance for sports activities as listed in Recommendations for Different Levels of COVID-19 Transmission Among Higher Education Institutions, or any other guidance or protocols.

24

78.     EO 20-99 allowed numerous categories of non-essential commercial services to continue, including: tanning establishments, body art establishments, tattoo parlors, piercing parlors, spas, salons, nail salons, cosmetology salons, esthetician salons, advanced practice esthetician salons, and eyelash salons. EO 20-99 only required that occupancy for such establishments "must not exceed 50 percent of the normal occupant capacity as determined by the fire marshal, with a maximum of 250 people in a single self-contained space."

79.     EO 20-99 did not close or limit retail establishments—whether selling Christmas ornaments or comic books. Nor did it change limitations on large shopping complexes, such as the Mall of America.

80.     EO 20-99 did not attempt to regulate tribal lands in Minnesota and allows youth activities and sports to continue, uninterrupted, on tribal lands.

81.     In a previous action, LTP and some of the individual Plaintiffs in this action challenged EO 20-99. During a December 16, 2020, hearing related to that challenged, the Solicitor General of Minnesota informed the Court "their motion asks this Court, pardon me, to enjoin enforcement of a particular order, 20-99, which as we have already discussed expires of its own terms on Friday." This statement was false.

82.     Governor Walz's spokesperson and other State officials had informed members of the media by at least the evening of December 15 that EO 20-99 would be extended by EO 20-103.

**EXECUTIVE ORDERS 20-103 AND 20-104 AND
MDH "GUIDANCE"/RULES RELATED TO MASKS AND OTHER ISSUES**

83.     After informing the media of the provisions of EO 20-103 on December 15, Governor Walz officially issued EO 20-103—extending EO 20-99—on December 16 moments after Minnesota's Solicitor General informed this Court that EO 20-99 would expire on December 18.

84.     EO 20-103 stated that "Masks and face coverings [are] required. Executive Order 20-81, requiring face coverings in certain settings, remains in full force and effect except as modified by this Executive Order." EO 20-103 § 3.

85.     EO 20-81 requires that "Minnesotans must wear a face covering in indoor businesses and indoor public settings, as described in this order and the related industry guidance, available at the Stay Safe Minnesota website (https://staysafe.mn.gov), as well as any other guidance referenced in this order" EO 20-81 at § 2.

86.     EO 20-81 provides exemptions for individuals with a medical condition, children five and under, and any adult "at their workplace when wearing a face covering would create a job hazard for the individual or others, as determined by local, state or federal regulators or workplace safety and health standards and guidelines." EO 20-81 § 8.

87.     EO 20-103 requires masks outside the home: "Individuals engaging in activities outside of the home must follow the requirements of this Executive Order, Executive Order 20-81 (face coverings), and MDH and CDC Guidelines." EO § 6(f).

88.     As to sports, EO 20-103 provided a more draconian mask rule than provided for adults at work, stating, "Notwithstanding the provisions of Executive Order 20-81, face

coverings must be worn by all persons at all times" when exercising or playing sports in a gymnasiums, fitness center, recreation center, indoor sports facilities, or similar location where youth sports occur.

89.     Sections 10.a and 10.b of EO 20-81, abrogated by EO 20-103, had exempted face coverings "[w]hen participating in organized sports in an indoor business or indoor public space while the level of exertion makes it difficult to wear a face covering" and "[w]hen exercising in an indoor business or public indoor space such as a gym or fitness center, while the level of exertion makes it difficult to wear a face covering, provided that social distancing is always maintained." EO 20-81.

90.     EO 20-103 had extended EO 20-99's ban on youth sports, continuing that total prohibition until January 4. On January 4, EO 20-103 allowed youth to practice, subject to rules to be drafted and promulgated by MDH. Specifically, the order stated:

> Indoor or outdoor facilities that support Organized Youth Sports must also adhere to the requirements set forth in paragraph 7.d, including development and implementation of a COVID-19 Preparedness Plan ***in accordance with applicable guidance for youth sports available on the Stay Safe Minnesota website*** (https://staysafe.mn.gov). COVID-19 Preparedness Plans must be distributed to, available for review, and followed by entities, associations, organizations, and clubs that provide Organized Youth Sports

91.     Meanwhile, since the publication of EO 20-103 on December 16, MDH has drastically changed its "applicable guidance for youth sports" on not less than three occasions, December 28, January 5, and January 6. A redline comparison showing changes from MDH's January 5 to its January 6 published guidance is attached hereto as Ex. C. MDH did not issue a press release or, to Plaintiffs' knowledge, otherwise publish a notice

that its guidance purporting to have the force of law, had changed overnight from January 6 to January 7.

92.     MDH's January 6 youth sports guidance states that: "Face coverings must be worn by all people at all times, including practices and games, with only a few exceptions (see Follow Face Covering Requirements section, below)." Ex. D; *see also id.* at 5 ("Face coverings must be worn in accordance with MDH guidance and Executive Order 20-81.").

93.     MDH's January 6 youth sports guidance firmly commands that youth athletes "are not permitted to remove their face coverings during activities that involve a high level of exertion." *Id.* at 6. Beyond the sport's specific exemptions below, or the broader exemptions for children under 5 or those with a qualifying medical condition, there are no temporal exemptions for individuals who are generally required to wear a face covering during activities (i.e. a basketball player would not be able to remove her mask between quarters even if she is 12 feet away from other participants).

94.     MDH's January 6 youth sports guidance exempts certain sports from EO 20-103's face coverings requirement at certain times, notwithstanding the fact that EO 20-103 appears to forbid exemptions. Sports partially exempt from EO 20-103's mask mandate include wrestling, performing gymnastics, cheerleading, and swimming and diving while in the water. Ex. D at 5.

95.     The guidance exempts face coverings when the sport requires a helmet but requires alternatives such as "full face shield[s]." *Id.* The guidance directs persons to visit https://www.health.state.mn.us/diseases/coronavirus/facecoverfaq.html   for   more information. This website states, *inter alia*, that "When worn in compliance with

manufacturer's instructions, athletes can consider these face shields as an alternative option when a helmet paired with a face covering poses identified safety concerns."

96.    MDH's January 6 youth sports guidance also bans youth sports from playing games until January 14, 2021. Ex. D at 8.

97.    MDH's ban of youth sports games until January 14, 2021, is not supported by any citation to data, science or any other rational basis.

98.    MDH's ban of youth sports games until January 14, 2021, is arbitrary and irrational.

### RELEVANT MDH DATA AND METHODOLOGY

99.    Available information demonstrates that Governor Walz's bans and previous ban and other limitations on youth sports have not been based on data or science. Rather, his limitations appear to be premised on incomplete data generated by selected and applying a different data-collection methodology and different and misleading definitions to youth sports than are applied to other activities.

100.    Among other concerns, EO 20-99 and EO 20-103 inexplicably single out collegiate and professional sports for favored treatment and relaxed criteria in comparison to youth sports.

101.    Leading up to these orders, Governor Walz stated that "18-35 year olds make up a disproportionate number of cases . . ." and that EO 20-99 would be designed to "target" locations where "18 and 35 year olds [are] congregating together . . . ."

102.    Professional and collegiate athletes generally fall between 18 and 35 years old. Proving Governor Walz's point, during a period of less than two weeks beginning one

day after EO 20-99 was issued, the Minnesota Gopher football program had 49 positive cases of COVID-19, including 23 student-athletes and 26 staff who tested positive for COVID.

103.    Despite this, college and professional athletes were and remain the only Minnesota athletes EO 20-99 allows to play. Collegiate athletes in particular are allowed to follow a weekly testing protocol, an accommodation that was not offered to youth sports.

104.    LTP and others were particularly concerned about the inconsistencies in EO 20-99 and its apparent lack of scientific support after LTP's experience in August and September 2020 related to high school football and volleyball.

105.    On August 4, 2020 Governor Walz was quoted as saying the Minnesota State High School League ("MSHSL") should consider "the best science, the best data that's out there and then the high school league and [high school] athletic directors will determine [what sports to play]. It is our goal again to use that best data . . . ." He admitted, however, that MDH Commissioner Malcolm "would tell you we have not seen a high transmission amongst those playing [sports over the summer], and I think that will impact their decision."

106.    EO 20-99's and MDH's use of "data" related to youth sports in 2020 is equally concerning. To justify EO 20-99's ban on youth sports, EO 20-99 stated that Minnesota has had "192 outbreaks connected to sports," that this metric is "too concerning to let these activities continue," and that "[s]ports-related cases are nearly twice as prevalent among high school-age children as any other age group, and they increasingly play a key role in the need to move schools to distance learning." However, the order does

not define "outbreaks" and provide no context for the number of cases involved in 192 "outbreaks" or whether the population at issue is the more than 500,000 youth athletes, youth athletes, parents, and siblings (a population likely encompassing more than 20% 0f Minnesota) or something else.

107. It is unclear what EO 20-99 means by the term "outbreaks connected to sports." As to its first word, MDH has used several different definitions of "outbreak" in different contexts and has not explained which definition it uses in regard to COVID-19. The definitions of "outbreak" applied by MDH include, at times, just one individual testing positive for COVID test and even when more than one positive test is required, it appears MDH does not require evidence that the setting of the "outbreak" has any bearing on how any two positive cases were contracted.

108. For example, MDH lists a general definition of "outbreak" on its website as meaning "an incident in which two or more persons experience a similar illness after a common exposure." It does not appear that MDH applies this definition to COVID-19.

109. In regard to influenza in schools, MDH has published at least two definitions of "outbreak," including (a) "a school [with] a double absentee rate with all of the . . . primary [influenza] symptoms . . . ;" and (b) "when the number of students absent with [influenza-like illness ("ILI")] reaches 5% of total enrollment or three or more students with ILI are absent from the same elementary classroom." *See* www.health.state.mn.us/diseases/reportable/dcn/sum97/9807dcn.pdf and https://www.health.state.mn.us/diseases/flu/stats/2019summary.pdf

110.   In regard to COVID-19, MDH has described an "active outbreak [as] meaning that [a nursing home has] had a [single] case in the past 14 days . . . ."

111.   Media and similar reports indicate that MDH defines an "outbreak" as "7 or more cases at an establishment" over an unknown period of time or as "7 or more cases who report visiting a given location within a 30-day window"—even if each person visited days apart and was never near any other seven persons—or "a pretty high threshold (five cases from five different households) to say there was likely transmission occurring at this place."

112.   Based on this conflicting information and MDH's failure to publish its definition of "outbreaks related to sports" it appears that MDH may be arbitrarily picking and choosing definitions of outbreak to suit the outcome it desires to find, or at least without any rational connection to scientific method.

113.   Based on the foregoing and upon information and belief, EO 20-99's use of "outbreaks connected to sports" is the same definition as used by MDH and means one or more individuals who test positive for COVID-19 during a fourteen-day period that have listed an activity or event during contact tracing investigations that MDH categorizes as "sports." In other words, when EO 20-99 or MDH uses the term "outbreak" in relation to sports, it could be read to mean remote possibility of one or more transmission, but does not mean that even a single transmission occurred as a result of or related to the particular "sports" event or a particular team, and does not mean that any player-to-player transmission has occurred.

114.   Using this methodology, if a Hutchinson High School football player who played in an away game at Rocori High School on November 12 and a fan from Grand Rapids who drove down to watch a game at Rocori on November 20, both tested positive for COVID-19 on November 22, MDH would classify Rocori High School as having an "outbreak" of COVID-19 even if it was obvious that both the Hutchison player and the Grand Rapids fan had contracted COVID at two different retail stores 190 miles apart and no one affiliated with Rocori contracted COVID.

115.   By contrast, if these two individuals visited the same gas station using adjoining pumps simultaneously or checked out in line with the same cashier at a local big-box retail store, MDH's published data, practices, and communications to date indicate that MDH would not consider this person-to-person transmission to be an "outbreak."

116.   Similar to the ambiguity of "outbreak" it has been unclear what EO 20-99 means by "connected to sports." The MDH has used the phrases "cases associated with sports" or "sports-related cases" when officials have discussed potential risks of COVID-19 from playing sports.

117.   At an October 26 media briefing, Kris Ehresmann, Director of MDH's Infectious Disease Epidemiology, Prevention, and Control Division, discussed "3,410 cases [of COVID-19] associated with sports and focusing on the high school athlete age 593 cases if you take that down to the middle school we add 309 cases . . . ."

118.   Data provided by MDH to the Minnesota Amateur Sports Commission ("MASC") of "COVID-19 Sports-Related Case" through October 24 with similar data to that quoted by Director Ehresmann showed that "Sports-Related Cases" means "Cases with

33

Sports Activities Listed" during an interview related for purposes of contact tracing. A true and correct copy of MASC's PowerPoint Presentation showing MDH's data in two charts on slides 15 and 16 is attached hereto as Exhibit A.

119.   Recent published information related to MDH contact tracing targets sports, bars, and activities Governor Walz and MDH desire to hold up as arbitrary examples, without ever asking a single question about retail shopping, gas stations, and other public places where COVID has and clearly continues to spread to an unknown degree.

120.   Simply listing sports activities on a contact tracing form, of course, is at most a correlation, and does indicate that any case of COVID-19 was "sports-related" or "associated with sports" any more than these same individuals visiting the same large retail store—which many, no doubt, have—would indicate the same cases were "retail related." State officials appear to know that EO 20-99's and MDH's use of the labels "sports-related," "associated with sports," and "outbreak" have no actually epidemiological support and require no evidence sufficient to declare alleged connection to youth sports.

121.   These numbers, particularly read with MDH's apparent misleading definitions, do not show any material risk of COVID-19 transmission related to sports, particularly if MDH had stepped back and considered that more than 500,000 Minnesota kids participated in youth sports in 2020.

122.   IF MDH applied the same definition and logic it has applied to sports, to retail shopping, every hour, of every day an outbreak is occurring at big-box retailers and gas stations in Minnesota simply because some (unclear, undefined) number of people visited the location within some (unclear, undefined) period of time.

123.   EO 20-99's statement that officials "see relatively fewer outbreaks in retail settings" is not a summary of data, it is a summation of MDH's policy choice not to look for "outbreaks."

124.   It is irrational for MDH and EO 20-99 to apply obviously different standards and methodology to the collection of data for "outbreaks" allegedly related to youth sports than are applied in other settings and activities.

125.   EO 20-99 is further undermined by scientific studies conducted during the pandemic that demonstrate that playing youth sports is better for kids, better for their communities and results in less transmission of COVID-10 than if sports are cancelled. playing sports.

126.   Attached hereto as Exhibit E is a true and correct copy of a published summary of a University of Wisconsin study that evaluated athletes 207 schools that restarted fall sports in September 2020. Those schools represented more than 30,000 athletes, more than 16,000 practices and more than 4,000 games. (Andrew Watson, MD, *COVID-19 in Wisconsin High School Athletics: Study Summary*, available at https://www.wiaawi.org/Portals/0/PDF/Health/Covid/WI_HS_SportCOVID-19.pdf.)

127.   No sports were found to have a higher incidence of COVID-19 in their participants than similarly situated students matched by age.( *Id.* at 3 ("In fact, no specific sport had a statistically higher incidence rate than the background incidence among adolescents across the state during the same time period.").)

128.   Of the 209 athletes who knew where they contracted the virus, only one case was attributed to participation in sports. *Id.* at 2. The vast majority of cases were

contacted in their household (55.0%), or in their community (not sport or school) (40.7%). (*Id.* at 2.)

129.    The study concluded that "participation in sports is not associated with an increased risk of COVID-19 among Wisconsin high school student-athletes." *Id.* at 3.

130.    This conclusion aligns with other conclusions that find that participation in youth sports reduces the risk of COVID-19 relative the similar broader community. Andrew Watson, *COVID-19 in Youth Soccer Study: Executive Summary*, *available at* https://www.wiaawi.org/Portals/0/PDF/Health/Covid/WI_HS_SportCOVID-19.pdf.

131.    That study found that among youth soccer players sampled, the COVID-19 rate was 310 cases of COVID-19 per 100,000 children. *Id.* at 2. They compared this to matched date from the American Academy of Pediatrics, stating that "during the 10 weeks prior to the survey (6/18/2020 through 8/27/2020) the nationwide case rate among children in the United States was 477 cases per 100,000 children." *Id.* Again, the case rate among athletes in organized sports is less than youth in the population at large.

132.    When the Governor allowed sports to resume in June 2020, youth sports organizations were required to put in place strict protocols that limit players exposure to COVID-19. Minnesota Dept. of Health, *COVID-19 Sports Guidance for Youth and Adults* (June 18, 2020), *available at* https://web.archive.org/web/20200630023021/https://www.health.state.mn.us/diseases/coronavirus/sportsguide.pdf.   Organization's guidance is compressive and precisely prescribes how youth sports participants are to act. *See, e.g.*, Edina Hockey Association, *COVID-19 Preparedness Plan for Edina Hockey Association* (Nov 11, 2020) (requiring players arrive no more than 7 minutes before the scheduled event

time and arrive fully dressed in hockey equipment); *see also Minnesota Hockey Return To Play Guidelines* (Oct. 19, 2020) (requiring association specific COVID-19 plans); Minnesota Hockey, *Association Guidelines for Managing Confirmed COVID-19 Cases* (Oct. 21, 2020).

133.   When youth athletes participate in organized sports, there activities are highly regulated thorough guidelines voluntarily imposed by each sport. MDH data on youth sports show that these measures—and not MDH's new mask hazard—have effectively reduced the risk of COVID-19 transmission.

134.   Defendants' actions have caused, and will continue to cause, Plaintiffs to suffer irreparable injury.

135.   Plaintiffs have no adequate remedy at law to correct the continuing deprivations of their rights.

### CLAIMS FOR RELIEF
**(Against All Defendants)**

### COUNT I
### DENIAL OF EQUAL PROTECTION IN VIOLATION OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION

136.   Plaintiffs incorporate by reference each and every preceding paragraph of this Complaint and reallege the same as if fully set forth herein.

137.   Through Governor Walz's Executive Orders, MDH's Youth Sports Rules, defined below, and other actions related to Plaintiffs' and youth athletes in Minnesota, including as described below, Defendants have irrationally, unreasonably, and arbitrarily singled out Minnesota youth who participate in youth sports, and youth sports, for

disfavored treatment, restrictions, and regulations, as compared to other activities, ages, politically favored categories of individuals, favored populations, or favored activities.

138.    Minnesota's young people who desire to safely participate in sports are treated less favorably than individuals of other ages engaged in the same activities and individuals who engage in favored activities, including activities that Defendants know create a greater risk of COVID-19 transmission to their participants and to Minnesota communities than youth sports.

139.    Defendants irrationally, unreasonably, and arbitrarily distinguish between persons that participate in disfavored youth sports activities which require masks be worn and persons that participate in favored activities such as certain occupations that are exempt from wearing masks.

140.    Defendants have throughout 2020 and into 2021, singled out youth sports for constantly changing and draconian restrictions.

141.    Defendants irrationally, unreasonably, and arbitrarily distinguish between persons that participate in disfavored youth sports activities which require masks be worn and persons that participate in favored adult sports activities that are exempt from wearing masks.

142.    Defendants decision to require participants in youth sports to wear masks is arbitrary and capricious because their decision is not rooted in any factual basis supported by the record.

143.    Defendants intentionally collected data, and designed their collection of data, for youth sports in a different and less favorable manner that is designed to make youth sports appear to be unsafe and/or for Defendants' political purposes.

144.    Defendants have favored persons, groups and activities while disfavoring others (including youth sports) without any rational or lawful basis for doing so.

145.    Defendants decision is irrational because Defendants' own data does not reasonably support its decision to ban youth sports.

146.    Defendants did not evaluate or collect data to demonstrate that their youth sports mask requirement decreases the spread of COVID-19 and does not create other, more serious risks.

147.    Defendants know it is unsafe for youth athletes to wear masks in sports, but do not exempt most youth athletes, even as Defendants favor and exempt others—such as economically favored  adult workers who have a greater risk from COVID than youth athletes.

148.    Defendants' failure to evaluate equally whether to require masks during particular activities or to apply such a ban equally among similarly situated persons violates Plaintiffs' equal protection rights.

149.    Defendants have irrationally and unequally created data collection processes and related definitions that disfavor youth sports.

150.    Defendants have misrepresented and falsely claimed that youth athletes and youth athletics are unsafe, while favoring and mislabeling other, favored populations and activities as safe.

151.   The Due Process Clause of Fourteenth Amendment to the Unites States Constitution provides in relevant part that "nor shall any state deprive any person of life, liberty, or property, without due process of law"

152.   The Equal Protection Clause of Fourteenth Amendment to the Unites States Constitution provides in relevant part that "nor shall any state . . . deny to any person within its jurisdiction the equal protection of the laws."

153.   As a direct result of Defendants' violation of Plaintiffs' Fourteenth Amendment rights to equal protection of the law and due process, as alleged above, Plaintiffs are suffering irreparable harm for which there is no adequate remedy at law. Plaintiffs are therefore entitled to injunctive relief, as well as attorneys' fees.

154.   As a direct and proximate result of Defendants' violations, including its continuing violations, of Plaintiffs' rights, Plaintiffs have in the past and will continue to suffer in the future direct and consequential damages, including but not limited to, the loss of the ability to exercise to safely play sports without harmful and irrational restrictions.

**COUNT II**
**VIOLATION OF PLAINTIFFS' RIGHTS TO DUE PROCESS,**
**PROCEDURAL DUE PROCESS AND/OR SUBSTANTIVE DUE PROCESS**
**GUARANTEED BY THE FOURTEENTH AMENDMENT TO**
**THE UNITED STATES CONSTITUTION**

155.   Plaintiffs incorporate by reference each and every preceding paragraph of this Complaint and reallege the same as if fully set forth herein.

156.   The Due Process Clause of Fourteenth Amendment to the Unites States Constitution provides, as relevant to this Count II,  prohibits state action "depriv[ing] any person of life, liberty, or property, without due process of law . . ."

157.   MDH has repeatedly promulgated, issued, amended, repealed, and/or reissued rules (also labeled "guidance" or "requirements") related to youth sports on a nearly weekly, and sometimes a daily basis throughout 2020 and into 2021 (hereinafter "MDH's Youth Sports Rules").

158.   MDH has no legal authority to issue its Youth Sports Rules.

159.   MDH has issued its Youth Sports Rules without advanced, or at times, without any notice at all.

160.   MDH's Youth Sports Rules are vague and subject to change.

161.   Governor Walz's executive orders purport to—but could not lawfully—empower or delegate authority to MDH to promulgate MDH's Youth Sports Rules.

162.   MDH's Youth Sports Rules threaten Plaintiffs and youth athletes in Minnesota with fines and other penalties for violation of their regularly changing rules.

163.   MDH's Youth Sports Rules disregard requirements in Executive Orders that purport to authorize them.

164.    Plaintiffs have been deprived of liberty and property interests by Plaintiffs' unlawful actions.

165.   Defendants purported orders, rules, and other actions are ultra vires and arbitrary and amount to a substantive due process violation.

166.   MDH Youth Sports Rules constitute rules under the Minnesota Administrative Procedures Act ("MAPA"), yet MDH has not followed the MAPA.

167.    Plaintiffs and Minnesota youth athletes have been subject to vague and constantly changing Youth Sports Rules without advanced, and often without any, noticed. Such rules often change without even a press release on a weekly or daily basis.

168.    Defendants have imposed rules that are unsafe for Plaintiffs without any scientific basis for such rules.

169.    EO 21-01 and other executive orders over the last years, require compliance—under threat of criminal penalty—with "development and implementation of a COVID-19 Preparedness Plan in accordance with applicable guidance for youth sports." This order also states that "[i]ndividuals engaging in activities outside of the home must follow the requirements of this Executive Order, Executive Order 20-81 (face coverings), and MDH and CDC Guidelines."

170.    Defendants actions, including MDH "guidelines" and limitation on exceed standards of inadvertence and are not mere errors of law.

171.    Defendants actions, rules, and orders, referenced herein, are arbitrary and capricious, without any evidentiary support, and lacking any rational basis.  Such actions, rules, and orders, referenced herein are motivated by bad faith and/or ill will."

172.    Minnesota Department of Health has promulgated youth sports guidance without following the Minnesota Administrative Procedures Act.

173.    "In performing duties under this chapter [12] and to effect its policy and purpose, the governor may . . . delegate administrative authority vested in the governor under this chapter, except the power to make rules, and provide for the subdelegation of that authority . . . ." Minn. Stat. § 12.21, Subd. 3(6) (2020) (emphasis added).

174.    MDH guidance requires that youth wear masks during sports.

175.    Defendants' guidance is irrational and arbitrary because it is made ultra vires and violation of it is punishable by fine and imprisonment. Executive Order 22-01 ¶ 7 (imposing a fine of up to $1,000 and 90 days in jail for an individual that willfully violates the order).

176.    Defendants actions, orders, and rule violate Plaintiffs' rights to due process, procedural due process, and substantive due process under the Fourteenth Amendment.

177.    As a direct result of Defendants' violation of Plaintiffs' Due Process rights, as alleged above, Plaintiffs are suffering irreparable harm for which there is no adequate remedy at law. Plaintiffs are therefore entitled to injunctive relief, as well as attorneys' fees.

178.    As a direct and proximate result of Defendants' violations, including its continuing violations, of Plaintiffs' rights, Plaintiffs have in the past and will continue to suffer in the future direct and consequential damages, including but not limited to, the loss of the ability to exercise to safely play sports without harmful and irrational restrictions.

**<u>COUNT III</u>**
**(Against All Defendants)**
**VIOLATION OF THE RIGHT TO EQUAL PROTECTION AND DUE PROCESS, AS GUARANTEED BY THE MINNESOTA CONSTITUTION**

179.    Plaintiffs incorporate by reference each and every preceding paragraph of this Complaint and reallege the same as if fully set forth herein.

180.    The Due Process Clause of Article I, section 7, of the Minnesota Constitution provides in relevant part that "[n]o person shall be . . . deprived of life, liberty or property without due process of law."

181.    The Equal Protection Clause of Article I, Section 2, of the Minnesota Constitution provides in relevant part that "[n]o member of this state shall be . . . deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers."

182.    The same bases and reasons set forth above in support pf Plaintiffs' Count I, are incorporated here, and support this Count III.

183.    As a direct result of Defendants' violation of Plaintiffs' equal protection and due process rights under the Minnesota Constitution, as alleged above, Plaintiffs are suffering irreparable harm for which there is no adequate remedy at law. Plaintiffs are therefore entitled to injunctive relief.

184.    As a direct and proximate result of Defendants' violations, including its continuing violations, of Plaintiffs' rights, Plaintiffs have in the past and will continue to suffer in the future direct and consequential damages, including but not limited to, the loss of the ability to exercise to safely play sports without harmful and irrational restrictions.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prays for judgment against Defendants and that this Court:

A.    Adjudge, decree and declare the rights and other legal relations of the parties to the subject matter in controversy in order that such declarations shall have the force and

effect of final judgment and that the Court retain jurisdiction of this matter for the purpose of enforcing the Court's orders;

B.      Pursuant to 28 U.S.C. § 2201, declare the aforementioned provisions of EO 20-99, EO 20-103, and any subsequent orders, and all MDH Youth Sports Rules on their face and as applied to Plaintiffs, to be in violation of the Fourteenth Amendment to the United States Constitution and the Minnesota Constitution;

C.      Pursuant to 28 U.S.C. § 2201, declare the aforementioned unlawful actions of Defendants to be in violation of the Fourteenth Amendment to the United States Constitution, and the Minnesota Constitution, including any effect of EO 20-99 or any effort to enforce EO 20-99 to: (a) stop any Organized Youth Sport, as defined in EO 20-99, from meeting for practices or game, or any business, facility, or entity serving or providing services to youth sports or activities; and (b) prohibit any form of protected expressive conduct, assembly, or speech;

D.      Pursuant to 28 U.S.C. § 2202, FED. R. CIV. P. 65, 42 U.S.C. § 1983, (i) permanently enjoin Defendants from enforcing EO 20-99 to stop any Organized Youth Sport, as defined in EO 20-99, from meeting for practices or game, or any business, facility, or entity serving or providing services to youth sports or activities; and (ii) prohibit any form of protected expressive conduct, assembly, or speech;

E.      Pursuant to 28 U.S.C. § 2202, FED. R. CIV. P. 65, 42 U.S.C. § 1983, award Plaintiffs compensatory and nominal damages, and pre-judgment and post-judgment interest on these awards;

F.      Pursuant to 42 U.S.C. § 1988, and FED. R. CIV. P. 54(d), and other

applicable law, award Plaintiffs its reasonable attorneys' fees and costs; and

G.      Grant such other and further relief as the Court deems equitable, just, and

proper.

Dated: January 8, 2021                   **CROSSCASTLE, P.A.**

                                         By:  _s/ Samuel W. Diehl_
                                              Samuel W. Diehl (#388371)
                                              Ryan D. Wilson (#400797)
                                              333 Washington Avenue N.
                                              Ste 300-9078
                                              Minneapolis, MN 55401
                                              P: (612) 412-4175
                                              F: (612) 234-4766
                                              Email: sam.diehl@crosscastle.com
                                                     ryan.wilson@crosscastle.com

                                         **ATTORNEYS FOR PLAINTIFFS**

                                         4850-7273-3142, v. 2