# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| Let Them Play MN, Jane Doe 1, both individually and as parent and guardian of Jane Doe 2 and John Moe 3, minors, John Moe 4, as parent and guardian of John Moe 5, a minor, Jane Doe 6, Jane Doe 7, as parent and legal guardian of John Moe 8 and Jane Doe 9, minors, | ) ) ) ) ) ) ) ) ) | Case No. 0:21-cv-00079-ECT-DTS |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) ) | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| Governor Tim Walz, in his official capacity, Attorney General Keith Ellison, in his official capacity, Commissioner Jan Malcolm, in her official capacity, Minnesota Department of Health, Commissioner Tarek Tomes, in his official capacity as designated coordinator of youth sports for the Administration of Governor Tim Walz, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## INTRODUCTION

COVID-19 has proven to be a difficult public health threat. In March 2020, Governor Tim Walz quickly responded to COVID-19, asserting sweeping "peacetime emergency" powers and issuing 26 of what would become 108 executive orders in 2020. These orders authorized a vast array of "guidelines" determined and modified by State cabinet agencies, most prominently the Minnesota Department of Health ("MDH"). Governor Walz simultaneously commenced an $8.75 million communication campaign to encourage compliance with his orders and convey promises to "provide Minnesotans with

the data that drives [the State's] response to COVID-19." (https://twitter.com/GovTimWalz/status/1246171800817537024.)[1]

      Soon after this campaign began, the Governor started circulating infographics with illustrated dials purporting to show Minnesota "how we're making our decisions."



(https://twitter.com/GovTimWalz/status/1253414916448346113.) Of course, neither the behavior of a virus nor the social activities of an entire state can be reduced to a "dial." And infographics do not show "how [the Governor, his commissioners, and their agencies are] making *our* decisions," any more than such cartoons provide evidence that they actually "consider[ed] public health, economic, or societal impacts" of any decision. While providing no substance, these communications made claims, and set expectations, that no scientist could fulfill, much less a politician. (Diehl Ex. F.)

---

[1] Exhibits not cited by hyperlink are provided through declarations filed herewith and cited by the Declarant's last name only unless otherwise noted. Hyperlinks are provided where feasible.

After Minnesota's seven-week shutdown proved unnecessary, Defendants soon found they could not control a virus with the turn of a dial. (Diehl Ex. G) Unwilling to admit their mistake, Defendants manufactured an appearance of control and settled on a scapegoat. Youth sports would be the expendable "dial" that could be turned on and off, even though it was never necessary to do so.

Defendants' pretextual discrimination against youth athletes continues today, as they apply a dangerous mask mandate only to youth athletes while exempting college and professional sports, and many working adults. And for those parents who hope to be present in case their son or daughter passes out at practice, MDH only allows one spectator per participant, unlike movie theaters and other favored venues.

The full measure of Defendants' scheme is shown by Defendants' November 2020 ban on youth sports through Executive Order ("EO") 20-99. In this November 18 order, Governor Walz explained "we see relatively fewer outbreaks in retail settings" but the "192 outbreaks connected to sports are too concerning to let these activities continue." Unfortunately for youth athletes, neither statement was true.

In reality, youth sports' "outbreaks" were no outbreaks at all. MDH lumped in "sports activities" (i.e., not sports) to increase its numbers, and then used a uniquely unfavorable definition of "outbreak" requiring neither an actual connection to "sports" or even to the other case on which MDH based its finding. Despite these disadvantages, by the beginning of November, MDH had discovered only 66 so-called youth sports outbreaks throughout all of 2020 (not 192) and these "outbreaks" only involved 150 cases of COVID

among a population of athletes, coaches, parents and fans of more than 1,500,000, all of whom MDH counted toward "outbreaks" in youth sports.

Governor Walz's failure to "see outbreaks in retail settings" was willful blindness, at best. In September, MDH had disclosed ***557 workplace "outbreaks"*** (applying a definition far less likely to find outbreaks). In November, this number dramatically increased when MDH announced it "***saw 95*** total workplace outbreaks" in just ***one week*** "with the highest number of outbreaks in other workplaces like ***retail and offices***." (Oct. 26 MDH Briefing 4:51-5:23.) And even though Governor Walz chose not to, the Minnesota Department of Labor and Industry was producing a chart announcing it ***saw***:



(Diehl Ex. I.)

Unlike other interest groups, Minnesota's kids have no lobbyists. They cannot vote and they are prohibited from making campaign contributions. Unlike healthcare CEOs,

kids are not asked to publicly pledge their support for the Governor.[2] They have no hope for a quid pro quo in the next executive order or MDH guideline. But, of course, Minnesota's youth athletes do matter.

Young people are not a dial, a lever, or any other tool to be used. They are human beings with intrinsic value that is not dependent on their economic or political utility. And they need to know they have not lost, they are just down by a few points at half-time. They can be encouraged because they have a team of tens of thousands behind them. They may be discouraged by the harm from irrational shutdowns, patently unsafe face coverings, or the realization that affixing a label of "science" may not be a synonym for "truth."

Plaintiffs only ask the Court to call balls and strikes, deciding the winner and loser based on the law and evidence, not any litigants' age or perceived short-term economic or political utility. Whether Defendants accept it or not, "even in a pandemic, the Constitution cannot be put away and forgotten." *Roman Catholic Diocese of Brooklyn v. Cuomo*, __ U.S. __, 2020 WL 6948354, at *3 (Nov. 25, 2020)(per curiam). And "[a] child … is not beyond the protection of the Constitution." *Bellotti v. Baird*, 443 U.S. 622, 633 (1979). Minnesota's youth athletes are protected by the same Constitution. Applicable law and the ample evidence Plaintiffs submit demonstrates their need for a preliminary injunction Prohibiting Defendants from:

---

[2] (Diehl Ex. H) (News release in which President and CEO of CentraCare; CEO of Allina Health; CEO of Fairview Health Services; CEO of Essentia Health; President and CEO of Children's Minnesota; President and CEO of Minnesota Hospital Association; and CEO of North Memorial Health, among others, pledge support for Governor Walz's policies).

1. enforcing Executive Order 21-01 or any other order, policy, practice, or procedure that discriminates against youth athletes or youth athletics without permission from the Court;

2. collecting data or applying public health terms or definitions to support predetermined policy choices that disfavor young people and youth sports, or any other group preselected and disfavored by Defendants; and

3. enforcing any MDH or other State agency rule that lacks statutory authorization—including MDH's current face covering and spectator rules for youth sports—or that adds to or contradicts an executive order; or, alternatively,

4. barring enforcement of MDH's current face covering and spectator rules.

Plaintiffs also request expedited discovery as described below and in their motion and proposed order.

## FACTUAL BACKGROUND

## I.   COVID-19 Executive Orders and Agency Rulemaking

On March 25, 2020, Governor Walz informed Minnesotans he had determined Minnesota's "plan of attack" to defeat coronavirus ("COVID" or "COVID-19"). (Mar. 25 Recording[3] 3:50-3:58.) The Governor promised to rely on science and data to ensure each mitigation measure would have a specific "outcome in mind" so it "will actually make a difference...." (*Id.* 26:52-27:04.) After closing most of the state and ordering Minnesotans to stay home, Governor Walz reopened many activities on May 13 through EO 20-56. The order mandated and prohibited central components of Minnesotans' religious, social, and economic life. Defendants first singled out youth sports for disfavor in EO 20-56.

---

[3] All online recordings are cited by date that includes a hyperlink to the video. These hyperlinks and additional description are included at paragraph 20 of the Declaration of Samuel W. Diehl. All declarations filed herewith are cited by last name, as in "Diehl ¶X."

While this order itself allowed "[o]utdoor tournaments, competitions, practices, and sports that allow for social distance," it prohibited certain sporting events the order deemed to be for "leisure, or recreational purpose—even if social distancing can be maintained." EO 20-56 § 6.c. More broadly, EO 20-56 mandated any Minnesotan who "leave[s] their homes for activities" follow MDH, CDC, and Minnesota Department of Natural Resources ("DNR") guidance, including DNR "guidelines on outdoor recreation and guidelines for facilities and the public...available at DNR's website…." (*Id*. p.3.) Pursuant to this authorization, DNR imposed new rules—many far beyond its statutory authority—never before required by Minnesota Statute, common law, EO 20-56, or any previous executive order. (Diehl Ex. J;) *see* Minn. Stat. 84.027, subds. 1-2.

DNR imposed new rules that it drafted, and also purported to incorporate state, federal, and even private websites via hyperlink. DNR purported to alternatively require and/or recommend compliance with 20 hyperlinked or referenced websites of State, federal, and even private guidance ranging from "face-covering guidance issued by...the CDC," "MDH's Guidance for Businesses and Employers," and "this Life Jacket Association website." (*Id*.) DNR or MDH made sure to eliminate any hope that Governor Walz intended to include youth sports as part of his permitted activities stating three times that "organized youth or adult athletics...are not authorized to resume by EO 20-56." (*Id*.)

While DNR's decision appeared to also apply to "adult athletics" and not just youth, DNR expressly allowed major adult activities. While DNR and MDH prohibited fifth graders from playing baseball and softball, the agency's rule endorsed a foursome of elderly golfers, so long as the course "rais[ed] golf cups and require[ed] golfers to leave

the flag stick in the hole" and other adult sports activities. (*Id.*) On the day EO 20-56 was issued, MDH tweeted:

> The data we gather from will continue to change as investigations happen. We're working closely with partners across the state and will continue to provide information on our website and in daily media briefings. We're all in this together.

(https://twitter.com/mnhealth/status/1260703288435126273.)

Youth athletes and their coaches and parents may not have immediately realized that "continu[ing] to provide information on our website" meant that MDH, or any other State agency could, on any given day without notice, create new rules to live by. This practice continues and is how MDH issued new rules for sports on December 28, January 5, and January 6 without notice, any semblance of rulemaking procedures or safeguards, and regardless of their consistency with the executive order from which they purportedly draw their authority.

## II.     Minnesota Youth Athletes

More than 515,000 Minnesota youth[4] regularly participate in sports and similar activities. Doctors, policymakers, and even Defendants, agree that youth sports promote the physical and mental health of Minnesota's young people. Even after the outbreak of COVID-19, MDH Commissioner Jan Malcom explained, "[i]t is important that we look for opportunities to allow children to engage in activities that promote health and well-

---

[4] Minnesota Department of Education ("MDE") data shows 959,613 young people are enrolled in Minnesota public, private, and home K-12 schools. (*See* Diehl Ex. K) 54% of Minnesota students participate in "[s]ports teams, such as park and rec teams, school teams, in-house teams or traveling teams" on one or more days "[d]uring a typical week" (using the average number of students who did so on one or more days "[d]uring a typical week" for the grades MDE studied (5, 8, 9, and 11) in 2019. (*See* Diehl Ex. L.) This number does not include younger children who participate in sports or similar activities or activities such as archery that may not have been reported in response to the question posed.

being," and noted she is "well aware of the importance of youth sports to...student athletes and the broader community." (Diehl Ex. M.) Contemporaneously, Governor Walz similarly noted the value of youth sports, stating: "The well-rounded student has these extracurricular activities, whether they be football, concert band, speech and debate, volleyball. And to try and get our students back into them — if we can do it safely with what we know now — we should try to do so." (Diehl ¶10.)

This year has been difficult for everyone, including youth athletes. Minnesota's youth have experienced unprecedented closings, cancellations, and a level of isolation unknown in their (or most adults') lifetime. Numerous sources have raised serious and growing concerns regarding stress and deteriorating mental health. In October 2020 the CDC noted:

> Beginning in April 2020, the proportion of children's mental health–related [Emergency Department]visits among all pediatric ED visits increased and remained elevated through October. Compared with 2019, the proportion of mental health–related visits for children aged 5–11 and 12–17 years increased approximately 24% and 31%, respectively.
> ***
> Children's mental health during public health emergencies can have both short- and long-term consequences to their overall health and well-being. . .

(https://www.cdc.gov/mmwr/volumes/69/wr/mm6945a3.htm.)

Mental Health America ("MHA") is a national nonprofit dedicated to addressing mental illness and promoting mental health in the United States. MDH recognized that Governor Walz's ban on youth sports imposed by EO 20-99 would cause mental health problems. MDH recognized these mental health problems and referred youth athletes to MHA's online mental health screening tool if MDH's suggestion to "[j]og in place in your

bedroom" did not succeed. (Compl. Ex. C) MHA summarized results from this test from

January to September 2020 for 1,560,288 individuals across the United States, finding:

- "The number of people looking for help with anxiety and depression has skyrocketed."

- "More people are reporting frequent thoughts of suicide and self-harm than have ever been recorded in the MHA Screening program since its launch in 2014."
- "Young people are struggling most with their mental health....throughout the COVID-19 pandemic youth ages 11-17 have been more likely than any other age group to score for moderate to severe symptoms of anxiety and depression."

- "In September 2020, over half of 11-17-year-olds reported having thoughts of suicide or self-harm more than half or nearly every day of the previous two weeks." (https://www.mhanational.org/number-people-reporting-anxiety-and-depression-nationwide-start-pandemic-hits-all-time-high).

The science is settled that youth sports are a positive activity for children and

adolescents, promoting their physical and mental health. And 2020's cancellations,

changes, and restrictions that continue in 2021 are a growing concern among young people.

### III.   Governor Walz and MDH's Intentional and Misleading Effort to Scapegoat Gyms, Bars/Restaurants, and, Particularly, Youth Sports

In August 2020, the Minnesota State High School League ("MSHSL") unexpectedly

cancelled high school football and volleyball. After some initial subterfuge, it became clear

that MDH caused the cancellation. But this led Dawn Gillman, a parent of multisport

athletes, to found Let Them Play MN, first as an unincorporated, but organized, Facebook

group, and later as a non-profit. After a lawsuit was filed in September Governor Walz and

MDH backed down and football and volleyball safely played. (Gillman ¶3.)

Since its founding, Let Them Play has organized 26,000 supporters from rural,

suburban, and metro-area Minnesota, including parents, coaches, and fans who understand

the value of participation in youth sports and activities. (Gillman ¶2.) However, after their efforts to cancel high school football and volleyball failed, Governor Walz and MDH's efforts to stop youth sports did not end. (Gillman ¶4.) By mid-November, MDH and the Governor became more openly hostile to youth sports when they announced plans to ban youth sports for four (later six) weeks. EO 20-99; EO 20-103 (collectively ("EO 20-99/103"). While not immediately visible to observers, the decision to ban sports was the culmination of a long-term strategy to use youth sports as a scapegoat that started when COVID cases rose beginning in September.

### A. The Groundwork: MDH's Frightening Rhetoric About Sports, Gyms, and Bars/Restaurants

Since September and continuing today, Governor Walz and MDH have made statements seeking to justify the ban on youth sports and other policy choices in EO 20-99/103. The Governor and MDH increasingly portrayed disfavored activities (they planned to shut down, including Gyms,[5] bars/restaurants, and youth sports) as frightening, while portraying favored workplace and retail activities (they planned to allow) as safe. For example:

- "Gyms facilitate ***risky social interactions that pose a substantial threat*** to further the community spread of COVID-19 throughout Minnesota. The ***science*** shows that people in proximity to one another in Gyms breathing heavily, exerting themselves, and exercising increases the risk of community spread of COVID-19....This, in turn, increases the community spread of the deadly virus because those infected with COVID-19 in Gyms ***take the virus with them back into their communities***…." (Danila ¶14 (emphasis added).)

---

[5] This memorandum will use MDH's defined term discussed further below. (Danila ¶ 6.).

- "The on-premises consumption of food and beverages at bars and restaurants in Minnesota continues to ***pose substantial risks to public health and safety***. Bars and restaurants pose a particularly high risk of COVID-19 transmission because they allow people to gather and congregate around people from different households to eat and drink without face coverings, often for extended periods of interaction…." (Diehl Ex. O p. 5.)

- "[A]n outbreak of COVID in one bar can lead to an entire community outbreak through the spread from patrons to their household members, coworkers and other members of the community." (Sept. 9 MDH Briefing 12:14-12:22.)

- "[I]f we look at our data. We have 1,452 cases…associated with sports activities. When we look at what that means for…household contacts that were recommended for quarantine that's 3,348 people who were recommended to be quarantined as a result of these…cases. And we've had 62 outbreaks….[W]hat we're seeing with disease transmission…is really concerning." (Sept. 16 MDH Briefing 38:13-39:19.)

In contrast to this doom and gloom, retail and other "workplace" settings are portrayed as totally safe. After discussing "workplace outbreaks," on September 28, MDH's Ehresmann felt compelled to add:

> And ***it's important to note that cases associated with workplaces aren't necessarily due to spread happening in the workplace***, but rather it's often an employee who gets exposed outside of work and then brings it in to the workplace while you may feel healthy or not worried about it.

(Sept. 28 Recording at 6:01 to 6:16.)

On October 26, MDH and Governor Walz held a lengthy press conference at which they explained that workplaces were safe, but "community outbreaks" like gyms, bars/gyms, and youth sports were a problem. Commissioner Malcolm explained:

> [S]ince the beginning of September,...[o]ur case growth now is being driven by community transmission, both known and unknown contacts of community outbreaks and community exposures that don't have to do with a

specific large workplace outbreak or large long term care outbreak....This community transmission has accounted for 78 percent of our cases since October 1st, which makes controlling outbreaks extremely difficult.

(Oct. 26 Walz-MDH Briefing 11:54-12:32.) Governor Walz's added, "We're not *seeing* the massive spread in retail settings. So it doesn't necessarily look like there would be a need there." (Oct. 26 Walz-MDH Briefing Part 2 1:16-1:24)

The press picked up on their implications and at the October 26 briefing asked:

> **[Press Question]** Governor I'm hearing reports that in mid-November you are preparing to close schools, possibly some businesses. Sounds like you just said retail is not a big problem, but perhaps bars and restaurants in mid-November if cases stay at the same trajectory and that that would include ending fall and winter sports, or at least for the time being. Can you respond to that?

> **[Governor Walz response:]** None of that is correct. And none of those things have been discussed....The dials are being turned. So that that's not true.

(*Id.* 4:32-5:09.) Of course, Defendants knew very well what they were doing.

At the end of the briefing Governor Walz came back to "community spread" and connected it to youth sports, explaining:

> Cases spiking is...an indication that you'll see of community spread....We are not fortune tellers here, it's scientists and it's numbers and this issue of what will happen and what will happen with sports and things like that,....But certainly, you know, as a[n assistant] high school coach and someone who's deeply engaged with educating the whole child, I know how important they are, but I also know how risky it is.

(*Id.* at 10:15-11:35.)

Commissioner Malcolm and Ehresmann continued, offering seemingly frightening numbers related to sports. They defined "athletics" to include both games and "ancillary" social activities. They alleged that there were "3,410 cases associated with sports" that

caused "7,000 household contacts who needed to be isolated" and that these cases included 593 cases among high-school athletes and 309 among middle-school athletes. (*Id*. 12:36-14:05.) While meant to be frightening, these numbers were only misleading.

### B. MDH's Definitions of "Outbreak" Designed Based on Desired Policy Outcomes, Not Meaningful Science

Throughout 2020, MDH applied different definitions to the term "outbreak" in different contexts. These differing definitions are not based on "science," but instead appear to be gerrymandered to fit MDH's policy preferences and desired outcomes. In September and October, State officials discussed activities they intended to shut down, using negative terminology disconnected from any data. As a result, gyms, bars, restaurants, and youth sports were afforded unfavorable "outbreak" definitions. Meanwhile, favored activities were judged according to favorable outbreak definitions and Minnesotans were repeatedly assured those favored activities were safe.

Governor Walz's numerous "Executive Orders require[d] Minnesotans to comply with public health best practices established by...the Centers for Disease Control and Prevention ("CDC"). EO 20-96 p. 2. The CDC's "recommended definition" provides that an "outbreak" may be shown by either of two criteria:

1. "***During (and because of) a case investigation and contact tracing, two or more contacts*** are identified as having active COVID-19, regardless of their assigned priority"; or

2. "Two or more patients with COVID-19 are discovered to be linked, and the linkage is established outside of a case investigation and contact tracing (e.g., two patients who received a diagnosis of COVID-19 ***are found to work in the same office***, and only one or neither of them was listed as a contact to the other)." (Diehl Ex R.)

Consistent with the CDC, MDH generally defines a "non-foodborne, non-waterborne" outbreak as:

> . . .outbreaks...as two or more cases of illness ***related by time and place*** in which an epidemiologic investigation suggests either person-to-person transmission occurred or a vehicle other than food or water (e.g., animal contact) is identified.

(https://www.health.state.mn.us/diseases/foodborne/outbreak/non.html (emphasis added).) When shutting down bars and restaurants, MDH's Deputy State Epidemiologist has repeated this definition, testifying:

> An outbreak is generally defined as multiple cases of illness related by time and place in which an epidemiologic ***investigation suggests person-to-person transmission***...occurred.

(Danila ¶10; Diehl Ex. O p.6.)

Contrary to the CDC's definition including "two or more" cases, MDH defines a "workplace outbreak" as a "workplace with ***three or more*** COVID cases among employees." (Sept. 28 MDH Briefing 5:19-5:26.) And in a "workplace" MDH ignores huge numbers of individuals involved in the activity—customers and other guests—because MDH only "counts the cases of employees, and not any customers or patrons of that particular place" in a workplace (Nov. 2 MDH Briefing 4:34-5:32). In sum, MDH's definition of workplace COVID-19 outbreaks departs from the CDC's recommended definition and its own standard definition in multiple ways calculated to ***decrease the number of outbreaks***.

Outbreak definitions applied to Gyms, bars/restaurants, and youth sports are just the opposite, dramatically departing from the CDC/MDH's definitions in a manner calculated

to *increase the number of outbreaks*. Specifically, MDH defines:

- "outbreak...for Gyms [a]s *seven* or more COVID-19 cases from different households that report visiting the Gym *within one month*." (Danila n. 2.)

- "outbreak...for bars/restaurants [a]s *seven* or more COVID-19 cases from different households that report visiting only the bar/restaurant *within one month*." (*Id*. p. 6 n. 1.)

- And, for some reason (hint: EO 20-99), "[o]n November 13, 2020, the threshold [for bars/restaurants] was lowered to *five* or more COVID-19 cases from different households that report visiting only the bar/restaurant *within one month*." (Danila p. 6 n. 1.)

- "For sports, [an outbreak is] *two* or more cases in different households [among players, coaches, their family members, any spectators, or opponents of a team] within a *14-day* period." (Diehl [Ex. U](#).)[6]

These definitions—applied to disfavored activities—do not require "contacts" (per the CDC) or a connection in "time" or any "investigation suggest[ing] person-to-person transmission…occurred" (per MDH's standard definition). Instead, MDH counts cases of COVID only by place, without any potential connection. So for a high school football game with 250 attendees outdoors (with normal stadium capacity of 2,500 spectators), one spectator in the home stands and one spectator in the away stands who tested positive within the next two weeks would constitute a football "outbreak" even if those two fans never came within 500 feet of each other. (Gillman ¶7.) This design was calculated to support Governor Walz's ban through EO 20-99/103.

---

[6] MDH does not appear to have ever publicly articulated each element of this definition.

### C.  MDH's and Governor Walz Mislead Minnesota Regarding Youth Sports

Even using their misleading definitions of "outbreak," the limited data that MDH has disclosed demonstrates that Gyms, bars/restaurants, and most of all, youth sports, were never frightening at all. When a State official claimed on September 9 that "an outbreak of COVID in one bar can lead to an entire community outbreak," it ignores that MDH had earlier stated there had been only 38 outbreaks at bars and restaurants in 2020, allegedly leading to 1,210 cases of COVID. (Sept. 9 MDH Briefing 7:18-30.) On September 28, in the sentence preceding Ehresmann's dramatic statement that "'One event can affect so many people," Malcom had stated there had been only 22 outbreaks associated with Gyms. And she failed to mention that MDH considers "Gyms" to include "gymnasiums, fitness centers, recreation centers, indoor sports facilities, indoor climbing facilities, trampoline parks, indoor and outdoor exercise facilities, martial arts facilities, and dance and exercise studios." (Sept. 28 MDH Briefing 7:16-22; Danila ¶6.)

On September 16, when MDH described cases allegedly related to "sports activities" as "really concerning," only 50 of the 62 alleged "outbreaks" involved youth sports. And the combined total of both adult and youth sports "outbreaks" involved only *140 COVID cases*. (Diehl Ex. S.) MDH neglected to mention, however, in May 2020, one "workplace outbreak," at one meat processing plant in Worthington, involved *four time*s the number of all alleged youth sports *combined over the entire year.* (Diehl Ex. T.) On September 28, Ehressman inexplicably declared that only "cases associated with workplaces aren't necessarily due to spread happening in the workplace, but rather it's often an employee who gets exposed outside of work." (Sept. 28 MDH Briefing 6:03-6:13.)

Undermining this statement, she had just described that, MDH was then aware of:

- 89 outbreaks in places food processing including, "bakeries, grocery stores, delis";

- 40 "outbreaks in meat processing plants" such as the Worthington's;

- 182 outbreaks "in manufacturing" and

- 246 outbreaks in "businesses of all types." (*Id*. 05:24-5:56.)

The disparity between outbreaks in workplace (favored) settings and youth sports (disfavored) only got worse as Governor Walz got closer to his planned shutdown of youth sports. On November 2, Commissioner Malcolm announced that in just one week (ending October 24) MDH "*saw* 95 total workplace outbreaks….with the highest number of outbreaks in other workplaces like *retail and offices*. (Oct. 26 MDH Briefing 4:51-5:23.) The combined total of workplace outbreaks disclosed by MDH through October 24 exceeds *652 outbreaks*.[7] Youth sports? Just *66*.

MDH's 66 allegedly confirmed outbreaks over the entire year (through October 24) show only one elementary school outbreak (in dance) and only four in middle school sports. (Compl. Ex. C p. 16.) Across all ages there were no youth swimming outbreaks, none in wrestling, and one in cheerleading. (*Id*.) And with tens of thousands of kids playing hockey and volleyball all summer, none of these outbreak numbers were material, "outbreak"— for sports—meant only that "sports activities" were "*Listed*" by an individual who either played or attended or picked someone up from a youth sports practice or game at some time in the previous 14 days. (*Id*.; Diehl Ex. U.) Had they ever asked questions about retail

---

[7] The apples-to-apples number to compare with youth sports is at least 652 because it does not include any outbreaks between September 9 and October 17 as those numbers were not shared with the public.

using the same logic and "science" applied to sports, every "sports" outbreak would also be considered a "retail" outbreak along with thousands of others. Moreover, using the ratio as MDH announced in September, Governor Walz banned over 500,000 kids from playing youth sports for six weeks *because of 150 cases of COVID*.

Governor Walz's restrictions on youth sports are and have been since the beginning of the pandemic, predicated on knowingly false statements. When the Governor signed EO 20-99 after stating "we see relatively fewer outbreaks in retail settings" but the "192 outbreaks connected to sports we[re] too concerning to let these activities continue," he and MDH knew they had never looked for customer outbreaks at all. They knew that retail and other employee workplace outbreaks had caused thousands, if not tens of thousands, of more cases of COVID than youth sports. In fact, they knew that all of the so-called sports "outbreaks" counted in the 192 were not nearly as "concerning" as a single retail/workplace outbreak. But Defendants decided that "cases associated with workplaces aren't necessarily due to spread happening in the workplace," they withheld the same generosity for Minnesota's kids. They did not care because they needed a "dial" to twist, and twist kids have. Defendants know that "Numbers are important, but we can't forget that these numbers represent people," Governor Walz just did not care about youth athletes who, of course, are people too.

If they had, Defendants would have reviewed real science that shows it is safer for kids—**and safer for their communities**—when kids play sports. A University of Wisconsin study evaluated athletes at 207 schools that restarted fall sports in September 2020. (Compl. Ex. E.) Across every sport, the 30,000 athletes studied contracted COVID-19 less than their

peers and so, by definition would transmit COVID less than those not playing sports. Of course athletes are not superior, they were just occupied and engaged in a healthy, distanced activity with thoughtful protocols to keep kids safe. In banning sports, MDH knowingly ignored the "substitution effect" that when one activity is cancelled, a scientist must review what activity is undertaken instead. Intentionally ignoring this, MDH pretended that kids would disappear and never accounted for what kids would do when they were not allowed to play. And it is this willful blindness and desire for a scapegoat lever that continues to irrationally drive Defendants' mask requirement, spectator limits, and disparate treatment of practices vs. games.

### D. Defendants' Biased Contact Tracing Process Designed to Produce Governor Walz's Favored Results, Not Scientific Data

Just before filing this motion, Let Them Play obtained what MDH describes as "screen shots of...the interview questions asked...as part of [contact tracing] Case Investigations" from December 2020. (Diehl Exs. V, W.) These forms show Defendants' contact tracing process is not designed to study COVID or collect scientific data. Instead, their questions seek to elicit the only answer that would support Governor Walz's chosen dials, ignoring valid scientific evidence.

After introductory questions, MDH asks every individual three potentially relevant series of questions related to their activities and occupation. The first, labelled "Exposures: Travel through Gym," asks only about the following during the previous 14 days:

1. "Any travel outside of Minnesota?

2. "[D]id you go to...[a] Restaurant or Bar (exclud[ing] takeout . . .)"

3. "[D]id you go to...[a] Salon or spa"

4. "Did you play any sports or attend any sporting event(s)?"

5. "Did you go to any Gyms, Fitness Centers, or studios?"

(Diehl Ex. W p. 8)

The next series of questions, labelled "Assess Contacts – Occupation" ask "Are you employed and/or do you volunteer?" Similar to questions regarding activities, the targeted response categories for this series of questions is limited to ten specific occupations or areas of volunteering:

1. "Healthcare setting"
2. "Long-term care or assisted living"
3. "Residential treatment facilities"
4. "Shelter includes homeless or domestic violence shelters"
5. "Group home[s]"
6. "Corrections setting"
7. "College or University"
8. "School"
9. "Childcare center"
10. ***"Organized sports"*** and
11. "Other"

(*Id*. p. 11.).

Unlike the other nine recognizable occupational settings, subjects are left to guess what "Organized sports" even means.[8] This increases the likelihood of positive responses that may have no connection with any actual risk of the spread of COVID-19 through

---

[8] The Bureau of Labor Statistics ("BLS") maintains a database of rigorously classified job categories. There is no category for "organized sports" in the database. Rather potential "sports" workers are lumped in with "Arts, Design, Entertainment, Sports, and Media Occupations." And, of course, there are 5,470 potential "sports" workers, not even 10% of the 78,860 of the "Fast Food and Counter Workers" in Minnesota. (Diehl ¶20.)

sports. For example, an individual could be employed in "Organized sports" as an administrator for the MSHSL, working from home, but the individual's response as employed in "Organized sports" would count as a positive COVID-19 case that is connected with sports activities. Meanwhile, a warehouse worker who works daily in close proximity with hundreds of coworkers, and whose occupation does not fit into any of the above categories, would simply answer "Other" and his or her COVID transmittal potential would have no bearing on any future adjustments to MDH restrictions.

Having already asked about sports twice in its contact tracing questionnaire, a third series of questions, labelled "Assess sports, school, childcare, university attendance during infectious period", asks "Did you attend/play any sports?" along with questions about whether the subject attended camp, childcare, an adult day center, or K-12 school. Again, the survey returns to sports (both attending and playing) as a targeted category for continued monitoring and scrutiny, without defining what it means to "attend/play any sports," providing yet another opportunity to count a sports-related COVID case where an individual may, in fact, have been engaged in an activity that has virtually no risk of spreading COVID-19 to other individuals. Critically, based on MDH's biased data collection, it is impossible to distinguish between COVID transmitted as a result of youth playing sports and a spectator simply watching.

Defendants' decisions to ban certain activities and permit or limit others are based on data collected from these contact tracing interviews. Unfortunately for MDH, youth athletes, and science, their contact tracing form on its face shows that Defendants' decisions related to youth sports are arbitrary at best.

The key question on their contact tracing form on which MDH and Governor Walz purport to rely when shutting down or regulating youth sports for 500,000 youth in Minnesota is a single, poorly-designed, binary question to assess youth sports outbreaks: "***Did you attend/play sports? Yes or No.***" This single, confounded question does not (and thus any MDH analysis cannot) determine whether the person interviewed:

- played youth sports versus was a spectator at a youth sporting event, a distinction that Defendants have repeatedly drawn in their orders limiting youth sports. (*Compare* Diehl Ex. W p. 8;) *with* EO 21-01 ¶7(c).

- played in a youth sports' game or only practiced, a distinction that Defendants have repeatedly drawn in their orders effecting youth sports. (EO 20-103 (permitting practices after the pause on Jan. 4, 2021, but prohibiting games until Jan. 14, 2021); Diehl Ex. Y (allowing baseball and other sports to resume games July 1, 2020);

- played one type of sport or another was played. Again, these are all distinctions Defendants have repeatedly drawn in their orders effecting youth sports. (Diehl Ex. Y (allowing so-called low risk sports to being competitions June 6 but prohibiting bobsledding, tables tennis, volleyball, basketball, and baseball games).)

MDH does not, and its guidelines could not, justifiably distinguish between whether any sport was played indoors vs. outdoors. Again, a distinction Defendants have repeatedly drawn in their orders affecting youth sports. (Compl. Ex. D p. 1 (permitting practices on Jan. 4, 2021, but prohibiting games until Jan. 14); EO 20-56 § 8.m (allowing outdoor

tournaments, competitions, practices, and sports but not indoor tournaments, competitions, practices, and sports).

If MDH is basing its decisions on data collected from contract tracing forms, asking a simple "yes" or "no" of whether someone "attend[ed]/play[ed]" sports, such a decision cannot be anything but arbitrary. No reasonable epidemiologist would (1) design a form with such confounding variables that result in de facto selection and observation bias; or (2) base any decision affecting more than half a million kids on such ineptly collected data. Instead of mandating everyone else comply with the CDC's "public health best practices," MDH should have reviewed the CDC's Field Epidemiology Manual describing its own errors. https://www.cdc.gov/eis/field-epi-manual/chapters/analyze-Interpret-Data.html.

## IV.   The Current Results of Defendants' Calculated Disfavor of Youth Sports

Minnesotans have been required to wear masks while indoors in public spaces since July 24, 2020. And EO 20-81 remains in place. This order exempts persons with medical conditions, persons five years old and under, and persons where wearing a face covering would make their job a hazard. *Id.* § 8. The order also allowed persons to remove their masks in a variety of settings, including when participating in organized sports indoors when the "level of exertion makes it difficult to wear a face covering." *Id.* §§ 10.a. EO 20-81 also "strong encourage[s]" masks when "participating as an athlete in indoor or outdoor organized sporting events, to the extent possible, where social distancing is not being maintained." *Id.* §11.d.

On January 6, 2020, EO 21-01 repealed executive orders 20-99, 20-103, and 20-104. EO 21-01 continues to penalize failure to comply with its mandates. EO 21-01 §10

(imposing fines and imprisonment). Even though previous orders were repeals, EO 21-01 retained the requirement from 20-99 and 20-103 that persons comply with EO 20-81 (ordering generally that masks be worn in certain settings but with exceptions that applied while playing youth sports). *Id.* § 6.f. EO 21-01 continued the requirement that "[i]ndividuals engaging in activities outside of the home must follow [MDH Mask] Guidelines." *Id.* § 6.f.

In addition to retaining the mask mandate, EO 21-01 added that with regards to "indoor gymnasiums [and] indoor sports facilities" that "[n]otwithstanding paragraphs 10.a and 10.b of Executive Order 20-81, face coverings must be worn by all persons at all times." *Id.* ¶7(c)(viii)(C). As to youth sports, EO 20-01 states: "Notwithstanding [the exceptions that previously applied to youth sports in] paragraphs 10.a and 10.b of Executive Order 20-81, face coverings must be worn in accordance with applicable guidance for youth sports available on the Stay Safe Minnesota website (https://staysafe.mn.gov)."[9] *Id.* § 7.g.v. Thus, while 10.a and especially 10.b (which does not apply just to organized youth sports) remain in effect generally, for youth playing organized sports, those provisions are abrogated to the extend mandated by MDH guidance at any given time.

However, EO 21-01 continues to exempt collegiate and professional sports from its mask mandates. EO 21-01 § 7.h.1.A-B. Professionals are completely exempt, and

---

[9] Of note, while EO 21-01 rescinds the mask exceptions in EO 20-81 10.a and 10.b for youth playing organized sports, the EO 20-81 provision that "strong[ly] encourage[s]" masks when "participating as an athlete in indoor or outdoor organized sporting events, *to the extent possible*, where social distancing is not being maintained" remains in place. EO 20-81 § 11.d (emphasis added).

collegiate athletes are required to follow MDH guidance with provisions unique to them, but not allowed for youth sports. (Diehl Ex. Z (allowing for an optional testing program that if followed removes the requirement to wear a mask during play).)

Meanwhile, MDH continues to issue, reissue, and modify guidance[10] related to masks and youth sports. While Plaintiffs were drafting their Complaint and this motion, Defendants posted three different order. The first, on January 5 "outline[d] requirements...for participants...in sports" and was not optional *Id.* at 2. It mandated "Face coverings must be worn by all people at all times, including practices and games, with only a few exceptions." *Id*. It allowed "[o]nly the following exceptions…[a list of exceptions for wrestlers, gymnasts, cheerleaders, swimmers/divers, other water sports, and some clarifications for sports that wear helmets)]." *Id*.

MDH mandated that "[p]eople are not permitted to remove their face coverings during activities that involve a high level of exertion." It does not mention, or otherwise reference EO 20-81 which it contradicts. That order, still in effect, only "strong[ly] encourage[s]" masks when "participating as an athlete in indoor or outdoor organized sporting events, *to the extent possible*, where social distancing is not being maintained." *Compare id. with* EO 20-81 § 11.d (emphasis added).

---

[10] MDH's January 5 guidance was updated sometime between January 6 at 6:00 pm and January 6, 2021 at 10:00 pm, with new guidance replacing. (Diehl  ¶23.). A redline comparison of the substantial changes between these two documents was attached to the Complaint. Compl. Ex. C. While writing this memorandum, the guidance was once again updated, unbeknownst to anyone, on January 14. By the time the Court reads this, MDH may update it further. All, of course, without notice or comment, and all, purportedly, with the full force and effect of law.

MDH's everchanging guidance also limits the number of spectators to youth sports. MDH guidance requires that "[t]he total number of spectators at games must comply with the appropriate venue guidance and capacity limits." Minn. Dept. of Health, *COVID-19 Sports Practice and Games Guidance for Youth and Adults*, at 8 (Jan. 6, 2021). But, inexplicably, MDH imposes an additional penalty for youth sports *practices* by limiting this capacity by restricting spectators to "up to one spectator per participant is allowed to attend [youth sports] practices." *Id.* at 7. For youth sports *games*, MDH youth sports guidance requires venues to "[s]trongly onsider limiting spectators to one to two people per participant to minimize transmission and to comply with applicable venue guidance and capacity limits." *Id.* at 8. Except when youth sports are involved, the current Executive Order only limits the capacity of gymnasiums, recreation centers, indoor sports facilities to "not exceed 25 percent of the normal occupant capacity, not to exceed 150 people in the entire facility." EO 21-01 § 7.c.viii. Several other types of venues have greater limits up to "50 percent of normal occupant capacity, with a maximum of 150 people." *Id.* 7.c.

These facts, when taken together, show that Defendants are arbitrarily singling out youth sports, beginning with their past irrational bans on youth sports and continuing in their requirements that most, but not all, youth wear masks while playing most, but not all, sports, and limiting the number of spectators allowed to watch their games. These facts lay bare Defendants violations of equal protection and due process.

## V.    Athletes, Parents, and Physicians (Even at MDH) Agree Masks Are Unsafe

Physicians have spoken out against the MDH mask mandate which is not grounded in sound science or medicine. Even more concerning, they Plaintiffs' expert declarations

27

demonstrate that MDH's mask rule is not neutral, but actually harmful to kids. The Declaration of A. Arthur, MD, a sports medicine expert, that based on his review that there is no basis, scientific or otherwise, to support youth wearing masks during sports as a means to slow the spread of COVID. (*Id.* ¶19.) He warns that masks can cause vision impairment which could put youth athletes in dangerously compromised positions. (*Id.* ¶¶20, 22, 23.) This physician also cautions of the impact masks have on respiratory function during exertion, putting athletes (who are not highly trained professionals) into respiratory distress. (*Id.* ¶¶26, 29.)

This opinion is shared by others in the medical community, including a Mayo Clinc physician who also warned the public of these dangers through the media. Maria Poirier, MD, *Hockey masking during the COVID-19 pandemic poses fall and collision risk*, Post Bulletin (Jan. 13. 2021) (column), available at https://www.postbulletin.com/opinion/columns/6644340-Dr.-Maria-K.-Poirier-Hockey-masking-during-the-COVID-19-pandemic-poses-fall-and-collision-risk. This physician specifically warns of the visual acuity issues created by the youth sports mask mandate as applied to youth hockey players. *Id.* (warning of collisions, and cautioning that because of the high-speed play and head down compensation to see the ice below the mask that there is an increased likelihood for head-down collisions resulting in concussions and spinal injuries).

Another physician and medical expert in respiratory devices (i.e. N95 and similar masks) has also weighed in on the harm caused to youth by wearing masks. (Alm). This expert is not only a physician but a public health expert. (Alm ¶¶11-12.) She has extensive experience in evaluating whether persons are medically fit to wear the types of masks now

mandated by MDH for youth athletes. (Alm ¶16.) She testifies that MDH's guidelines for youth sports are woefully inadequate in light of long-standing federal standards (both CDC and OSHA) and that the inadequacy of MDH's guidelines is harmful for youth playing sports (Alm ¶¶24-30.) But even more concerning and warranting of immediate remedy by this Court, her expert medical opinion explains the physiological harms that complying with MDH's Guidance would inflict on youth athletes, including clinically significant respiratory distress and dangerous situations such as one example where a player was vomited in her or his mask and was then unable to remove because it was strapped on. (Alm ¶¶17-23).

Unfortunately, the concerns of these medical experts are not just hypothetical harms. In the short time that youth have been forced to wear masks while playing sports, several of the very injuries described have manifested themselves. A multitude of personal stories have been shared on the Let Them Play MN Facebook group, many of which include video. (Gillman ¶5.) These include a player that became disoriented while playing to the point of nearly blacking out. (Trost ¶4-6.) That player (while playing hockey) felt confused, light headed and disoriented; she nearly fainted, collapsing to the ice for at least 20 seconds. (Trost ¶5.). She experienced extreme dizziness while skating on the ice and felt like she was spinning and was unable to catch her breath. (Trost ¶5.).

Another parent shared a video of his son skating when his mask suddenly obstructed his vision. (Peterson ¶9.) The group member shared that he could observe, and his son confirmed, that the vicious, unprotected hit occurred because his vision was temporarily obstructed at the critical moment at which he had the puck. (Peterson ¶4-8.)

Data further supports the extent of these problems. Let Them Play completed a member survey on January 12, 2021. This survey polled members regarding their family's experience participating in youth sports with masks. 2,951 members responded. 84% of respondents reported having shortness of breath while playing, 48% dizziness, 42% headache, 23% cough, 20% wheezing, and 6% vomiting and 6% confusion while wearing a mask. 8% noted no symptoms experienced. Unexplainably, 27% of participants reported seeking a medical mask exemption but were denied one by their provider. (Gillman ¶6.)

Of course, MDH's ***physician*** agrees with this expert's concerns. (Alm ¶¶27). In an email exchange with MDH, an MDH physician epidemiologist stated:

> We are also working on drafting language to ***emphasize not only that masks can be removed during high exertion*** but that anyone experiencing concerning symptoms such as dizziness, lightheadedness or shortness of breath while exercising with a face covering should remove it immediately. ***We completely agree*** that no-one should feel compelled to continue to wear a face covering if they are having difficulties as you reference.

(*Id*. Ex. A.)

Non-physician leaders at MDH and Governor Walz apparently irrationally overruled their own physician's opinion. Minnesota kids now face steep fines, jail time, and, as concerning, being prohibited from playing the sports that they love.

## ARGUMENT

### I.  The Court Should Immediately Issue a Preliminary Injunction Barring Application of Defendants' Restrictions on Youth Sports

#### A. Legal Standard: The Court's Broad Power to Order Injunctive Relief

The Court has broad power to order injunctive relief. A federal court may issue a preliminary injunction upon notice to the adverse party. Fed. R. Civ. P. 65(a) (1). In the

Eighth Circuit, a plaintiff seeking injunctive relief must establish the following:

1. The threat of irreparable harm to the movant;
2. The balance between the harm to the moving party and the injury that granting the injunction will inflict on the other party;
3. The probability that the movant will succeed on the merits; and
4. The public interest.

*Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).

The court must balance all four factors to determine "whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Hill v. Xyquad*, 939 F.2d 627, 630 (8th Cir. 1991). However, "[t]he third factor, probable success on the merits, is frequently considered the most important," *Am. Dairy Queen v. New Line Prod., Inc.*, 35 F. Supp. 2d 727, 729 (D. Minn. 1998).

### B. Plaintiffs Are Likely to Succeed on the Merits

Since March 2020, Governor Walz and MDH have continuously limited the lives of Minnesota's youth athletes with a manic array of rules imposed by executive order and, more frequently, agency fiat without advanced notice, opportunity to comment, or any controls on agency rulemaking. Defendants have assumed dramatic and ever-present control of Plaintiffs' and their children's lives, imposing an exhausting and ever-changing web of orders, mandatory "guidance," and plain-old guidance "guidance." Plaintiffs have no justification for their mandates as their data is tainted by their inherently biased collection methodology that did not, of course, produce any inherent dangers Defendants sought to confirm. Defendants' actions are particularly harmful because of the inherent

benefit and value of youth sports decisions to force youth athletes to wear masks while engaging in vigorous exercise is dangerous, unhealthy, and completely unnecessary. Masks are not required of everyone. Meanwhile Defendants application of spectator rules for sport as compared to other activities and events equal or greater to spread COVID-19. And of course, what Governor Walz and MDH term "guidance" is simply *ultra vires* rulemaking by their liberty interests are restricted at the whim and the hyperlink of MDH and other agencies. Even in a pandemic, even in Minnesota, the United States' remains "a government of laws, and not of men," *Marbury v. Madison*, 5 U.S. 137, 163 (1803). Under the Fourteenth Amendment to the U.S. Constitution Defendants may not "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." Defendants have violated Plaintiffs' rights under the Fourteenth Amendment by targeting them for regulation based on political calculation and knowingly false application of science and, on such bases, repeatedly applying harmful and intrusive restrictions on youth athlete's right to engage in activities necessary for their physical and mental health.

1. **Plaintiffs will Succeed on the Merits of Their Substantive Due Process and Equal Protection Claims Because of Defendants' Discriminatory Science**

Plaintiffs will succeed on the merits of their substantive due process and equal protection claims because Defendants' have applied restrictions to youth athletes, knowing that their data collection methods and terminology were misleading and intended to justify unnecessary intrusions on Plaintiffs' (both youth athletes themselves and their parents) protected liberty interests. The Fourteenth Amendment prohibits "government intrusions"

into "spheres of our lives and existence, outside the home, where the State should not be a dominant presence." *Lawrence v. Texas*, 539 U.S. 558, 562 (2003). The U.S. Supreme Court has expressed particular "concern for the vulnerability of children is demonstrated in its decisions dealing with minors' claims to constitutional protection against deprivations of liberty or property interests by the State." *Bellotti*, 443 U.S. at 634. "Without an independent voice in legislative decisionmaking, minors must rely on others to ensure adequate protection of their rights….plac[ing] youth outside 'those political processes ordinarily…relied upon to protect minorities.'" *Ramos v. Town of Vernon*, 353 F.3d 171, 181 (2d Cir. 2003) (quoting *United States v. Carolene Prods. Co*., 304 U.S. 144, 153 n. 4 (1938)). A "child is not the mere creature of the state," instead who "nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for" the future. *Pierce v. Society of Sisters*, 268 U.S. 510, 535 (1925).

Defendants banned and now uniquely limit youth sports with a remarkable callousness. Their own November 30 "guidance" pointed Minnesota kids to ***online*** mental health screening tools, knowing that the "benefits for youth who engage in regular physical activity are clear." (Department of Health and Human Services, National Youth Sports Strategy 11 (2019), https://health.gov/sites/default/files/2019-10/National_Youth_Sports_ Strategy.pdf; Compl. Ex. B.)

Defendants data collection methodology and definitions were not inadvertent. Defendants could not lawfully invade and intentionally limit youth athletes' and their parents' basic liberty interests with fraudulent "data." Politicization of children's health cannot survive any level of scrutiny. And when reviewing far less egregious intrusions

upon the fundamental rights of children and families, federal courts have applied intermediate or strict scrutiny. *See, e.g.*, *Ramos*, 353 F.3d at 181; *Johnson v. City of Opelousas*, 658 F.2d 1065, 1071 (5th Cir. 1981); *Cleburne v. Cleburne Living Center*, 473 U.S. 432, 446–447 (1985); *Townes v. City of St. Louis*, 949 F. Supp. 731, 735 (E.D. Mo. 1996), aff'd, 112 F.3d 514 (8th Cir. 1997).

Defendants cannot show that "the discriminatory means [they] employed [are] substantially related to the achievement" of any legitimate objective. *Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142, 150 (1980). Liberty interests "may not be abridged by legislation which has no reasonable relation to some purpose within the competency of the state." *Pierce*, 268 U.S. at 535. While Defendants might otherwise have power to impose emergency restrictions in the name of public health, Plaintiffs have demonstrated that Defendants "conspired to manufacture evidence" against youth athletics, thereby violating Plaintiffs and youth athletes' fundamental "liberty interests." *White v. Smith*, 696 F.3d 740, 754 (8th Cir. 2012).

### 2. Defendants' *Ultra Vires* Agency Guidance Violates Plaintiffs' Right to Procedural Due Process

Each of Governor Walz's executive orders has mandated that Plaintiffs follow state and federal agency "guidelines" under penalty of fines and imprisonment. The Governor's orders purport to cloak these guidelines—whether CDC, MDH, or any other agency—with the force and effect of law, even if the guideline has not yet been written, is later modified, or contradicts the order by which it purportedly derives its authority. MDH's current youth sports' guidelines illustrate Defendants' sweeping process.

MDH published new versions of its "COVID-19 Sports Practice and Games Guidance for Youth and Adults" on January 5, 6, and 14, 2021, each time without advance notice or official publication. After all, EOs 20-99, 20-103, and 21-01, each mandated that Plaintiffs follow any future agency guidance published at https://staysafe.mn.gov, https://www.dnr.state.mn.us/covid19.html, or and any other unnamed, uncited "MDH and CDC Guidelines."

Both EO 20-99 and the Governor's current EO 21-01 mandate that Plaintiffs and all other Minnesotans may not "engag[e] in activities outside of the home" unless they follow all "MDH and CDC Guidelines," wherever and whenever published, amended, or withdrawn, with or without notice and certainly without comment. EO 21-99 § 6.f.; EO 21-01 § 6.f. As such, these Executive Orders seek to transform unnamed state and federal guidance into mandatory "statement[s] of general applicability and future effect…" Minn. Stat. §14.02. The actions violate Plaintiffs' rights under the Fourteenth Amendment and Minnesota law.

The Governor may only issue emergency executive orders as authorized Minnesota Statute. Under Minn. Stat. § 12.21, subd. 3(1), the Governor may only "make, amend, and rescind the necessary orders and rules...*within the limits of the authority conferred by this section*," Minn. Stat. § 12.21, subd. 3(1). Just five provisions later, within the same "section" (12.21), the Governor is further authorized to "delegate administrative *authority* vested in the governor under this chapter, except the *power to make rules*…." Minn. Stat. § 12.21, subd. 3(6). As such, MDH's current Youth Sports Guidance is of no force and effect to the extent it amends, alters or contradicts, the mandates of EO 21-01. And that it

does, purporting revoke or override EO 20-81's provision that only ***"strong[ly]***

***encourage[s]"*** masks when "participating as an athlete in indoor or outdoor organized

sporting events, to the extent possible, where social distancing is not being maintained"

remains in place. EO 20-81 § 11.d (emphasis added).

> [The United States'] federal system rests on what might at first seem a counterintuitive insight, that "freedom is enhanced by the creation of two governments, not one." *Alden v. Maine*, 527 U.S. 706, 758 (1999). The Framers concluded that allocation of powers between the National Government and the States enhances freedom, first by protecting the integrity of the governments themselves, and second by protecting the people, from whom all governmental powers are derived.
>
> ***
>
> Federalism…protects the liberty of all persons within a State by ensuring that laws enacted in excess of delegated governmental power cannot direct or control their actions. *See ibid*. By denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power. When government acts in excess of its lawful powers, that liberty is at stake.

*Bond v. United States*, 564 U.S. 211, 222 (2011); *Cf. Carson v. Simon*, 978 F.3d 1051, 1060

(8th Cir. 2020) (applying *Bond*). This issue here is not one of federalism, but rather more

basic principles that support doctrines like federalism – that the liberty of an individual

should be free from arbitrary power and when the government, as it does here, acts ultra

vires, that liberty is at stake. This deprivation of liberty by means or arbitrary government

goes to the heart of the due process requirements of our Constitution.

As such, Plaintiffs are not required to follow any MDH or other state agency

"guidance" cannot be required, notwithstanding the language in any of Governor Walz's

executive orders, to the extent the guidance alters, extends, or contradicts any executive

order. Minn. Stat. § 12.21, subd. 3(6). While fundamental, this is not the only constitutional defect with such guidance.

This rule of law accords with other longstanding principles of law that hold one should be on notice for the acts that one's conduct violates. *Lambert v. People of the State of California*, 355 U.S. 225, 228 (1957) ("Engrained in our concept of due process is the requirement of notice."); *cf. McBoyle v. United States*, 283 U.S. 25, 27 (1931) (noting that the rule of lenity ensures that "a fair warning ... [is] given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed"); *Lanzetta v. State of N.J.*, 306 U.S. 451, 453 (1939) ("All are entitled to be informed as to what the State commands or forbids."). Administrative rulemaking—consistent with the strict requirements of the Minnesota APA—is expressly designed to provide fair notice preventing violation of the Fourth. *See F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("[R]egulated parties should know what is required of them so they may act accordingly."); *cf. Talk Am., Inc. v. Michigan Bell Tel. Co.*, 564 U.S. 50, 69 *(*2011) (stating that "notice and predictability [are] purposes of rulemaking" and "frustrating" those purposes "promotes arbitrary government.") (Scalia, J., concurring).

Administrative rulemaking also requires that rules be properly promulgated, not just published late at night on a state website. *See Hirsch v. Bartley-Lindsay Co.*, 537 N.W.2d 480, 485 (Minn. 1995) ("An agency has the power to issue binding administrative rules only if, and to the extent, the legislature has authorized it to do so."); *In re Hibbing Taconite Co.*, 431 N.W. 2d 885, 890 (Minn. Ct. App. 1988) (concluding agency exceeded its statutory authority and engaged in unpromulgated rulemaking: "[A]uthority bestowed

upon an administrative agency is measured by the statute from which it derives its authority."); *see also State ex rel . Spurck v. Civil Serv. Bd.*, 32 N.W. 2d 583, 586 (Minn. 1948) ("Jurisdiction of an administrative agency consists of the powers granted it by statute. Lack of statutory power betokens lack of jurisdiction. It is therefore well settled that a determination of an administrative agency is void and subject to collateral attack where it is made either without statutory power or in excess thereof.").

As such, Defendants violate Plaintiffs' due process rights when they issue orders that criminalize activities defined by MDH, activities and definitions that change with no notice, no comment, no semblance of rulemaking. To have one's liberty restrained by such an arbitrary and ultra vires process is no process at all and thus violated Plaintiffs due process right imbued throughout the Constitution.

### 3.  Defendants' Mask Mandate and Spectator Limit Fail Under Rational Basis Scrutiny Even if the Court Ignored Defendants' Intentional Acts

Defendants' current restrictions applied to youth sports violate the Equal Protection Clause of the Fourteenth Amendment, even if the Court were to ignore Defendants' intent, planning, and creation of these restrictions and applied the less stringent rational basis standard. When a discriminatory law does not implicate a suspect or quasi-suspect class, nor a fundamental right, federal courts apply rational basis review. This scrutiny requires Defendants to demonstrate that their regulatory distinctions between groups are "rationally related to a legitimate government interest." *Gallagher v. City of Clayton*, 699 F.3d 1013, 1019 (8th Cir. 2012). The review of state action under the rational basis test is not "toothless." *Kansas City Taxi Cab Drivers Ass'n, LLC v. City of Kansas City, Mo.*, 742

F.3d 807, 810 (8th Cir. 2013). The Equal Protection Clause, even under a rational basis review, "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Texas v. Cleburne Living Cntr.*, 473 U.S. 432, 439 (1985).

State 'discrimination between two like classes cannot be rationalized by assigning them different labels.'…There must actually be a distinction between the two classes worthy of the difference in treatment." *Fowler v. United States*, 633 F.2d 1258, 1263 (8th Cir. 1980) (quoting *Richardson v. Belcher,* 404 U.S. 78, 83 (1971)). States may "impose special burdens upon defined classes in order to achieve permissible ends" if the State "in defining a class subject to legislation, the distinctions that are drawn have 'some relevance to the purpose for which the classification is made.'" *Rinaldi v. Yeager*, 384 U.S. 305, 308–09 (1966)(citations omitted); *s*, 517 U.S. 620, 633 (1996)("By requiring that the classification bear a rational relationship to an independent and legitimate legislative end, we ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law."). Defendants cannot meet their burden here.

The evidence demonstrates that Defendants have applied a heightened level of scrutiny, methodology and regulation to youth playing sports, but a lesser level of scrutiny, methodology and regulation to adult sports and other non-sport activities. Of course, these are the same 18-35 year-olds who Defendants know are "driving a lot of the spread of the virus." (Nov. 4. Briefing 6:40-7:15.) There is no rational justification for Defendants intentional selection and changing of definitions of "outbreak" to suit its conclusions, rather than a definition rooted in science and epidemiologically principles. In public statements, Defendants have asserted specific, rational-sounding bases for drawing lines allowing

other activities, and allowing other age groups to play, while banning youth activities without any such rationale.

The sports in which Plaintiffs participate were already subject to, and in compliance with, extensive COVID-19 tracking, reporting, and tracing requirements. Defendants use this compliance against Plaintiffs by mislabeling the data produced and intentionally ignoring that the vast majority of cases in other circumstances are either untraceable or MDH has simply chosen not to trace them. This not only violates equal protection principles, but standing alone deprives Plaintiffs of due process by applying illogical and irrational decision-making processes that result in substantial needless deprivation of Plaintiffs liberty by completely banning the types of public and private activities they are free to engage in.

**A. Plaintiffs Have Demonstrated Irreparable Harm**

Here, Plaintiffs have demonstrated a likelihood of success on the merits of its constitutional claims, and therefore has shown it will suffer irreparable harm if the preliminary injunction does not issue. *See Phelps-Roper*, 545 F.3d at 690) (citing *Marcus v. Iowa Pub. Television*, 97 F.3d 1137, 1140-41 (8th Cir. 1996); *Kirkeby v. Furness*, 52 F.3d 772, 774 (8th Cir. 1995)).

**B. The Balance of Harm and Public Interest Favors an Injunction**

"[I]t is always in the public interest to protect constitutional rights." *Phelps-Roper*, 545 F.3d at 690; *see also Kirkeby*, 52 F.3d at 775. Like the irreparable harm factor, the balance of equities factor is generally determined by examining the plaintiff's likelihood of success on the merits. *Phelps-Roper*, 545 F.3d at 690. The "likely First Amendment

violation" demonstrated by Plaintiffs "means that the public interest and the balance of harms" favor an injunction. *Child Evangelism Fellowship of Minnesota v. Minneapolis Special Sch. Dist. No. 1*, 690 F.3d 996, 1004 (8th Cir. 2012).

**C. Plaintiffs Have Good Cause for the Narrow, Expedited Discovery They Seek**

"A district court may order expedited discovery for good cause." *Nilfisk, Inc. v. Liss*, No. 17-CV-1902(WMW/FLN), 2017 WL 7370059, at *7 (D. Minn. June 15, 2017) (citing *Oglala Sioux Tribe v. Van Hunnik*, 298 F.R.D. 453, 455 (D.S.D. 2014); *see also Council on Am.-Islamic Relations-Minnesota v. Atlas Aegis*, LLC ("*CAIR*"), No. 20-CV-2195 (NEB/BRT), 2020 WL 6336707, at *6 (D. Minn. Oct. 29, 2020); *Benefits Admin. Comm. of Brush Aftermarket N. Am., Inc. Grp. Pension Plan v. Wencl*, No. 16-CV-2794 (WMW/BRT), 2016 WL 8809478, at*4 (D. Minn. Aug. 22, 2016) (granting expedited discovery for the "purpose of appropriately tailoring the scope of the TRO and preliminary injunction as necessary to protect Plaintiff's interests"); *Bonus of Am., Inc. v. Angel Falls Servs., L.L.C.*, No.CIV.10-2111(DSD/FLN), 2010 WL 2218574, at *4 (D. Minn. May 28, 2010) (granting expedited discovery to prepare for a motion for a preliminary injunction); *Meritain Health Inc. v. Express Scripts, Inc*., No. 4:12-CV-266 CEJ, 2012 WL 1320147, at *2 (E.D. Mo. Apr. 17, 2012). The freedom of Minnesota kids to move, be active, and improve their mental health free from unlawful and discriminatory intrusion warrants expedited discovery.

**CONCLUSION**

500,000 kids should not be harmed by Defendants' manipulation of data and discriminatory processes. Kids should be allowed to play. Plaintiffs respectfully ask the Court to grant their motion and approve their proposed injunction.

Dated: January 19, 2020                     **CROSSCASTLE, P.A.**

                                           By:   <u>s/ Samuel W. Diehl</u>
                                                 Samuel W. Diehl (#388371)
                                                 Ryan D. Wilson (#400797)
                                                 333 Washington Avenue N.
                                                 Ste 300-9078
                                                 Minneapolis, MN 55401
                                                 P: (612) 412-4175
                                                 F: (612) 234-4766
                                                 Email: <u>sam.diehl@crosscastle.com</u>
                                                        <u>ryan.wilson@crosscastle.com</u>

                                         **ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this Memorandum conforms to the requirements or Local Rules 7.l(f) and (h). The length of this Memorandum is 10,915 words, and was prepared using Microsoft Word version 16.43, Times New Roman font size 13 (size 11 for footnotes). The word processing program has been applied specifically to include all text, including headings, footnotes, and quotations.

Dated: January 19, 2020                                  **CROSSCASTLE, P.A.**

                                                    By: __s/ Samuel W. Diehl__
                                                         Samuel W. Diehl (#388371)
                                                         Ryan D. Wilson (#400797)
                                                         333 Washington Avenue N.
                                                         Ste 300-9078
                                                         Minneapolis, MN 55401
                                                         P: (612) 412-4175
                                                         F: (612) 234-4766
                                                         Email: sam.diehl@crosscastle.com
                                                                  ryan.wilson@crosscastle.com

                                                    **ATTORNEYS FOR PLAINTIFFS**

4813-5917-5896, v. 3