UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Let Them Play MN; Jane Doe 1, both
individually and as parent and guardian of
Jane Doe 2 and John Moe 3, minors; John
Moe 4, as parent and guardian of John Moe
5, a minor; Jane Doe 6; Jane Doe 7, as
parent and legal guardian of John Moe 8 and
Jane Doe 9, minors,

       Plaintiffs,

v.

Governor Tim Walz, in his official capacity;
Attorney General Keith Ellison, in his
official capacity; Commissioner Jan
Malcolm, in her official capacity;
Commissioner Tarek Tomes, in his official
capacity as designated coordinator of youth
sports for the Administration of Governor
Tim Walz; Minnesota Department of Health,

       Defendants.

File No. 21-cv-79 (ECT/DTS)

**OPINION AND ORDER**

---

Samuel W. Diehl and Ryan Wilson, CrossCastle, P.A., Minneapolis, MN, for Plaintiffs.

Cicely R. Miltich and Elizabeth C. Kramer, Office of the Minnesota Attorney General, St. Paul, MN, for Defendants.

---

This case concerns the state of Minnesota's decision to require youth athletes to wear face coverings while participating in organized sports activities and to limit spectators at organized youth sports events, both in an effort to limit the spread of COVID-19. Plaintiffs are Let Them Play MN—a non-profit corporation that opposes these restrictions—and several anonymous youth athletes, parents, and coaches. In this lawsuit,

Plaintiffs claim that the face-covering requirement and spectator limits violate their rights under the Equal Protection Clause and Due Process Clause of the Fourteenth Amendment, as well as similar guarantees under the Minnesota constitution.  Plaintiffs have moved for a preliminary injunction that would bar Minnesota's officials from enforcing the challenged restrictions and for leave to seek expedited discovery.

The motion will be denied in all respects.  Plaintiffs have not shown that they are likely to succeed on the merits of their constitutional claims, that they would suffer irreparable harm in the absence of an injunction, that the equities and public interest weigh in their favor, or that there is any need for expedited discovery.  What Plaintiffs have shown are sincere, reasonable, and good-faith objections to Minnesota's policies.  Plaintiffs' primary concern is that, when worn by athletes engaged in high-intensity contact sports such as ice hockey and basketball, face coverings heighten the risk of significant injuries, and the evidence Plaintiffs have submitted to support the validity of this concern is credible. Regardless, for many decades now, our federal Constitution has been understood to give the political branches great latitude to resolve difficult questions concerning social and economic policy.  These are just the type of decisions Plaintiffs challenge here: the challenged policies balance the interests of limiting the spread of COVID-19 and its sometimes-lethal consequences with the unquestionably positive benefits of permitting Minnesotans to participate in organized sports.  Even if Plaintiffs had the better argument as a matter of policy, the law is clear that the appropriate audience for their argument and objections are Minnesota's political branches, not a federal court.

I

A

As most are now aware, COVID-19 is a disease caused by a virus called SARS-CoV-2. Danila Decl. ¶ 5 [ECF No. 28]. The disease has proven deadly; as of February 2, 2021, Minnesota had seen at least 462,528 confirmed cases of COVID-19 and 6,202 deaths. *Id.* ¶ 6. The virus is "primarily spread by respiratory droplets carried through the air and released when people talk, breathe or exhale, cough, or sneeze." *Id.* ¶ 5. People can spread the virus even if they are "[a]symptomatic" or will "later become sick but are pre-symptomatic," and this type of unwitting diffusion accounts for more than 50% of COVID-19 transmissions. *Id.* The United States Centers for Disease Control and Prevention ("CDC") therefore recommends that people "maintain social distancing of a[t] least six feet and wear a face covering to reduce the risk of transmission." *Id.* ¶ 6.

Based on these undisputed facts about the virus, as well as "published scientific literature," the Minnesota Department of Health ("MDH") has concluded that some settings pose greater risks of spread than others. *Id.* ¶ 13. For example, there is a heightened risk "when multiple persons gather close together for an extended period of time," particularly in an indoor setting. *Id.* Activities that "involve higher levels of exertion and exhalation" can also pose problems because they "greatly increase the amount of airborne respiratory aerosol droplets that can carry" the virus. *Id.* ¶ 20. On the other hand, outdoor settings that allow for social distancing—as well as indoor settings where people wear face coverings and "do no[t] gather or linger"—are less risky. *Id.* ¶ 14.

B

The pandemic has inspired significant government responses.  On March 13, 2020, the President declared a national emergency and approved major disaster declarations in all fifty states.  Miltich Decl., Exs. 5–6 [ECF No. 27-5–6].  That same day, Minnesota Governor Tim Walz declared a "peacetime emergency."  Minn. Exec. Order 20-01; *see* Minn. Stat. § 12.31, subds. 2–3.  This kicked off a series of executive orders intended to address different aspects of the COVID-19 threat.   Compl. ¶¶ 59–62 [ECF No. 1] (characterizing these actions as "sweeping" and "unilateral"); *see* Defs.' Mem. at 6 [ECF No. 26] (listing COVID-19-related executive orders meant to "slow[] the spread of the disease, protect[] the capacity of the State's medical system, and ensur[e] the continued operation of critical sectors").

This case concerns Minnesota's pandemic-related restrictions on youth sports.  Organized youth sports activities were first halted between March 27 and May 21, 2020, at which point they were permitted to resume with a gradually loosening set of restrictions.  Compl. ¶¶ 62, 64–70.  By July 1, both indoor and outdoor games and practices were once again allowed, and participants were not required to wear masks while playing.  Compl. ¶¶ 70–71; *see* Minn. Exec. Order 20-63 ¶ 7(g) (May 27, 2020).[1]  That was more or less the state of affairs for the rest of the summer and early fall.

---

[1]     On July 22, 2020, Governor Walz issued an executive order generally requiring all Minnesotans to wear face coverings in indoor businesses and public settings.  *See* Miltich Decl., Ex. 8 ("EO 20-81") [ECF No. 27-8]; *see also Minn. Voters All. v. Walz*, __ F. Supp. 3d __, No. 20-cv-1688 (PJS/ECW), 2020 WL 5869425 (D. Minn. Oct. 2, 2020) (denying a preliminary injunction in a constitutional challenge to EO 20-81).  That order allowed individuals to temporarily remove their face coverings "[w]hen participating in organized

On November 18, in response to record numbers of "new COVID-19 cases, hospitalizations and intensive care unit admissions, and deaths[,]" Governor Walz issued Executive Order 20-99, which imposed restrictions on a number of personal and business activities. Miltich Decl., Ex. 9 at 1 ("EO 20-99") [ECF No. 27-9]. As relevant here, that order generally required "Organized Youth Sports organizations [to] stop all in-person activities—including practices, group workouts, games, and tournaments"—until December 18, 2020. *Id.* ¶¶ 2, 7(g).[2] Two more orders in December slightly modified EO 20-99. The first extended the ban on most in-person youth sports activities through January 3, 2021, while allowing certain "[o]utdoor workouts, practices, training, [and] skill-building" to resume and allowing indoor sports facilities to reopen for individual exercise as long as "face coverings [were] worn by all persons at all times." Miltich Decl., Ex. 10 ¶¶ 1, 7–8 ("EO 20-103") [ECF No. 27-10]. The second extended EO 20-103's restrictions through January 10, 2021, but allowed public pools to open up for organized youth sports activities. *See* Minn. Exec. Order 20-104 ¶¶ 1, 4 (Dec. 23, 2020).

Finally, on January 6, Governor Walz issued Executive Order 21-01, which is currently in effect. *See* Miltich Decl., Ex. 11 ("EO 21-01") [ECF No. 27-11]. That order

---

sports . . . while the level of exertion makes it difficult to wear a face covering." EO 20-81 ¶ 10(a).

[2]     "Organized Youth Sports," as used in the executive orders relevant to this case, means "any sports activity, where participants are children or adolescents, organized by an entity, association, club, or organization," including "all sports offered by schools (public and nonpublic), the Minnesota State High School League, or similar organizations, as well as dance, cheerleading, and other sports traditionally offered by supplemental associations or organizations." *Id.* ¶ 7(g)(i).

allows organized youth sports activities to continue so long as they abide by certain requirements, two of which matter to this case. First, entities that provide organized youth sports (and the indoor and outdoor facilities that support them) must develop and implement a "COVID-19 Preparedness Plan in accordance with applicable guidance for youth sports available on [MDH's] Stay Safe Minnesota website." *Id.* ¶ 7(g)(ii)–(iv). Second, "face coverings must be worn in accordance with applicable guidance for youth sports available on the Stay Safe Minnesota website."[3] *Id.* ¶ 7(g)(v).

As of January 14, 2021, MDH had posted a 16-page guidance document concerning organized youth and adult sports activities. Miltich Decl., Ex. 15 [ECF No. 27-15]. For purposes of the present motion, Plaintiffs take issue with two components of that guidance. The first is the document's elaboration of the face-covering requirement. It provides that face coverings must generally be "worn by all people at all times" and that "[p]eople are not permitted to remove their face coverings during activities that involve a high level of exertion." *Id.* at 5–6. People with medical conditions that "make it difficult to tolerate wearing a face covering" are exempt from the requirement. *Id.* at 6. Athletes may temporarily remove their face coverings during several specified activities: while engaging in "wrestling contact" and gymnastic and cheer routines, during which a mask could present a choking hazard; while in the water for water sports; and while playing outside, where social distancing is possible. *Id.* at 5. And when a child wears a helmet that

---

[3]     In a different paragraph, EO 21-01 explicitly abrogated the paragraphs in EO 20-81 that had allowed individuals to temporarily remove their face coverings during strenuous physical exercise. EO 21-01 ¶ 7(c)(viii)(C).

"interferes with wearing a face covering safely or effectively," the child may wear a "full face shield" instead.[4]  *Id.*

The second restriction that Plaintiffs challenge is the limit on the number of spectators at youth sporting events.  For practices, the guidance "strongly discourage[s]" spectators but allows "[u]p to one spectator per participant."  *Id.* at 7.  For games, the guidance urges youth sports organizations to "[s]trongly consider limiting spectators to one to two people per participant," but it imposes no absolute limit as long as they "comply with the appropriate venue guidance and capacity limits."  *Id.* at 8.

## C

Plaintiff Let Them Play MN is a Minnesota non-profit corporation that "promotes youth participation in athletics and activities."  Compl. ¶¶ 17–18; *see* Gillman Decl. ¶¶ 1–2 [ECF No. 12].  Together with a group of unnamed youth sports athletes, coaches, and parents, Let Them Play first filed a lawsuit challenging Executive Order 20-99—which included the temporary ban on organized youth sports—in December 2020.  *See Let Them Play MN v. Walz*, No. 20-cv-2505 (JRT/HB) (D. Minn.), ECF No. 1.  Plaintiffs moved for

---

[4]    According to one source, Minnesota is one of twenty states that currently require athletes to wear face coverings during competition.  National Federation of State High School Associations, *Winter Sports Seasons Guide*, (Feb. 5, 2021), https://www.nfhs.org/articles/winter-sports-seasons-guide/; *see, e.g.*, Ill. Dep't of Pub. Health, *Sports Safety Guidance*, https://www.dph.illinois.gov/covid19/community-guidance/sports-safety-guidance (last updated Feb. 5, 2021).  Another thirteen states require athletes to wear face coverings except for during competition.  *See Winter Sports Seasons Guide*, *supra*; *see, e.g.*, Ohio Dep't of Health, *Director's Order for Facial Coverings Throughout the State of Ohio* (July 23, 2020), https://coronavirus.ohio.gov/static/publicorders/Directors-Order-Facial-Coverings-throughout-State-Ohio.pdf.

a preliminary injunction in that case, arguing that EO 20-99's restrictions on social gatherings violated their First Amendment rights of free speech and assembly, and Chief Judge Tunheim denied their motion. *See Let Them Play MN v. Walz*, No. 20-cv-2505 (JRT/HB), 2020 WL 7425278, at *8–9 (D. Minn. Dec. 18, 2020). Soon thereafter, Plaintiffs appealed and requested a preliminary injunction pending appeal, which the Eighth Circuit denied. *See* Order, *Let Them Play MN v. Walz*, No. 20-3656 (8th Cir. Dec. 28, 2020). Plaintiffs then moved to dismiss their appeal and filed a notice of voluntary dismissal in the District Court on January 5, 2021. *See* No. 20-cv-2505, ECF Nos. 29, 47, 49.

Plaintiffs filed this action three days later. *See generally* Compl. They claim that, through Minnesota's restrictions on youth sports, Defendants—Governor Walz, Attorney General Keith Ellison, the Minnesota Department of Health, Commissioner of Health Jan Malcolm, and Commissioner Tarek Tomes, Governor Walz's "designated coordinator of youth sports"—are violating their rights to equal protection, procedural due process, and substantive due process under the Fourteenth Amendment to the United States Constitution, and to equal protection and procedural due process under the Minnesota constitution. *Id.* ¶¶ 136–84. In the present motion, Plaintiffs make two overarching requests. First, they seek a preliminary injunction prohibiting Defendants from:

> 1. enforcing Executive Order 21-01 or any other order policy, practice, or procedure that disfavors or discriminates against youth athletes or youth athletics without permission from the Court;
>
> 2. collecting data or applying public health terms or definitions to support predetermined policy choices that

disfavor young people and youth sports, or any other group preselected and disfavored by Defendants; and

3. enforcing any MDH or other State agency rule that lacks statutory authorization—including MDH's current face covering and spectator rules for youth sports—or that adds to or contradicts an executive order; or, alternatively,

4. [enforcing] MDH's current face covering and spectator rules.

Pl.'s Mot. at 1–2 [ECF No. 10].  Second, Plaintiffs seek an order authorizing them to take expedited discovery, which would include up to ten document requests, ten interrogatories, and two four-hour depositions of Defendants.  *Id.* at 2.

## II

Before considering the merits of Plaintiffs' motion, it is worth pausing to note two jurisdictional questions.  The first is which Defendants, if any, Plaintiffs may sue.  The Eleventh Amendment generally bars suits against "an unconsenting State . . . brought in federal courts by her own citizens as well as by citizens of another state."  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) (quotation omitted).  Under an exception to this general rule, recognized in *Ex parte Young*, 209 U.S. 123 (1908), "a private party can sue a state officer in his official capacity to enjoin a prospective action that would violate federal law."  *281 Care Comm. v. Arneson*, 638 F.3d 621, 632 (8th Cir. 2011).  But the *Ex parte Young* exception only applies if the state official has "'some connection' with the enforcement of the allegedly unconstitutional law."  *Minn. Voters All.*, __ F. Supp. 3d __, 2020 WL 5869425, at *6 (citation omitted).

In their response to Plaintiffs' motion, Defendants do not argue that any individual Defendant lacks the requisite connection to the enforcement of Minnesota's youth sports face-covering requirements and spectator limits. Although Eleventh Amendment immunity is generally considered a matter of subject-matter jurisdiction that a court may raise on its own, *see Fromm v. Comm'n of Veterans Affs.*, 220 F.3d 887, 890 (8th Cir. 2000), a court is not required to do so, *see Wisc. Dep't of Corr. v. Schacht*, 524 U.S. 381, 389 (1998). Given the lack of briefing and evidence on this question, as well as Defendants' statement that they "will move to dismiss on immunity grounds," Defs.' Mem. at 44, it makes sense to leave this question for another day.

There is, however, a second Eleventh Amendment issue. Plaintiffs claim that Defendants have violated the Minnesota constitution's equal-protection and due-process guarantees, though they did not address this claim in their brief. *See* Compl. ¶¶ 179–84. Under the Eleventh Amendment, a federal court lacks jurisdiction to order state officials to "conform their conduct to state law." *Pennhurst*, 465 U.S. at 106. If Plaintiffs wish to raise these claims, they must do so in state court. *See Minn. Voters All.*, __ F. Supp. 3d __, 2020 WL 5869425, at *7 (holding that the court lacked jurisdiction over the plaintiffs' claim that EO 20-81 violated the Minnesota constitution).

### III

Now move to the merits of Plaintiffs' motion. A preliminary injunction is an "extraordinary remedy." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted); *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). The Eighth Circuit's familiar *Dataphase* decision describes the list of considerations applied to decide

whether to grant preliminary injunctive relief: "(1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest." *Lexis-Nexis v. Beer*, 41 F. Supp. 2d 950, 956 (D. Minn. 1999) (citation omitted). The core question is whether the equities "so favor[] the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc) (footnote omitted). "The burden of establishing the four factors lies with the party seeking injunctive relief." *CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 807 (D. Minn. 2018) (citing *Watkins*, 346 F.3d at 844).

## A

"While no single factor is determinative, the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (internal quotation marks and citations omitted). Although this factor uses the term "probability," the movant need not show a greater than fifty percent likelihood of success. *Dwyer*, 294 F. Supp. 3d at 807. And the movant "need only show likelihood of success on the merits on a single cause of action, not every action it asserts[.]" *Id.* "[T]he absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied." *CDI Energy Servs., Inc. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009).

Before addressing Plaintiffs' constitutional claims, it is necessary to say a word about the "lens through which to view [those] claims," *Heights Apartments, LLC v. Walz*,

__ F. Supp. 3d __, No. 20-cv-2051 (NEB/BRT), 2020 WL 7828818, at *9 (D. Minn. Dec. 31, 2020), and specifically, the role of the Supreme Court's decision in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905).  The Court in *Jacobson* upheld the constitutionality of a state compulsory-vaccination law enacted to combat a smallpox outbreak.  *Id.* at 12–14, 39.  In doing so, the Court said the following:

> Whatever may be thought of the expediency of this statute, it cannot be affirmed to be, beyond question, in palpable conflict with the Constitution. Nor, in view of the methods employed to stamp out the disease of smallpox, can anyone confidently assert that the means prescribed by the state to that end has no real or substantial relation to the protection of the public health and the public safety.

*Id.* at 31.  Many courts have concluded that *Jacobson* provides the standard for reviewing all constitutional claims that arise during a public-health crisis.  *See, e.g.*, *In re Abbott*, 954 F.3d 772, 778 (5th Cir. 2020), *vacated on other grounds sub nom. Planned Parenthood v. Abbott*, __ S. Ct. __, No. 20-305, 2021 WL 231539 (U.S. Jan. 25, 2021); *Lewis v. Walz*, __ F. Supp. 3d __, No. 20-cv-1212 (DWF/HB), 2020 WL 5820549, at *4 (D. Minn. Sept. 30, 2020).  Indeed, early on in the COVID-19 pandemic, the Eighth Circuit endorsed this approach, concluding that *Jacobson* established a "two-part framework" that governs "in the context of a public-health crisis": a state "may implement measures that infringe on constitutional rights" unless those measures (1) have "no real and substantial relation" to public health, safety or morals or (2) are, "beyond all question, a plain, palpable invasion of rights secured by the fundamental law[.]"  *In re Rutledge*, 956 F.3d 1018, 1027–28 (8th Cir. 2020) (quoting *Jacobson*, 197 U.S. at 31).  In *Rutledge*, the Eighth Circuit held that,

by failing to apply the *Jacobson* framework, a district court had "abused its discretion" and "produced a patently erroneous result." *Id.* at 1028.

The Supreme Court cast doubt on *Jacobson*'s significance in November 2020 when it decided *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020). The Court applied strict scrutiny in that case to evaluate the plaintiffs' claims that state COVID-19-related restrictions on attendance at religious services violated their rights under the Free Exercise Clause of the First Amendment, *id.* at 66–67, and it never discussed or cited *Jacobson*. *See id. at* 71 (Gorsuch, J., concurring) (arguing that courts had "mistaken [the] modest decision in *Jacobson* for a towering authority that overshadows the Constitution during a pandemic"). The majority did not explicitly reject or overturn *Jacobson*, and the Eighth Circuit has not revisited the issue after *Roman Catholic Diocese of Brooklyn*.[5]

For purposes of this case, it is not necessary to decide between *Jacobson* and the "ordinary constitutional analysis." *Heights Apartments*, __ F. Supp. 3d __, 2020 WL 7828818, at *11. First, as discussed below, the rational-basis standard likely governs Plaintiffs' equal-protection claims. It is far from clear that the Court in *Jacobson* did anything other than apply rational-basis review, particularly when one considers that the decision "pre-dated the modern tiers of scrutiny" applicable to such claims. *Roman Catholic Diocese of Brooklyn*, 141 S. Ct. at 70 (Gorsuch, J., concurring). Second, if

---

[5]      Just three days ago, the Supreme Court granted in part another application for injunctive relief against state limitations on indoor worship services in *South Bay United Pentecostal Church v. Newsom*, __ S. Ct. __, No. 20A136 (20-746), 2021 WL 406258 (U.S. Feb. 5, 2021). That case produced four separate signed opinions, none of which cited *Jacobson*.

*Jacobson* does establish a different standard of review that applies only during a public-health crisis, that standard would certainly be more deferential than the typical constitutional analysis. *See Lewis*, __ F. Supp. 3d __, 2020 WL 5820549, at *4 n.5. Because, as discussed below, Plaintiffs are not likely to succeed under normally applicable constitutional standards, they would necessarily be unlikely to succeed under *Jacobson*. With that background in mind, it is time to turn to Plaintiffs' specific claims.

1

Start with the equal-protection claims. "The Equal Protection Clause of the Fourteenth Amendment commands that no [s]tate shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). The "first step" when evaluating an equal-protection claim is to decide "whether the plaintiff has demonstrated that she was treated differently than others who were similarly situated to her." *Adam & Eve Jonesboro, LLC v. Perrin*, 933 F.3d 951, 959 (8th Cir. 2019) (quoting *In re Kemp*, 894 F.3d 900, 909 (8th Cir. 2018)). Once a plaintiff clears that "threshold," the next step is to apply the appropriate level of scrutiny to the challenged law. *Id.*; *see True v. Nebraska*, 612 F.3d 676, 683–84 (8th Cir. 2010).

a

To succeed at the first step, Plaintiffs must show that they are similarly situated to another, more favorably treated group "in all relevant respects." *Carter v. Arkansas*, 392 F.3d 965, 969 (8th Cir. 2004) (quoting *Bills v. Dahm*, 32 F.3d 333, 335 (8th Cir.

14

1994)); *see Satanic Temple v. City of Belle Plaine*, 475 F. Supp. 3d 950, 962 (D. Minn. 2020). A court must typically "look to the end or purpose of the legislation in order to determine whether persons are similarly situated in terms of that governmental system." *Gilmore v. Cnty. of Douglas*, 406 F.3d 935, 938 (8th Cir. 2005) (quoting R. Rotunda, J. Nowak & J. Young, *Treatise on Constitutional Law: Substance and Procedure* § 18.2 (3d ed. 1999)). Plaintiffs argue that youth sports have been treated less favorably than "adult sports and other non-sport activities." Pls.' Mem. at 39. Defendants respond that organized youth sports differ from those other groups in relevant respects. Defs.' Mem. at 16–18.

Defendants have the better argument. First, the record does not support Plaintiffs' assertion that EO 21-01 and MDH's related guidance treat youth sports less favorably than "adult sports" across the board. On the contrary, EO 21-01 subjects "Organized Adult Sports" to the same restrictions as organized youth sports; organizations and facilities must implement a "COVID-19 Preparedness Plan," and participants must generally wear face coverings at all times. EO 21-01 ¶ 7(h). And the MDH guidance document appears to apply the same face-covering rules and spectator limits without distinguishing between youth and adult sports. *See* Miltich Decl., Ex. 15 at 5–8.

When Plaintiffs argue that EO 21-01 treats "adult sports" more favorably, they seem to refer to the fact that the order exempts "[p]rofessional sports" and "[c]ollegiate sports" from the requirements that generally apply to "Organized Adult Sports." EO 21-01 ¶ 7(h)(i)(A)–(B); *see* Compl. ¶ 76 (discussing EO 20-99). The record shows, however, that professional and collegiate sports are not similarly situated to youth sports in all relevant respects. Specifically, professional and collegiate sports organizations are able to exercise

significant, centralized control over athletes' and coaches' behavior, allowing them to "enforce isolation requirements" and ensure frequent testing.  Danila Decl. ¶¶ 24–25. Professional and collegiate groups also have greater economic resources at their disposal, many employing medical personnel that are dedicated to monitoring the health of their players and staff. *Id.* ¶ 25.  Youth sports, by contrast, are simply not in a position to impose similar internal restrictions. *See id.* ¶¶ 24–25.  If the goal is to use behavioral changes to control the spread of COVID-19, *see Gilmore*, 406 F.3d at 938, these differences are relevant. *Cf. Carter*, 392 F.3d at 969 (concluding that "public school employees" and "state employees" were not similarly situated in a lawsuit challenging the amount of employer health-insurance contributions because "the two groups ha[d] different employers").

The result is the same for the "other non-sport activities" that Plaintiffs' argue are treated more favorably than youth sports.  First of all, Plaintiffs do not identify what these activities are.  But even setting that aside, there is no reason to believe that the other activities are similarly situated to youth sports.  That's because sports, by their nature, almost always involve behaviors and settings that increase the risk of spreading COVID-19—namely, multiple persons gathering closely, combined with "higher levels of exertion and exhalation." Danila Decl. ¶ 20.  Any non-sport activity that did not share these crucial characteristics would differ from youth sports in relevant respects.

b

If youth sports were similarly situated to professional and collegiate sports, the next step would be to decide the applicable degree of scrutiny with which to examine

Defendants' policies.  "Where a law neither implicates a fundamental right nor involves a suspect or quasi-suspect classification," courts apply the rational-basis standard. *Gallagher v. City of Clayton*, 699 F.3d 1013, 1019 (8th Cir. 2012).

Plaintiffs argue that heightened scrutiny is warranted because this case implicates fundamental rights.  *See* Pls.' Mem. at 32–34.[6]  The problem is that Plaintiffs have not identified with any specificity what fundamental right they believe is at play here.  "A fundamental right is one which is, 'objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it] were sacrificed.'"  *Gallagher*, 699 F.3d at 1017 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997)).  Plaintiffs refer at one point to a "right to engage in activities necessary for their physical and mental health," Pls.' Mem. at 32, but more frequently they use broad phrases like "basic liberty interests," *id.* at 33.  Similarly, at the hearing on this motion, Plaintiffs' counsel suggested that Plaintiffs are asserting a general right to protection from harmful government action.  Given the nature of the facts and legal arguments in this case, however, Plaintiffs really seem to be asserting a more specific right: the right to participate, without restriction, in organized youth sports.

Plaintiffs provide no authority suggesting that such a right (in the relevant constitutional sense) exists.  They rely principally on *Ramos v. Town of Vernon*, in which

---

[6]     Plaintiffs also hint, but do not directly argue, that EO 21-01 and the related MDH guidance are subject to heightened scrutiny because they discriminate against younger athletes in favor of older ones.  Age, however, is not a suspect or quasi-suspect classification, so differential treatment based on age does not automatically trigger heightened scrutiny.  *See City of Cleburne*, 473 U.S. at 441–42.

the Second Circuit applied intermediate scrutiny to a juvenile curfew ordinance. 353 F.3d 171, 176 (2d Cir. 2003). But *Ramos* involved a constitutionally recognized fundamental right to travel. *See id.* Similarly, all of the other cases that Plaintiffs cite involved either recognized constitutional rights or suspect classifications. *See Lawrence v. Texas*, 539 U.S. 558, 578 (2003) (addressing the right to engage in private sexual acts in the home); *Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142, 150 (1980) (applying intermediate scrutiny to a gender-based classification); *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534–35 (1925) (addressing a compulsory-public-education law that implicated parents' rights to "direct the upbringing and education of children under their control"); *White v. Smith*, 696 F.3d 740, 754 (8th Cir. 2012) (addressing a criminal defendant's "liberty interest . . . in obtaining fair criminal proceedings" (citation omitted)); *Johnson v. City of Opelousas*, 658 F.2d 1065, 1071–72 (5th Cir. 1981) (addressing juvenile curfew ordinances that implicated the First Amendment ); *Townes v. City of St. Louis*, 949 F. Supp. 731, 735 (E.D. Mo. 1996) (assuming that the Constitution protected a right to intrastate travel and applying intermediate scrutiny to an ordinance closing a street); *cf. City of Cleburne*, 473 U.S. at 446–48 (applying rational-basis review). There is no reasonable connection between these cases and Plaintiffs' claims.

c

In the absence of a suspect classification or a fundamental right, the rational-basis standard applies. Under that standard, a challenged state law will be upheld as long as it is "rationally related to a legitimate government interest." *Gallagher*, 699 F.3d at 1019. Plaintiffs do not seem to dispute that Minnesota has a legitimate interest in controlling the

18

spread of COVID-19, and it is hard to see how they could.  *See Rutledge*, 956 F.3d at 1031;

*Heights Apartments*, __ F. Supp. 3d __, 2020 WL 7828818, at *12; *Let Them Play MN*,

2020 WL 7425278, at *6; *see also, e.g.*, *Roman Catholic Diocese of Brooklyn*, 141 S. Ct.

at 67; *Vill. of Orland Park v. Pritzker*, 475 F. Supp. 3d 866, 886 (N.D. Ill. 2020).  Instead,

Plaintiffs argue that Minnesota's youth-sports restrictions are arbitrary and irrational in

relation to that interest.  *See* Pls.' Mem. at 39–40.

Rational-basis review sets a low bar.  The challenged law is presumptively valid,

and a plaintiff can only overcome that presumption by showing that no "reasonably

conceivable state of facts" could support the law.  *F.C.C. v. Beach Commc'ns, Inc.*,

508 U.S. 307, 313–15 (1993).  A challenged law may survive even if it is both

overinclusive and underinclusive in advancing the asserted interest, *see Gallagher*,

699 F.3d at 1019 (citing *Vance v. Bradley*, 440 U.S. 93, 108 (1979)), and even if it is based

on "rational speculation unsupported by evidence or empirical data," *Beach Commc'ns*,

508 U.S. at 315.  Moreover, the state decisionmakers' "subjective motives" for imposing

the challenged restrictions are "irrelevant for constitutional purposes."  *Barket, Levy &*

*Fine, Inc. v. St. Louis Thermal Energy Corp.*, 21 F.3d 237, 241 (8th Cir. 1994) (citations

omitted).  In other words, under these long-settled principles, it doesn't matter whether

Plaintiffs have the better policy argument.  The question isn't whether the state has made

the best decision.  The question the law requires us to answer is whether the challenged

policies have some rational basis.

Under this standard, Plaintiffs have not shown that Minnesota's face-covering and

spectator requirements likely violate the Equal Protection Clause.  In the preamble to EO

21-01, Governor Walz acknowledged that the state was facing a "challenging balancing act." EO 21-01 at 2. He concluded that restrictions like the ones that Plaintiffs challenge were necessary because lifting the temporary ban on certain activities, like youth sports, would increase the risk of COVID-19 transmission. *Id.* He described his reasoning for that conclusion in some detail:

> [S]ome settings continue to pose more risks than others. Indoor activities pose higher risks than outdoor activities. Strenuous activities resulting in increased respiration pose higher risk than sedentary activities. Unpredictable settings are riskier than more predictable and controlled settings. Settings conducive to prolonged contact provide more opportunity for transmission than settings featuring more transitory interactions.

*Id.* Based on the whole record in this case, it is perfectly reasonable to conclude that youth sports—which often involve sustained close contact, physical exertion, and large groups of spectators—would pose a risk of transmission. According to Defendants' evidence, sports have been associated with multiple COVID-19 outbreaks throughout the country. Danila Decl. ¶¶ 21–22, Exs. 1–5 [ECF Nos. 28-1 through 28-5]. In Minnesota, MDH has "traced at least 334 outbreaks and 10,207 positive COVID-19 cases to sports activities" and found that "[s]ports-related cases are more than twice as prevalent among high school-age children as any other age group[.]"[7] *Id.* ¶ 23. It is also reasonable to conclude that the

---

[7]    Plaintiffs argue that Defendants have arbitrarily applied inconsistent definitions of "outbreak" to sports-related and non-sports-related activites in order to systematically disfavor sports. *See* Pls.' Mem. at 14–16. There are two problems with this argument. First, it appears that MDH applies one "outbreak" definition to "sports" in general, not to youth sports in particular. *See* Diehl Decl., Ex. U at 4 [ECF No. 16-16]. Second, Defendants have provided a rational basis for their approach—specifically, that the threshold number of positive cases required for an outbreak is lower for sports because

face-covering and spectator restrictions would lessen this risk.  Social distancing is a basic recommendation for limiting the spread of COVID-19.  *See id.* ¶ 6.  The American Academy of Pediatrics has specifically recommended that children wear face coverings while playing sports, *id.* ¶ 28, Ex. 12 at 4 [ECF No. 28-12], and a recent nationwide survey found that the use of face coverings was associated with decreased COVID-19 infections in high-school athletes, at least for indoor sports, *id.* ¶ 30, Ex. 14 at 2 [ECF No. 28-14].  Numerous courts in this District and around the country have concluded that similar—and some more severe—restrictions satisfied the rational-basis standard.  *See Lewis*, __ F. Supp. 3d __, 2020 WL 5820549, at *5 (dismissing an equal-protection challenge to executive orders limiting the size of in-person gatherings); *see also, e.g.*, *Big Tyme Invs., L.L.C. v. Edwards*, __ F.3d __, Nos. 20-30526, 20-30537, 2021 WL 118628, at *9 (5th Cir. Jan. 13, 2021) (upholding an executive order prohibiting on-site food and alcohol consumption at bars); *League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 814 F. App'x 125, 127–30 (6th Cir. 2020) (staying a lower court injunction against an executive order closing indoor fitness facilities); *Talleywhacker, Inc. v. Cooper*, 465 F. Supp. 3d 523, 538–540 (E.D.N.C. 2020) (upholding an executive order closing various entertainment businesses, including dance clubs and music venues).

To be sure, Plaintiffs present another side of the story with their evidence.  They have submitted affidavits from multiple individual physicians opining that it is not safe for

---

sports typically involve "frequent in-person interactions with a recurring group of the same people," which makes it "much more likely that two positive COVID-19 tests are related" as compared to other settings.  Danila Decl. ¶ 19.

children to wear masks while playing sports.  *See* Arthur Decl. ¶¶ 18–20 [ECF No. 13];

Alm Decl. ¶¶ 17–30 [ECF No. 14]; Waibel Decl. ¶¶ 14–23 [ECF No. 24]; Poirier Decl.

¶¶ 15–18 [ECF No. 25].[8]  The concern, according to these sources, is that masks could

hamper an athlete's breathing, leading to dizziness, hyperventilation, and other negative

effects.  *E.g.*, Alm Decl. ¶¶ 19–22; *see* Gilman Decl. ¶ 6 [ECF No. 12].  Or they could

obstruct an athlete's vision, increasing the risk of collisions and related concussive injuries.

*E.g.*, Poirier Decl. ¶¶ 15–18.  Plaintiffs provide anecdotal evidence, including videos, to

show that some of these injuries may already have occurred.  *See* Peterson Decl., Ex. 1

[ECF No. 17]; Trost Decl. [ECF No. 18].  Plaintiffs also emphasize the significant physical

and emotional benefits of participation in youth sports, and with their Complaint, they

included a summary of a Wisconsin study finding that "participation in sports is not

associated with an increased risk of COVID-19[.]"  Compl. Ex. E at 3 [ECF No. 1-5].  All

of this evidence shows that Plaintiffs have a reasonable, good-faith policy disagreement

with Minnesota's approach to combating COVID-19 in youth sports.   But their

disagreement is ultimately a political one; it does not show that Defendants likely violated

the Equal Protection Clause.  *See S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct.

1613, 1613 (2020) (Roberts, C.J., concurring) ("The precise question of when restrictions

on particular social activities should be lifted during the pandemic is a dynamic and fact-

intensive matter subject to reasonable disagreement.  Our Constitution principally entrusts

---

[8]     Plaintiffs improperly filed some of these affidavits outside of the ordered briefing
schedule.  *See* ECF No. 21; *see generally* Local Rule 7.1.  All of Plaintiffs' evidence has
nonetheless been considered.

the safety and health of the people to the politically accountable officials of the [s]tates to guard and protect." (internal quotation marks, alterations, and citation omitted)).[9]

2

Now turn to Plaintiffs' claim that Defendants violated their right to procedural due process. To succeed on this claim, Plaintiffs must show two things: "(1) the existence of a constitutionally protected liberty or property interest; and (2) that [Defendants] deprived [them] of that interest without constitutionally adequate process." *Raymond v. Bd. of Regents of Univ. of Minn.*, 140 F. Supp. 3d 807, 815 (D. Minn. 2015) (citations omitted). Plaintiffs essentially argue that it violates due process for Governor Walz to require them to follow the guidance released on MDH's website because that guidance exceeds MDH's statutory authority and is being continually updated without following statutory rulemaking procedures. *See* Pls.' Mem. at 34–38.

Plaintiffs are not likely to succeed on their procedural-due-process claim. First, just as Plaintiffs do not identify a fundamental right for purposes of their equal-protection and substantive-due-process claims, they have not identified a protected liberty or property interest here. "Protected liberty interests 'may arise from two sources—the Due Process Clause itself and the laws of the States." *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006) (quoting *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)).

---

[9]     Because Plaintiffs have identified no fundamental right, and because the challenged restrictions likely satisfy the rational-basis standard, Plaintiffs are not likely to succeed on the merits of their substantive-due-process claim. *See Schmidt v. Ramsey*, 860 F.3d 1038, 1049 (8th Cir. 2017) (explaining that a "rational basis for equal protection purposes also satisfies substantive due process analysis" (internal quotation marks and citation omitted)); *accord Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 470 n.12 (1981).

Although an "independent source" like state law must create the underlying substantive interest, "federal constitutional law determines whether the interest rises to the level of entitlement protected by the Due Process Clause." *Patel v. City of Sauk Centre*, 631 F. Supp. 2d 1139, 1146 (D. Minn. 2007) (quoting *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978)) (internal quotation marks omitted). As noted above, Plaintiffs refer generally to a "right to engage in activities necessary for their mental and physical health," Pls.' Mem. at 32, but they do not identify any state-law sources creating such a right. Moreover, what they really seem to assert are rights to participate in organized youth sports without a face covering and to have more than one spectator present at youth sporting events. Plaintiffs do not identify any authority suggesting that the federal Due Process Clause protects those rights.

Second, if Plaintiffs had identified a constitutionally protected interest, they have not shown that they were likely deprived of that interest without adequate process. All of Plaintiffs' arguments are focused on the propriety of Minnesota's face-covering requirements and spectator rules under Minnesota state law. *See* Pls.' Mem. at 34–38. But violations of state law, standing alone, do not ordinarily give rise to a federal due-process violation. *See Holloway v. Reeves*, 277 F.3d 1035, 1038 (8th Cir. 2002). What Plaintiffs seek, in practical effect, is an injunction forcing state officials to comply with state law. As noted above, the Eleventh Amendment bars such injunctions. *Greene v. Dayton*, 806 F.3d 1146, 1149 (8th Cir. 2015); *see Pennhurst*, 465 U.S. at 106; *Minn. Voters All.*, __ F. Supp. 3d __, 2020 WL 5869425, at *7. It is therefore unsurprising that other courts addressing challenges to COVID-19 restrictions have rejected procedural-due-process

24

claims premised on state-law violations.  *See, e.g.*, *Stewart v. Justice*, __ F. Supp. 3d __, Civ. Action No. 3:20-611, 2020 WL 6937725, at *2 & n.2 (S.D. W. Va. Nov. 24, 2020); *Murphy v. Lamont*, No. 3:20-CV-0694 (JCH), 2020 WL 4435167, at *11 (D. Conn. Aug. 3, 2020).

There is also another, more fundamental flaw in Plaintiffs' due-process claim.  The Due Process Clause's classic procedural guarantees of notice and an opportunity to be heard only come into play "when the government makes an individualized determination, not when the government commits a legislative act equally affecting all those similarly situated."  *Foster v. Hughes*, 979 F.2d 130, 132 (8th Cir. 1992) (citations omitted).  The idea behind this rule is that "the rights of an individual affected by a law of general applicability 'are protected in the only way that they can be in a complex society, by [the affected individual's] power, immediate or remote, over those who make the rule.'"  *Hartman v. Acton*, __ F. Supp. 3d __, No. 2:20-CV-1952, 2020 WL 1932896, at *8 (S.D. Ohio Apr. 21, 2020) (quoting *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915)).  It does not matter whether the government actor in question is formally a part of the legislative or executive branch; what matters is whether the action taken was "legislative"—*i.e.*, whether it produced generally applicable "policy-type rules or standards"—or whether it was "adjudicative"—*i.e.*, whether it "adjudicate[d] disputed facts in particular cases."  *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245 (1973) (acknowledging that an administrative agency can engage in either type of action).  This basic distinction between legislative and adjudicative acts dates back more than a century.  *See Bi-Metallic Inv. Co.*, 239 U.S. at 445; *Londoner v. Denver*, 210 U.S. 373

(1908); 3 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Substance & Procedure* § 17.8(c) (May 2020 Update).

Plaintiffs do not argue that Minnesota's face-covering requirements and spectator limits are anything other than legislative in character. Indeed, Plaintiffs and Defendants conceded at the hearing that the restrictions are generally applicable. So, as long as Defendants make the policies available to the public, as they undisputedly have done, no more process is required. *See, e.g.*, *Bimber's Delwood, Inc. v. James*, __ F. Supp. 3d __, No. 20-CV-1043S, 2020 WL 6158612, at *14–15 (W.D.N.Y. Oct. 21, 2020); *Six v. Newsom*, 462 F. Supp. 3d 1060, 1073 (C.D. Cal. 2020); *Hernandez v. Grisham*, __ F. Supp. 3d __, No. CIV 20-0942 JB/GBW, 2020 WL 7481741, at *52 (D.N.M. Dec. 18, 2020); *Hartman*, 2020 WL 1932896, at *7–8; *Hund v. Cuomo*, __ F. Supp. 3d __, No. 20-cv-1176 (JLS), 2020 WL 6699524, at *11 (W.D.N.Y. Nov. 13, 2020). For all these reasons, Plaintiffs are not likely to succeed on the merits of their claims, which "strongly suggests" that their motion should be denied. *CDI Energy Servs., Inc.*, 567 F.3d at 402.

B

The second *Dataphase* factor is irreparable harm, which "occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). The harm must be "*likely* in the absence of an injunction," *Winter*, 555 U.S. at 22, "great[,] and of such imminence that there is a clear and present need for equitable relief," *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996). A plaintiff must show more than a future risk of irreparable harm; "[t]here must be a clear showing of

immediate irreparable injury." *Berkley Risk Adm'rs Co. v. Accident Fund Holdings Inc.*, No. 16-cv-2671 (DSD/KMM), 2016 WL 4472943, at *4 (D. Minn. Aug. 24, 2016) (internal quotation marks and citation omitted). "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins, Inc.*, 346 F.3d at 844; *see also Gamble v. Minn. State Indus.*, No. 16-cv-2720 (JRT/KMM), 2017 WL 6611570, at *2 (D. Minn. Dec. 1, 2017) (collecting cases).

Plaintiffs' only argument on this point is that their likelihood of success on the merits of their constitutional claims establishes irreparable harm. Pl.'s Mem. at 40 (citing *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds by Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012) (en banc)). There are three problems with this argument. First, Plaintiffs have not shown a likelihood of success on the merits of their claims. *See Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015). Second, all of the cases Plaintiffs cite for this theory of irreparable harm involved likely First Amendment violations. Although the Supreme Court has recognized that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion), Plaintiffs do not assert a First Amendment claim here, and it is not at all clear that the principle from *Elrod* applies in other constitutional contexts. *See Plastino v. Koster*, No. 4:12-CV-1316 CAS, 2013 WL 1769088, at *3 & n.5 (E.D. Mo. Apr. 24, 2013) (concluding that temporary violations of the Second Amendment and the Equal Protection Clause would not automatically constitute irreparable harm); *cf. Munt v. Larson*, No. 15-cv-582 (SRN/SER), 2015 WL 5673108, at *12 n.18 (D. Minn. Sept. 23, 2015) ("[T]he

deprivation of constitutional rights related to the Eighth Amendment and medical treatment does not necessarily constitute irreparable harm[.]").  Third, even in the First Amendment context, the Supreme Court has stated that "a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018) (per curiam) (assuming that plaintiffs were likely to succeed on the merits a First Amendment challenge to partisan gerrymandering but reversing a preliminary injunction based on the balance of the equities and the public interest).

If Plaintiffs had made an independent argument for irreparable harm, they would have faced a difficult burden.  Irreparable harm must be both imminent and attributable to the defendant's conduct.  *See Iowa Utils. Bd.*, 109 F.3d at 425; *Gen. Motors Corp.*, 590 F. Supp. 2d at 1137.  As noted above, Plaintiffs have presented evidence that wearing face coverings may cause some youth athletes to suffer physical injuries.  But that generalized risk does not show that the specific Plaintiffs in this case are likely to suffer immediate injuries in the absence of an injunction and that those injuries would be attributable to Defendants' face-covering requirements, as opposed to some other risk inherent in playing youth sports.  Moreover, it is not clear on this record that an injunction against Defendants would eliminate whatever increased risk of injury flows from wearing face coverings. That's because such an order would not prevent private sports facilities from imposing and enforcing their own face-covering requirements.[10]  *See Shelton v. City of Springfield*, No.

---

[10]     Here, it is worth noting that the President recently issued an executive order requiring federal agencies to "encourage widespread mask-wearing" and to engage with

6:20-cv-3258-MDH, 2020 WL 6503407, at *3 (W.D. Mo. Sept. 2, 2020) (denying a request for a temporary restraining order against a mask ordinance in part because such an order "would not prevent business[es] and churches from adopting their own facial covering requirements").  In short, Plaintiffs have not shown that they will suffer irreparable harm in the absence of the requested relief.

C

The last two factors to consider are the balance of the relative harms and the public interest.  For practical purposes, these factors "merge" when a plaintiff seeks injunctive relief against the government.  *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see Angelica C. v. Immigr. & Customs Enf't*, No. 20-cv-913 (NEB/ECW), 2020 WL 3441461, at *17 (D. Minn. June 5, 2020), *report and recommendation adopted*, 2020 WL 3429945 (D. Minn. June 23, 2020).  Once again, Plaintiffs argue only that their likelihood of success on the merits establishes that the equities and the public interest weigh in their favor.  Pls.' Mem. at 40–41.  Defendants, for their part, argue that the requested injunction "would deal a major blow to Minnesota's efforts to stem the spread of COVID-19."  Defs.' Mem. at 35.

Plaintiffs have not shown that the equities or the public interest favor the injunction they seek.   As discussed above, Plaintiffs rely only on cases involving the First Amendment, and in any event, they are not likely to succeed on the merits.  Moreover, Defendants and the public both have a substantial interest in combatting the spread of COVID-19.   In an attempt to do this, Defendants have adopted measures that are

---

"business . . . and other community leaders" to achieve that result.  Miltich Decl. Ex. 12 at 3 [ECF 27-12].

undisputedly recommended by public-health experts and that are supported by a rational basis.  As with all public-policy decisions, those measures may come with disadvantages and risks, but Defendants have concluded that the benefits outweigh the drawbacks.  A federal court is no better positioned to second-guess those judgments when balancing the equities than when evaluating the merits of an equal-protection claim.  *See Minn. Voters Alliance*, __ F. Supp. 3d __, 2020 WL 5869425, at *13; *see also Talleywhacker, Inc.*, 465 F. Supp. 3d at 543 (concluding that the public interest weighed against an injunction "where defendant ha[d] taken intricate steps to craft reopening policies to balance the public health and economic issues associated with the COVID-19 pandemic").  Once again, Plaintiffs' remedy, if any, lies with Minnesota's political processes.  Because none of the *Dataphase* factors weigh in favor of injunctive relief here, Plaintiffs' request for a preliminary injunction will be denied.

IV

Finally, along with their request for a preliminary injunction, Plaintiffs seek permission to conduct expedited discovery.  Specifically, Plaintiffs would like to serve up to ten document requests and ten interrogatories on Defendants and schedule two four-hour depositions of Defendants.  ECF No. 10 at 2.  In their brief, Plaintiffs argue that "[t]he freedom of Minnesota kids to move, be active, and improve their mental health free from unlawful and discriminatory intrusion warrants expedited discovery," Pls.' Mem. at 42, but they do not say what information they seek.  Defendants respond that Plaintiffs have not shown good cause for expedited discovery and that their requests would be unduly burdensome.  Defs.' Mem. at 41–44.

The general rule is that "[a] party may not seek discovery from any source before the parties have conferred as required by Rule 26(f)." Fed. R. Civ. P. 26(d)(1). Some courts, however, have found that expedited discovery is "appropriate in limited circumstances and for limited rationales." *Midwest Sign & Screen Printing Supply Co. v. Dalpe*, 386 F. Supp. 3d 1037, 1057 (D. Minn. 2019) (quoting *ALARIS Grp., Inc. v. Disability Mgmt. Network, Inc.*, No. 12-cv-446 (RHK/LIB), 2012 WL 13029504, at *2 (D. Minn. May 30, 2012)). The party seeking discovery must typically show "good cause"— *i.e.*, that "the need for expedited discovery . . . outweighs [the] prejudice to the responding party." *Nilfisk, Inc. v. Liss*, No. 17-cv-1902 (WMW/FLN), 2017 WL 7370059, at *7 (D. Minn. June 15, 2017) (quoting *Oglala Sioux Tribe v. Van Hunnik*, 298 F.R.D. 453, 455 (D.S.D. 2014)). In determining whether to grant expedited discovery, courts frequently consider: "(1) whether a preliminary injunction is pending; (2) the breadth of discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made." *ALARIS Grp.*, 2012 WL 13029504, at *2 (quoting *Disability Rights Council of Greater Wash. v. Wash. Metro. Area Transit Auth.*, 234 F.R.D. 4, 6 (D.D.C. 2006)).

In this case, there is no need to consider the potential prejudice to Defendants, because Plaintiffs have not shown that there is any need for expedited discovery. First, although Plaintiffs combined their request for expedited discovery with their request for a preliminary injunction, they have not shown that the two are related. A common reason to grant expedited discovery is to ensure that the record is adequately developed in advance

of a preliminary-injunction hearing.  *See Nilfisk, Inc.*, 2017 WL 7370059, at *7; *Edudata Corp. v. Sci. Computs., Inc.*, 599 F. Supp. 1084, 1088 (D. Minn. 1984).  That is not a concern here.  Plaintiffs have never argued that they needed discovery before they could file a "well-supported [preliminary] injunction motion," *Nilfisk, Inc.*, 2017 WL 7370059, at *7, and the Parties have been able to create a "relatively robust record without discovery."  *Dalpe*, 386 F. Supp. 3d at 1058.

Second, Plaintiffs' discovery requests are extremely broad.  The purpose of expedited discovery is to allow a party to obtain specific, limited, and identifiable pieces of information, particularly when there is some risk of spoliation or when the suit cannot reasonably proceed without the information.  *See, e.g.*, *Council on Am.-Islamic Relations— Minn. v. Atlas Aegis, LLC*, No. 20-cv-2195 (NEB/BRT), 2020 WL 6336707, at *6 (D. Minn. Oct. 29, 2020) (granting expedited discovery to allow plaintiffs to obtain names and contact information for ten John Doe defendants); *see also* 8A Richard L. Marcus, *Federal Practice and Procedure* § 2046.1 n.10 (3d ed. Oct. 2020 Update) (collecting cases).  There is no apparent risk of spoliation here.  Plaintiffs have made no attempt to limit the scope of topics to be explored in their proposed discovery.  And they have not said which specific Defendants they seek to depose.  Without guardrails like these, expedited discovery in this case would undoubtedly exceed its intended scope.

Finally, without any indication of what the Plaintiffs hope to discover, it is impossible to evaluate their purpose in seeking discovery.  Instead, given the broad and open-ended nature of the Plaintiffs' requests, the most natural conclusion is that they

simply wish to start discovery ahead of schedule.  That's not what expedited discovery is for.  Plaintiffs' request for expedited discovery will therefore be denied.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT** Plaintiffs' Motion for Preliminary Injunction and Expedited Discovery [ECF No. 10] is **DENIED**.

### LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  February 8, 2021                    s/ Eric C. Tostrud
                                            Eric C. Tostrud
                                            United States District Court