UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Let Them Play MN; Jane Doe 1, both individually and as parent and guardian of Jane Doe 2 and John Moe 3, minors; John Moe 4; Jane Doe 5; John Moe 6, as parent and guardian of John Moe 7 and Jane Doe 8, minors; Jane Doe 10; John Moe 11,

    Plaintiffs,

v.

Governor Tim Walz, in his official capacity; Attorney General Keith Ellison, in his official capacity; Commissioner Jan Malcolm, in her official capacity; Minnesota Department of Health,

    Defendants.

File No. 21-cv-79 (ECT/DTS)

**OPINION AND ORDER**

Samuel W. Diehl and Ryan Wilson, CrossCastle, P.A., Minneapolis, MN, for Plaintiffs.

Cicely R. Miltich and Elizabeth C. Kramer, Office of the Minnesota Attorney General, St. Paul, MN, for Defendants.

This case involves restrictions the state of Minnesota imposed on youth sports activities in an effort to limit the spread of COVID-19. After Plaintiffs were denied a preliminary injunction against the restrictions, they filed an Amended Complaint incorporating new factual allegations. Defendants have now moved to dismiss the Amended Complaint for lack of subject-matter jurisdiction and for failure to state a claim upon which relief can be granted.

Defendants' motion will be granted. The Eleventh Amendment bars many of the claims Plaintiffs assert in the Amended Complaint. To the extent it does not, Plaintiffs' claims are moot. By the time of the hearing on Defendants' motion, most of the challenged restrictions had already been lifted. After the hearing, the Minnesota Legislature terminated the peacetime-emergency declaration that had given all of Governor Tim Walz's COVID-19-related emergency executive orders legal effect. Finally, if a live controversy remained, Plaintiffs' claims would still fail on the merits.

I

A

The COVID-19 pandemic has inspired significant responses from federal, state, and local government officials. On March 13, 2020, the President declared a national emergency. Second Miltich Decl. ¶ 30, Ex. 26 [ECF Nos. 51, 51-26]. That same day, Minnesota Governor Tim Walz declared a "peacetime emergency." Minn. Exec. Order 20-01 (Mar. 13, 2020); *see* Minn. Stat. §§ 12.21, subd. 3, 12.31, subds. 2–3, and 12.32 (authorizing the Governor to promulgate orders and rules with "the full force and effect of law" during a peacetime emergency). Since the peacetime-emergency declaration, Governor Walz has issued a series of executive orders restricting various aspects of social and economic life in an effort to control the spread of the virus that causes COVID-19. Some of those orders have affected youth sports activities. Although several executive orders—which were summarized in a prior order, *see Let Them Play MN v. Walz*, __ F. Supp. 3d __, No. 21-cv-79 (ECT/DTS), 2021 WL 423923, at *2 (D. Minn. Feb. 8, 2021)—

restricted youth sports in the early months of the pandemic, the allegations in this case focus on restrictions imposed between the late fall of 2020 and the present.

Plaintiffs generally allege that, in an effort to justify restricting youth sports, state officials designed their data collection and contact tracing methods so as to exaggerate the relative risk of COVID-19 transmission attributable to sports, as opposed to other activities. Am. Compl. ¶¶ 55–95 [ECF No. 45]. For example, MDH would classify a COVID-19 case as "sports-related" if the infected individual reported playing sports or attending a sporting event "during their incubation period . . . or infectious period," even if there was no clear evidence that "the transmission occurred while playing the sport." *Id.* ¶ 67. In contrast, Defendants "intentionally chose[] to avoid collecting data regarding COVID cases and outbreaks in retail settings." *Id.* ¶ 51. But this alleged bias occurred at the systemic level; in other words, Plaintiffs do not allege that Defendants inappropriately targeted any individual youth athletes—let alone named Plaintiffs—for data collection.

Plaintiffs challenge three types of limitations on youth sports activities. The first was a temporary ban on all youth sports. Governor Walz ordered the ban in Executive Order 20-99, which he issued on November 18, 2020. Second Miltich Decl., Ex. 4 ("EO 20-99") [ECF No. 51-4]. That order, among other things, required "Organized Youth Sports organizations [to] stop all in-person activities—including practices, group workouts, games, and tournaments." *Id.* ¶¶ 2, 7.g.[1] On December 18, 2020, Governor

---

[1] "Organized Youth Sports," as used in the executive orders relevant to this case, means "any sports activity in which participants are children or adolescents and which is organized by an entity, association, club, or organization providing for registration of participants and oversight on a regular basis for a defined period of time," including "all

Walz allowed certain "[o]utdoor workouts, practices, training, [and] skill-building" to resume. First Miltich Decl., Ex. 10 ¶¶ 1, 7–8 ("EO 20-103") [ECF No. 27-10]. Starting January 3, organized youth sports could start back up in full as long as they abided by certain conditions. *See id.; see also id.*, Ex. 11 ¶¶ 2, 7.g.

Those conditions are the second and third components of Plaintiffs' challenge. Second, starting on January 10, "face coverings [had to] be worn in accordance with applicable guidance for youth sports available on the [MDH's] Stay Safe Minnesota website." *Id.*, Ex. 11 ¶ 7.g.v. According to MDH's online guidance at the time, face coverings generally needed to be "worn by all people at all times," and "[p]eople [were] not permitted to remove their face coverings during activities that involve a high level of exertion." Second Miltich Decl., Ex. 35 at 5–6 [ECF No. 51-35]. People with medical conditions that "ma[d]e it difficult to tolerate wearing a face covering" were exempt from the requirement. *Id.* at 6. Athletes could temporarily remove their face coverings during several specified activities: while engaging in "wrestling contact" and gymnastic and cheer routines, during which a mask could present a choking hazard; while in the water for water sports; and while playing outside, where social distancing was possible. *Id.* at 5. And when a child wore a helmet that "interfere[d] with wearing a face covering safely or effectively," the child could wear a "full face shield" instead. *Id.* Over the next couple of

---

sports offered by schools (public and nonpublic), the Minnesota State High School League, or similar organizations, as well as dance, cheerleading, and other sports traditionally offered by supplemental associations or organizations." First Miltich Decl., Ex. 11 ¶ 7.g.i ("EO 21-01") [ECF No. 27-11].

4

months, the agency released several updated versions of its youth-sports guidance, but these core face-covering requirements did not change, and Governor Walz most recently renewed the requirement in Executive Order 21-11 on March 12, 2021. *See id.*, Exs. 7, 35–38 [ECF Nos. 51-7, 51-35 through 51-38].

Third, under EO 21-01 and later orders that reaffirmed it, youth sports organizations were required to follow certain quarantine protocols identified by the Minnesota Department of Health ("MDH"). According to Plaintiffs, state officials have "applied unfair and unequal quarantine rules on young people and youth athletes[.]" Am. Compl. ¶ 136. The content of the challenged quarantine rules is not clear. Rather than pointing to a specific executive order or source of MDH guidance, as they do in their other allegations, Plaintiffs recount specific scenarios in which youth athletes have been required to quarantine. For example, although "[n]on-athlete students are required to quarantine if they are within 6 feet of each other for a cumulative total of 15 minutes in a day," a youth hockey goalie "will be required to quarantine if a defenseman on the opposing team tests positive for COVID even if that defenseman never crosses the blueline and never comes within 25 feet of the goalie." *Id.* ¶¶ 138, 141; *see also id.* ¶¶ 142–46. Plaintiff John Moe 11, a high school swimmer, was required to quarantine for fourteen days after an exposure—causing him to miss a competition—while Governor Walz allegedly quarantined for only ten days after an exposure of his own. *Id.* ¶¶ 163–64.

Defendants, for their part, have submitted MDH quarantine protocols with their briefing. According to a document entitled "Quarantine Guidance for COVID-19," MDH recommends that all Minnesotans exposed to COVID-19 quarantine for fourteen, ten, or

seven days depending on various factors. Second Miltich Decl., Exs. 39, 40 [ECF No. 51-39 through 51-40]. EO 21-01 and its successor orders required youth sports organizations to adopt a COVID-19 preparedness plan that included quarantine and isolation rules. *See* EO 21-01 ¶ 7.g.ii. According to a document called "COVID-19 Organized Sports Practice and Games Guidance for Youth and Adults," sports organizations are advised to use a 14-day quarantine rule but "may allow shortened quarantine periods (of either 10 or 7 days) as long as the exposed individual meets the criteria for shortened quarantine in the" general "Quarantine Guidance for COVID-19" document. Second Miltich Decl., Ex. 38 at 15. In other words, the executive orders seem to incorporate the quarantine rules that are generally recommended for all Minnesotans, and Plaintiffs' allegations do not identify any policy imposing unique quarantine guidance specific to youth sports.

B

Plaintiff Let Them Play MN is a Minnesota non-profit corporation that "promotes youth participation in athletics and activities[.]" Am. Compl. ¶¶ 14–15. Together with a group of unnamed youth sports athletes, coaches, and parents, the organization first filed a lawsuit challenging Executive Order 20-99—which included the temporary ban on organized youth sports—in December 2020. *See Let Them Play MN v. Walz*, No. 20-cv-2505 (JRT/HB) (D. Minn.), ECF No. 1. Plaintiffs moved for a preliminary injunction in that case, arguing that EO 20-99's restrictions on social gatherings violated their First Amendment rights of free speech and assembly, and Chief Judge Tunheim denied their motion. *See Let Them Play MN v. Walz*, No. 20-cv-2505 (JRT/HB), 2020 WL 7425278, at *4–8 (D. Minn. Dec. 18, 2020). Soon thereafter, Plaintiffs appealed and requested a

preliminary injunction pending appeal, which the Eighth Circuit denied. *See* Order, *Let Them Play MN v. Walz*, No. 20-3656 (8th Cir. Dec. 28, 2020). Plaintiffs then moved to dismiss their appeal and filed a notice of voluntary dismissal in the District Court on January 5, 2021. *See* No. 20-cv-2505, ECF Nos. 29, 47, 49.

Plaintiffs filed this action three days later. ECF No. 1. On January 19, Plaintiffs moved for a preliminary injunction and for leave to conduct expedited discovery. ECF No. 10. That motion was denied after a hearing. ECF No. 33; *see Let Them Play MN*, 2021 WL 423923, at *14. Defendants then moved to dismiss the Complaint. ECF No. 36. With Defendants' agreement, Plaintiffs responded with the now-operative Amended Complaint, and Defendants' original motion was denied as moot. ECF Nos. 43, 45, 46.

In the Amended Complaint, Plaintiffs raise three claims against Governor Walz, Attorney General Keith Ellison, Commissioner of Health Jan Malcolm, and MDH. First, they claim that Minnesota's youth-sports restrictions violate the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. Am. Compl. ¶¶ 165–93. Second, they claim that the restrictions violate their "rights to due process, procedural due process, and/or substantive due process" under the federal Constitution. Am. Compl. ¶¶ 194–217.[2] Third, they claim that Defendants have violated their rights to due process and equal protection under the Minnesota constitution. Am. Compl. ¶¶ 218–24. They seek a declaration that Minnesota's youth-sports restrictions—including "quarantine guidance unique to young people or youth sports, any mask requirement outdoors, . . . any

---

[2]  Plaintiffs did not respond to Defendants' argument that their due-process claims failed on the merits, and Plaintiffs abandoned those claims at the hearing on this motion.

7

subsequent orders, Defendants' intentionally biased fact-finding efforts, and all guidance on their face and as applied to Plaintiffs"—violate the federal and Minnesota constitutions; permanent injunctive relief; compensatory and nominal damages, with interest; and reasonable attorneys' fees and costs. *Id.* at 48–49. Defendants have moved to dismiss the Amended Complaint in its entirety. ECF No. 47.

An important development followed the hearing on Defendants' motion. On June 29, 2021, the Minnesota Legislature passed a bill that, among other things, terminated the peacetime emergency that Governor Walz declared in Executive Order 20-01 on March 13, 2020. *See* Notice of Suppl. Authority [ECF Nos. 77, 77-1]; *see also* Minn. Stat. § 12.31(b) (authorizing the termination of a peacetime emergency "[b]y majority vote of each house of the legislature"). The effect of this legislative action was to terminate the legal effect of executive orders issued under the authority of the peacetime declaration—*i.e.*, the executive orders Plaintiffs challenge in this case.

II

In their motion, Defendants argue both that subject-matter jurisdiction is lacking and that Plaintiffs' claims fail on the merits. A court reviewing a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) must first determine whether the movant is making a "facial" attack or a "factual" attack. *Branson Label, Inc. v. City of Branson*, 793 F.3d 910, 914 (8th Cir. 2015). Defendants have introduced evidence outside the pleadings, making their attack on subject-matter jurisdiction factual. *See* Defs.' Mem. in Supp. at 10 [ECF No. 50]. The factual nature of Defendants' attack enables the reviewing court to resolve disputed facts, applying no presumption of truth to the

8

nonmoving party's allegations or evidence (or, for that matter, to the moving party's evidence). *Branson*, 793 F.3d at 914–15; *Osborn v. United States*, 918 F.2d 724, 729–30 & n.6 (8th Cir. 1990).

A

As Plaintiffs seemed to concede at the hearing on Defendants' motion, the Eleventh Amendment narrows the scope of this dispute at the starting gate. That amendment generally bars suits against "an unconsenting State . . . brought in federal courts by her own citizens as well as by citizens of another state." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) (citation omitted). Under an exception to the general rule, recognized in *Ex parte Young*, 209 U.S. 123 (1908), "a private party can sue a state officer in his official capacity to enjoin a prospective action that would violate federal law." *281 Care Comm. v. Arneson*, 638 F.3d 621, 632 (8th Cir. 2011). These principles have several consequences for the claims raised in the Amended Complaint.

First, Plaintiffs purport to sue MDH directly. But the Eleventh Amendment bars suit against "states or state agencies" for "any kind of relief." *Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007). Plaintiffs' claims against MDH must therefore be dismissed.

Second, Plaintiffs assert claims for "compensatory and nominal damages" against all Defendants in their official capacities. Am. Compl. at 49 ¶ E. The Eleventh Amendment bars these claims because "claims against state officials in their official capacities are really suits against the state[.]" *Kruger v. Nebraska*, 820 F.3d 295, 301 (8th Cir. 2016); *see Kentucky v. Graham*, 473 U.S. 159, 169 (1985); *Reynolds v. Dormire*, 636

F.3d 976, 981 (8th Cir. 2011). Plaintiffs' official-capacity claims for monetary relief must therefore be dismissed, too.

Third, in Count III of the Amended Complaint, Plaintiffs claim that Defendants are violating their rights under the Minnesota constitution. Am. Compl. ¶¶ 218–24. As noted in the order denying Plaintiffs' motion for a preliminary injunction, however, "a federal court lacks jurisdiction to order state officials to 'conform their conduct to state law.'" *Let Them Play MN v. Walz*, 2021 WL 423923, at *4 (quoting *Pennhurst*, 465 U.S. at 106). Count III therefore must be dismissed. After accounting for the Eleventh Amendment, then, only Plaintiffs' federal constitutional claims for declaratory and injunctive relief remain.[3]

B

Apart from the Eleventh Amendment, there are other jurisdictional problems with Plaintiffs' claims. The United States Constitution limits the subject-matter jurisdiction of federal courts to ongoing cases and controversies. *See* U.S. Const. art. III, § 2, cl. 1. "Therefore, the plaintiff's standing to sue 'is the threshold question in every federal case, determining the power of the court to entertain the suit.'" *Steger v. Franco, Inc.*, 228 F.3d

---

[3]  There is another potential Eleventh Amendment issue. The *Ex parte Young* exception to Eleventh Amendment immunity only applies when the official sued has "some connection with the enforcement" of the challenged law, *281 Care Comm.*, 638 F.3d at 632 (citation omitted), and has threatened or is "about to commence proceedings" against the plaintiff, *Young*, 209 U.S. at 156. Defendants argue that Governor Walz and Commissioner Malcolm are immune from suit because they do not meet these requirements. Defs.' Mem. in Supp. at 11–14. Because Defendants do not argue that Attorney General Ellison is immune, and because subject-matter jurisdiction is lacking for other reasons, it is not necessary to address this issue.

889, 892 (8th Cir. 2000) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). "To show Article III standing, a plaintiff has the burden of proving: (1) that he or she suffered an 'injury-in-fact,' (2) a causal relationship between the injury and the challenged conduct, and (3) that the injury will likely be redressed by a favorable decision." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). "[S]tanding is based on the facts as they existed at the time the lawsuit was filed," *id.* at 893, but it must exist "through all stages of the litigation," not just "at the time the complaint is filed," *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (internal quotation marks and citations omitted). A plaintiff only has standing to seek prospective injunctive and declaratory relief when she faces an ongoing injury or a "real and immediate" threat of future injury. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–05, 107 n.8 (1983).

"When, during the course of litigation, the issues presented in a case 'lose their life because of the passage of time or a change in circumstances . . . and a federal court can no longer grant effective relief,' the case is considered moot." *Ali v. Cangemi*, 419 F.3d 722, 723 (8th Cir. 2005) (alteration in original) (quoting *Haden v. Pelofsky*, 212 F.3d 466, 469 (8th Cir. 2000)); *see Already LLC*, 568 U.S. at 91. If an action is moot because it no longer satisfies the case-or-controversy requirement, a federal court "ha[s] no discretion and must dismiss the action for lack of jurisdiction." *Ali*, 419 F.3d at 724 (citing *Powell v. McCormack*, 395 U.S. 486, 496 n.7 (1969)).

To recap, Plaintiffs seek declaratory and injunctive relief with respect to three of Minnesota's COVID-19-related restrictions: (1) the temporary ban on youth sports in Executive Order 20-99; (2) the youth-sports face-covering requirement; and (3) quarantine

11

rules as applied to youth athletes.[4]  None of these three restrictions presents an ongoing case or controversy over which a federal court may exercise jurisdiction.

Start with the temporary ban on youth sports.  Even before the original Complaint was filed in this case on January 8, 2021, youth sports activities had resumed, and the ban has now been lifted for over seven months.  *See* First Miltich Decl., Exs. 10, 11.  No allegations or evidence in the record suggest that Plaintiffs face a present injury or a "real and immediate" threat of future injury resulting from the ban.  *Lyons*, 461 U.S. at 101–05, 107 n.8.

The face-covering requirement was rescinded after Defendants filed their motion but before the hearing.  Specifically, on May 14, 2021, Governor Walz issued Executive Order 21-23, which "lift[ed] face-covering requirements in most settings."  Third Miltich Decl., Ex. 52 [ECF No. 73-1].  The order "immediately" rescinded Paragraph 7.g.v of Executive Order 21-11, which had required participants in youth sports activities to wear face coverings.  *Id.* ¶ 5.  Both Executive Order 21-23 and updated MDH guidance continued to recommend that youth sports participants wear face coverings "when recommended by MDH or CDC" but made clear that it was "no longer a statewide requirement."  *Id.*, Ex. 53 at 2 [ECF No. 73-2].[5]  Just as with the temporary ban on youth

---

[4]    Although Plaintiffs purport to challenge Defendants' allegedly biased collection of data as a separate government action, they identify no injury resulting from that data collection beyond the three types of legal restrictions identified above.  Instead, Plaintiffs' allegations concerning biased data collection are best understood as support for their legal argument that the restrictions are irrational under the Equal Protection Clause.

[5]    Plaintiffs provide no support for their assertion that the face-covering requirement "arguably remains in effect."  Pls.' Mem. in Opp'n at 28 [ECF No. 67].

sports, Plaintiffs do not identify an ongoing injury or a real and immediate threat of future injury flowing from the face-covering requirement.

Finally, Minnesota's quarantine rules do not create an ongoing redressable injury. As noted above, it is not entirely clear what quarantine rules Plaintiffs challenge. But all agree that the challenged rules derived their legal effect from delegations in Governor Walz's executive orders. *See, e.g.*, Second Miltich Decl., Ex. 7 ¶ 7.g.ii–v. The Minnesota Legislature has now terminated the peacetime emergency that gave Governor Walz the power to issue those orders, depriving them of legal effect. *See* ECF No. 77-1. Plaintiffs did not seek leave to respond to Defendants' notice of this legislative action and do not seem to contest that the challenged quarantine rules are no longer in effect.

Notwithstanding these changed circumstances, Plaintiffs argue that the case is not moot because Defendants voluntarily rescinded the challenged restrictions. *See* Pls.' Mem. in Opp'n at 26–29. "To be sure, voluntary cessation of a challenged practice does not necessarily moot a case." *Hillesheim v. Holiday Stationstores, Inc.*, 903 F.3d 786, 791 (8th Cir. 2018). If it did, "a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." *Already LLC*, 568 U.S. at 91. Even when cessation is voluntary, however, a case "might become moot if subsequent events ma[k]e it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Prowse v. Payne*, 984 F.3d 700, 702–03 (8th Cir. 2021) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)). "The burden of showing that the challenged conduct is unlikely to recur rests on the party asserting mootness."

13

*Strutton v. Meade*, 668 F.3d 549, 556 (8th Cir. 2012). Although this is a "heavy burden," it is "slightly less onerous when it is the government that has voluntarily ceased the challenged conduct." *Prowse*, 984 F.3d at 703 (collecting cases); *see* 13C Edward H. Cooper, *Federal Practice and Procedure* § 3533.7 (3d ed. Apr. 2021 Update).

On this record, Defendants have shown that the challenged restrictions cannot reasonably be expected to recur. First, none of the circumstances surrounding the voluntary lifting of restrictions indicate the type of manipulative behavior the voluntary-cessation exception is meant to address. Governor Walz issued his order lifting the temporary ban on youth sports after Plaintiffs voluntarily dismissed their prior case and before they had filed this action. *See* First Miltich Decl., Ex. 11. The face-covering requirement was rescinded more than four months after Plaintiffs filed this action, and after Defendants had already prevailed on Plaintiffs' motion for a preliminary injunction. The stated justifications for this change were new guidance from the Centers for Disease Control and Prevention, the state's "progress on vaccine administration," and trends in "public health risk metrics." Third Miltich Decl., Ex. 52 at 1. In other words, there is no indication that Defendants lifted the restrictions to evade judicial review in this case. *See Cnty. of Butler v. Governor of Pa.*, __ F. 4th __, No. 20-2936, 2021 WL 3520610, at *1 (3d Cir. Aug. 11, 2021); *Calvary Chapel of Bangor v. Mills*, __ F. Supp. 3d __, No. 1:20-cv-00156-NT, 2021 WL 2292795, at *11 (D. Me. June 4, 2021).

Second, it is doubtful that the more fundamental cause of mootness in this case—the Minnesota Legislature's termination of the peacetime-emergency declaration—was even "voluntary" in the relevant sense. It was a policy choice made, not by Defendants,

but by a different branch of the Minnesota government. *Lewis v. Cuomo*, No. 20-CV-6316, 2021 WL 3163238, at *8 (W.D.N.Y. July 27, 2021) (holding that the voluntary-cessation exception did not apply in challenge to COVID-19 restrictions that were rescinded "due to the combined actions of the Legislature and [the governor]"); *see also League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 843 F. App'x 707, 709–710 (6th Cir. 2021) (finding challenge to state COVID-19 restrictions moot after state supreme court held that governor lacked authority to impose them). As a result of the Legislature's action, Governor Walz no longer has the standing legal authority to issue binding rules under the previously declared peacetime emergency. In effect, then, Plaintiffs have received much of the relief they seek. S*ee N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525, 1526 (2020). And the Legislature's participation in the decision detracts from Plaintiffs' primary argument, which is that "the Governor could unilaterally reimpose restrictions at any moment." Pls.' Mem. in Opp'n at 27.

To be sure, there is always some "uncertainty about the future course of the pandemic." *Cassell v. Snyders*, 990 F.3d 539, 546 (7th Cir. 2021). The emergence of the Delta variant of the virus, among others, has presented new concerns and inspired new public-health measures. *See Delta Variant: What We Know About the Science*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (last visited Aug. 23, 2021). But the fact "that the government once imposed a particular COVID restriction does not necessarily mean that litigation over a defunct restriction presents a live controversy in perpetuity." *Hawse v. Page*, __ F. 4th __, No. 20-1960, 2021 WL 3234293, at *6–7 (8th Cir. July 30, 2021)

15

(finding case moot despite concerns posed by Delta variant).  Under these circumstances, finding a live controversy would require both scientific and political speculation—*i.e.*, that the pandemic will proceed in a particular way, and that Minnesota's political branches will decide to reimpose the particular restrictions challenged in this case.  *See id.*  A federal court is not well suited to either brand of speculation.  The better answer is that Plaintiffs' claims are moot.

### III

Lack of subject-matter jurisdiction is, of course, sufficient to require dismissal of this case.  Nonetheless, under the unique circumstances of this case, it is worth briefly explaining why Plaintiffs would not have prevailed on the merits.

In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.  *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014).  Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level[.]"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).  The complaint must "state a claim to relief that is plausible on its face."  *Id.* at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiffs claim that the challenged restrictions violate the Equal Protection Clause of the Fourteenth Amendment.  That clause "commands that no [s]tate shall 'deny to any

person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).  The "first step" when evaluating an equal-protection claim is to decide "whether the plaintiff has demonstrated that she was treated differently than others who were similarly situated to her."  *Adam & Eve Jonesboro, LLC v. Perrin*, 933 F.3d 951, 959 (8th Cir. 2019) (citation omitted).  Once a plaintiff clears that "threshold," the next step is to apply the appropriated level of scrutiny to the challenged.  *Id.*; *see True v. Nebraska*, 612 F.3d 676, 683–84 (8th Cir. 2010).

Plaintiffs' allegations do not satisfy either step.  First, Plaintiffs have not plausibly identified a more favorably treated group to which they are similarly situated "in all relevant respects."  *Carter v. Arkansas*, 392 F.3d 965, 969 (8th Cir. 2004) (citation omitted); *see Satanic Temple v. City of Belle Plaine*, 475 F. Supp. 3d 950, 962 (D. Minn. 2020).  Adult organized sports, for example, have consistently been subject to the same restrictions as youth organized sports.  *Compare, e.g.*, Second Miltich Decl. Ex. 7 ¶ 7.g, *with id.* ¶ 7.h; *see also id.*, Ex. 38 (online sports guidance applicable to "youth and adults").  Plaintiffs suggest that participants in organized youth sports are similarly situated to participants in *un*organized youth sports, *see* Am. Compl. ¶ 174, but this is not plausible.  The executive orders at issue define organized youth sports as activities provided by an organization "on a regular basis for a defined period of time."  Second Miltich Decl., Ex. 7 ¶ 7.g.i.  Plaintiffs seem to acknowledge in their allegations, at least implicitly, that regular, sustained contact poses the greatest risk of viral transmission.  *See, e.g.*, Am.

Compl. ¶¶ 139–44.  They do not explain how youth participating in intermittent, irregular, and unstructured sports activities are similar to participants in organized sports in this "relevant respect[]."  *Carter*, 392 F.3d at 969.[6]

Second, Plaintiffs have not plausibly alleged that the challenged restrictions fail to satisfy the rational basis standard.[7]  Under that standard, a challenged state law will be upheld as long as it is "rationally related to a legitimate government interest."  *Gallagher v. City of Clayton*, 699 F.3d 1013, 1019 (8th Cir. 2012).  The Eighth Circuit has said that courts can conduct this inquiry even at the motion to dismiss stage.  *See id.* at 1019–20; *Gilmore v. Cnty. of Douglas*, 406 F.3d 935, 938 (8th Cir. 2005), and in order to prevail, a plaintiff's allegations must plausibly show that no "reasonably conceivable state of facts" could support the challenged law.  *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313–15 (1993).  The Amended Complaint, and documents embraced by it, show why Plaintiffs

---

[6]   Plaintiffs also seem to allege that Governor Walz is similarly situated in all relevant respects to Plaintiff John Moe 11, a high school swimmer, for purposes of their challenge to MDH's quarantine rules.  Am. Compl. ¶¶ 163–64.  Plaintiffs have not plausibly alleged differential treatment between the two.  They allege that John Moe 11 was forced to quarantine for fourteen days, while Governor Walz ended his quarantine after ten.  But the publicly available MDH protocols Defendants have submitted contemplate quarantines of seven, ten, or fourteen days, based on several criteria.  *See* Second Miltich Decl., Exs. 39, 40.  Plaintiffs have not alleged that John Moe 11 met the criteria for a ten-day quarantine, or that Governor Walz did not.

[7]   Two things are worth mentioning about the standard of review.  First, although Plaintiffs previously argued that strict or intermediate scrutiny should apply, *see Let Them Play MN*, 2021 WL 423923, at *7–8, they no longer do so.  Second, Defendants argue that the Supreme Court announced an even more deferential standard of review for certain public-health measures in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905).  But if the challenged restrictions satisfy the rational-basis standard, they would necessarily satisfy the more deferential standard that Defendants believe *Jacobson* requires.  *See Let Them Play MN*, 2021 WL 423923, at *6.

have not done so here. All three challenged restrictions share the common purpose of limiting the spread of COVID-19—undoubtedly a legitimate state interest. *See Let Them Play MN*, 2021 WL 423923, at *8. The youth-sports ban and quarantine rules pursued this goal by temporarily limiting all contact between youth athletes. The face-covering requirement took a different tack, allowing sports to continue but trying to block the respiratory droplets believed to carry the virus. The pleading-stage record shows a reasonably conceivable state of facts that could support this policy: namely, that sustained contact, combined with physical exertion that increases respiration, results in a heightened risk of spreading COVID-19, and that youth sports activities necessarily involve these risks. *See, e.g.*, Second Miltich, Decl., Ex. 7 at 2; *see also id.* Exs. 16–21 [ECF Nos. 51-16 through 51-21].

Plaintiffs' arguments do not overcome this analysis. To be sure, Plaintiffs' allegations present a competing factual narrative that they believe would not support the challenged restrictions. This does not make a legal difference because the Constitution allowed Defendants to make their policy choices based on "rational speculation unsupported by evidence of empirical data."[8] *Beach Commc'ns*, 508 U.S. at 315. Plaintiffs also allege that the policies resulted from a subjective bias against youth sports. But, at least in this context, state decisionmakers' "subjective motives" for imposing the

---

[8]   Contrary to Plaintiffs' suggestion, this analysis does not improperly resolve factual disputes at the pleading stage. Applying the rational-basis standard does not require picking one factual narrative over another. *See Gilmore*, 406 F.3d at 939–40.

restrictions are "irrelevant for constitutional purposes." *Barket, Levy & Fine, Inc. v. St. Louis Thermal Energy Corp.*, 21 F.3d 237, 241 (8th Cir. 1994).

At bottom, just as they did in their request for a preliminary injunction, Plaintiffs present "sincere, reasonable, and good-faith objections to Minnesota's policies." *Let Them Play MN*, 2021 WL 423923, at *1. As before, "the appropriate audience for their argument and objections are Minnesota's political branches, not a federal court." *Id.*

### ORDER

Based on the foregoing, and on all the files, records, and proceedings in this case,

**IT IS ORDERED THAT:**

1. Defendants' Motion to Dismiss [ECF No. 47] is **GRANTED**; and

2. This action is **DISMISSED WITHOUT PREJUDICE** for lack of subject-matter jurisdiction.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: August 24, 2021

s/ Eric C. Tostrud
Eric C. Tostrud
United States District Court